Exhibit  A

Brian Martinez (State Bar No. 274210)
Brian.Martinez@aporter.com
ARNOLD & PORTER LLP
777 South Figueroa Street, Forty-Fourth Floor
Los Angeles, California 90017-5844
Telephone: 213.243.4000
Facsimile: 213.243.4199

Matthew Wolf (*pro hac vice*)
Matthew.Wolf@aporter.com
Edward Han (*pro hac vice*)
Ed.Han@aporter.com
John Nilsson (*pro hac vice*)
John.Nilsson@aporter.com
ARNOLD & PORTER LLP
555 Twelfth Street NW
Washington, DC 20004-1206
Telephone: 202.942.5000
Facsimile: 202.942.5999

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION - RIVERSIDE

| | |
|---|---|
| G. DAVID JANG, M.D.,<br><br>        Plaintiff /<br>        Counter-Defendant,<br><br>   v.<br><br>BOSTON SCIENTIFIC CORPORATION, a Delaware corporation; and SCIMED LIFE SYSTEMS, INC., a Minnesota corporation,<br><br>        Defendants/<br>        Counter-Claimants. | Case No. ED CV 05-00426-VAP-MRW<br><br>**DEFENDANTS' AMENDED ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT AND COUNTERCLAIMS**<br><br>**[DEMAND FOR JURY TRIAL]**<br><br>**The Honorable Virginia A. Phillips** |

1       Defendants Boston Scientific Corporation ("BSC") and SciMed Life Systems,

2   Inc. ("SciMed") (together, "Defendants") for their amended answer to the First

3   Amended Complaint, state as follows:

4       1.     Defendants admit that the Court has subject matter jurisdiction over

5   Plaintiff's claims and lack sufficient information to admit or deny the allegations in

6   paragraph 1 of the First Amended Complaint regarding Plaintiff's citizenship and

7   therefore deny those allegations.

8       2.     Defendants deny each and every allegation in paragraph 2 of the First

9   Amended Complaint except that Defendants admit that venue lies in this district.

10      3.     Defendants lack sufficient information to admit or deny the allegations

11   in paragraph 3 of the First Amended Complaint and therefore deny those allegations.

12      4.     Defendants admit the allegations in paragraph 4 of the First Amended

13   Complaint.

14      5.     Defendants admit the allegations in paragraph 5 of the First Amended

15   Complaint.

16      6.     Paragraph 6 of the First Amended Complaint contains legal conclusions

17   that are incorrect, imprecise or too abstract to admit or deny.  Out of caution,

18   Defendants deny the remaining allegations of paragraph 6 of the First Amended

19   Complaint.

20      7.     Defendants admit that a doctor may perform a coronary balloon

21   angioplasty during the course of treating a blocked coronary artery.  Defendants

22   further admit that a coronary balloon angioplasty involves the surgical insertion of a

23   balloon catheter.  The remaining allegations in paragraph 7 are incorrect, imprecise or

24   too abstract to admit or deny.  Out of caution, Defendants deny the remaining

25   allegations of paragraph 7 of the First Amended Complaint.

26      8.     Defendants admit that Doctors commonly employ coronary stents to

27   prevent coronary restenosis and otherwise to treat coronary blockage.  Defendants

28   further admit that a stent is delivered through the use of a catheter.  Defendants

further admit that "drug-eluting" stents are designed to reduce risk of restenosis. Defendants further admit that coronary stents are implanted in the vast majority of angioplasty procedures currently performed.  The remaining allegations in paragraph 8 are incorrect, imprecise or too abstract to admit or deny.  Out of caution, Defendants deny the remaining allegations of paragraph 8 of the First Amended Complaint.

9.      The allegations in paragraph 9 of the First Amended Complaint are incorrect, imprecise or too abstract to admit or deny.  Out of caution, Defendants deny the allegations of paragraph 9 of the First Amended Complaint.

10.     Defendants deny each and every allegation in paragraph 10 of the First Amended Complaint except that Defendants admit that Defendants negotiated with Plaintiff in late-2000 and that Messrs.  Best and Godshall had authority to negotiate on Defendants' behalf.

11.     The allegations contained in paragraph 11 of the First Amended Complaint were resolved pursuant to the Revised Consent Judgment (Dkt. # 268). However, out of caution, Defendants deny each and every allegation in paragraph 11 of the First Amended Complaint.

12.     Defendants admit that the parties executed a Term Sheet dated March 14, 2001, which Term Sheet speaks for itself.  The remaining allegations contained in paragraph 12 of the First Amended Complaint were resolved pursuant to the Revised Consent Judgment (Dkt. # 268).  However, out of caution, Defendants deny each and every remaining allegation in paragraph 12 of the First Amended Complaint.

13.     Defendants deny each and every allegation in paragraph 13 of the First Amended Complaint except that Defendants admit that Defendants executed an Option Agreement with Plaintiff on or about May 4, 2001, which Option Agreement speaks for itself.

**AMENDED ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT   CASE NO. 05-00426 VAP (MRW)
AND COUNTERCLAIMS [DEMAND FOR JURY TRIAL]**

14.  Defendants deny each and every allegation in paragraph 14 of the First Amended Complaint except that Defendants admit that BSC assigned all of its rights and obligations under the Option Agreement to SciMed on or about April 29, 2002.

15.  Defendants deny each and every allegation in paragraph 15 of the First Amended Complaint except that Defendants admit that Defendants entered into an Assignment Agreement and an Employment Agreement with Plaintiff on or about June 3, 2002, which agreements speak for themselves.

16.  Defendants admit that Defendants entered into an Assignment Agreement with Plaintiff on or about June 3, 2002, which agreement speaks for itself. The remaining allegations contained in paragraph 16 of the First Amended Complaint were resolved pursuant to the Revised Consent Judgment (Dkt. # 268).  However, out of caution, Defendants deny each and every remaining allegation in paragraph 16 of the First Amended Complaint.

17.  Defendants deny each and every allegation in paragraph 17 of the First Amended Complaint except that Defendants admit that Defendants entered into an Assignment Agreement with Plaintiff on or about June 3, 2002, which agreement speaks for itself.

18.  Defendants deny each and every allegation in paragraph 18 of the First Amended Complaint.  In addition, Dr. Jang previously had withdrawn all allegations as to "Liberté" and "the drug-coated version of Liberté coronary stent products"; on that additional basis, Defendants deny each and every allegation in paragraph 18 of the First Amended Complaint that are directed to those stent products.

19.  The allegations contained in paragraph 19 of the First Amended Complaint were resolved pursuant to the Revised Consent Judgment (Dkt. # 268). However, out of caution, Defendants deny each and every allegation in paragraph 19 of the First Amended Complaint.

## FIRST CLAIM FOR RELIEF

- 4 -

20.     Defendants specifically reallege and incorporate herein by reference each and every answer contained in paragraphs 1 through 19 hereof.

21.     Defendants deny each and every allegation in paragraph 21 of the First Amended Complaint.

22.     The Court previously entered summary judgment in Defendants' favor as to all allegations set forth in paragraph 22 of the First Amended Complaint, and as to any portion of Plaintiff's First Claim for Relief that relate to his allegations concerning the "balloon catheter technology" (Dkt. # 220).  In addition, the allegations contained in paragraph 22 of the First Amended Complaint were resolved pursuant to the Revised Consent Judgment (Dkt. # 268).  However, out of caution, Defendants deny each and every allegation in paragraph 22 of the First Amended Complaint except that Defendants lack sufficient information to admit or deny the allegations in paragraph 22 of the First Amended Complaint regarding Plaintiff's beliefs, opinions and/or intentions.  Defendants therefore deny those allegations as well.

23.     Defendants deny that service of the First Amended Complaint constitutes adequate and valid notice of rescission.  To the extent that there are additional allegations in Paragraph 23 of the First Amended Complaint that require admission or denial, Defendants deny them.

24.     Paragraph 24 of the First Amended Complaint does not contain factual or legal allegations that require or permit admission or denial.

## SECOND CLAIM FOR RELIEF

25.     Defendants specifically reallege and incorporate herein by reference each and every answer contained in paragraphs 1 through 24 hereof.  In addition, the Court previously entered summary judgment in Defendants' favor as to the entirety of Plaintiff's Second Claim for Relief (Dkt. # 220).

26.     The Court previously entered summary judgment in Defendants' favor as to all allegations set forth in paragraph 26 of the First Amended Complaint, and as

- 5 -

to the entirety of Plaintiff's Second Claim for Relief (Dkt. # 220).  In addition, the

allegations contained in paragraph 26 of the First Amended Complaint were resolved

pursuant to the Revised Consent Judgment (Dkt. # 268).  However, out of caution,

Defendants deny each and every allegation in paragraph 26 of the First Amended

Complaint except that Defendants lack sufficient information to admit or deny the

allegations in paragraph 26 of the First Amended Complaint regarding Plaintiff's

beliefs, opinions and/or intentions.  Defendants therefore deny those allegations as

well.

27.    The Court previously entered summary judgment in Defendants' favor

as to all allegations set forth in paragraph 27 of the First Amended Complaint, and as

to the entirety of Plaintiff's Second Claim for Relief (Dkt. # 220).  In addition, the

allegations contained in paragraph 27 of the First Amended Complaint were resolved

pursuant to the Revised Consent Judgment (Dkt. # 268).  However, out of caution,

Defendants deny each and every allegation in paragraph 27 of the Complaint except

that Defendants lack sufficient information to admit or deny the allegations in

paragraph 27 of the First Amended Complaint regarding Plaintiff's beliefs, opinions

and/or intentions.  Defendants therefore deny those allegations as well.

## THIRD CLAIM FOR RELIEF

28.    Defendants specifically reallege and incorporate herein by reference

each and every answer contained in paragraphs 1 through 27 hereof.

29.    Defendants admit that the Assignment Agreement is a written agreement

and that the parties entering into the Assignment Agreement were Plaintiff and

Defendant Scimed Life Systems, Inc.

30.    Defendants deny each and every allegation in paragraph 30 of the First

Amended Complaint.

31.    Defendants deny each and every allegation in paragraph 31 of the First

Amended Complaint.  In addition, Dr. Jang previously had withdrawn all allegations

as to "Liberté coronary stent products (including the drug-coated versions thereof)";

- 6 -

on that additional basis, Defendants deny each and every allegation in paragraph 31 of the First Amended Complaint that are directed to those stent products.

32.     Defendants deny each and every allegation in paragraph 32 of the First Amended Complaint.

## FOURTH CLAIM FOR RELIEF

33.     Defendants specifically reallege and incorporate herein by reference each and every answer contained in paragraphs 1 through 32 hereof.

34.     Defendants deny each and every allegation in paragraph 34 of the First Amended Complaint.

35.     Defendants deny each and every allegation in paragraph 35 of the First Amended Complaint.  The allegations contained in paragraph 35 of the First Amended Complaint pertaining to the "balloon catheter technology and patents" were resolved pursuant to the Revised Consent Judgment (Dkt. # 268).  However, out of caution, Defendants deny those allegations.

36.     Defendants deny each and every allegation in paragraph 36 of the First Amended Complaint.

37.     Defendants deny each and every allegation in paragraph 37 of the First Amended Complaint.

## FIFTH CLAIM FOR RELIEF

38.     Defendants specifically reallege and incorporate herein by reference each and every answer contained in paragraphs 1 through 37 hereof.  In addition, Plaintiff's Fifth Claim for Relief was resolved pursuant to the Revised Consent Judgment (Dkt. # 268).

39.     The allegations contained in paragraph 39 of the First Amended Complaint were resolved pursuant to the Revised Consent Judgment (Dkt. # 268). However, out of caution, Defendants deny the allegations of paragraph 39 of the First Amended Complaint, except that Defendants admit their belief that the Assignment

Agreement requires Plaintiff to assign to them all stent delivery technology, including balloon catheter technology, patents, and improvements thereto.

40.   The statements contained in paragraph 40 of the First Amended Complaint were resolved pursuant to the Revised Consent Judgment (Dkt. # 268). However, out of caution, paragraph 40 of the First Amended Complaint does not contain factual or legal allegations that require or permit admission or denial.

## AFFIRMATIVE DEFENSES

In further answer to the First Amended Complaint, Defendants allege the following affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE

The First Amended Complaint fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims against Defendants are barred, in whole or in part, by the doctrine of accord and satisfaction.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims against Defendants are barred, in whole or in part, by the equitable defenses of estoppel, waiver, and laches.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Defendants are barred, in whole or in part, by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Defendants are barred, in whole or in part, by Plaintiffs ratification of Defendants' actions.

## SIXTH AFFIRMATIVE DEFENSE

The First Amended Complaint fails to plead its claims of, and circumstances constituting, fraud and/or intentional misrepresentation with sufficient particularity. In addition, all allegations of fraud and/or intentional misrepresentation pertain to

- 8 -

1  Plaintiff's claims regarding the "balloon catheter technology," which claims were

2  resolved pursuant to the Revised Consent Judgment (Dkt. # 268).

3  ## SEVENTH AFFIRMATIVE DEFENSE

4        Plaintiff's claims against Defendants are barred, in whole or in part, because

5  Defendants have fully performed all their obligations, and discharged any and all

6  duties that may be owed to Plaintiff, contractual or otherwise.

7  ## EIGHTH AFFIRMATIVE DEFENSE

8        Defendants' actions were fully justified and privileged as a matter of law and,

9  therefore, give rise to no claims by Plaintiff.

10  ## NINTH AFFIRMATIVE DEFENSE

11        Plaintiff's claims are barred because under Plaintiff's proposed claim

12  constructions for the '021 and '743 patents, the asserted claims of the '021 and '743

13  patents are invalid under 35 U.S.C. §§ 102 and/or 112.  First, under Plaintiff's claim

14  constructions, the asserted claims of the '021 and '743 patents are invalid under 35

15  U.S.C. § 102 in view of U.S. Patent Nos. 6,203,569, 6,818,014, and 5,514,154.

16  Second, under Plaintiff's claim constructions , the asserted claims of the '021 and

17  '743 patents are invalid under 35 U.S.C. § 112 because Plaintiff's constructions

18  render the asserted claims indefinite.

19  ## PRAYER FOR RELIEF

20        WHEREFORE, having answered Plaintiff's First Amended Complaint,

21  Defendants pray the Court: (a) enter judgment in favor of Defendants and dismiss the

22  First Amended Complaint with prejudice; (b) that Plaintiff's prayer for relief be

23  denied in its entirety; (c) award Defendants their costs and expenses incurred in the

24  defense of this action; and (d) grant Defendants such other and further relief as is just

25  and proper.

26

27

28

**AMENDED ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT   CASE NO. 05-00426 VAP (MRW)
AND COUNTERCLAIMS [DEMAND FOR JURY TRIAL]**

1  **COUNTERCLAIMS OF DEFENDANTS**

2  **BOSTON SCIENTIFIC CORPORATION AND SCIMED LIFE SYSTEMS, INC.**

3          Defendants-Counterclaimants Boston Scientific Corporation ("BSC") and

4  SciMed Life Systems, Inc. ("SciMed") (collectively, "Defendants"), by their

5  attorneys, counterclaim against Plaintiff, and for their causes of action allege and

6  state as follows:

7          **THE NATURE OF THE COUNTERCLAIMS**

8          1.      Plaintiff brings suit against Defendants in this Court alleging breach of a

9  June 3, 2002 Assignment Agreement (the "Assignment Agreement"), and intentional

10  misrepresentation (except that Plaintiff's allegations of intentional misrepresentation

11  were resolved pursuant to this Court's grant of summary judgment in Defendants'

12  favor (Dkt. # 220) and the parties' Consent Judgment (Dkt. # 268). A true and

13  correct copy of the Assignment Agreement is attached hereto as Exhibit "A."

14  Plaintiff seeks damages, rescission of the Assignment Agreement as well as a

15  declaratory judgment that "coronary balloon catheters, patents, and improvements

16  thereon are not covered by the Assignment Agreement" (except that Plaintiff's

17  allegations as to the balloon catheter technology were resolved pursuant to this

18  Court's grant of summary judgment in Defendants' favor (Dkt. # 220) and the parties

19  Consent Judgment (Dkt. # 268)). Plaintiff also asserts that Defendants' Express, and

20  Taxus Express stent products are "Contingent Payment Products" under the

21  Assignment Agreement — *i.e.*, he asserts that those products infringe the patents

22  covered by the Assignment Agreement (the "Patents") — and that he is therefore

23  entitled to a royalty on sales of those products.

24          2.      Under the Assignment Agreement, to be a "Contingent Payment

25  Product," a product must be covered by valid claims of the Patents.

26          3.      Plaintiff has alleged that Defendants' Express and Taxus Express stent

27  products infringe Claims 1, 6, 7, 8, and 17 of the '021 patent and claims 1, 10, 11, 13,

28  and 16-20 of the '743 patent.

**AMENDED ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT   CASE NO. 05-00426 VAP (MRW)
AND COUNTERCLAIMS [DEMAND FOR JURY TRIAL]**

4.    Defendants seek a declaratory judgment that the asserted claims of the '021 and '743 patents are invalid under 35 U.S.C. §§ 102 and 112 under Plaintiff's claim constructions.

## JURISDICTION

5.    This Court has subject matter jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 1332 and 1367 as the parties are citizens of different States and the amount in controversy exceeds $75,000. This Court also has subject matter jurisdiction over the instant matter pursuant 28 U.S.C. §§ 1331, 1367, 1338(a), 2201, and 2202.

6.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 because, inter alia, a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this district.

## PARTIES

7.    BSC is a company incorporated under the laws of the State of Delaware having a principal place of business in Natick, Massachusetts.

8.    SciMed is a company incorporated under the laws of the State of Minnesota having a principle place of business in Minnesota.

9.    Upon information and belief, Plaintiff is a citizen of the State of California, residing in the county of San Bernardino.

## COUNT ONE

### (Declaratory Judgment of Invalidity)

10.    Defendants specifically reallege and incorporate by reference herein each and every allegation contained in paragraphs 1 through 9 hereof.

11.    Plaintiff has filed suit in this Court alleging that Defendants have breached the Assignment Agreement whereby Plaintiff assigned certain patents and technology to Defendants.

12.    Plaintiff alleges that Defendants' Express stent product infringes the Patents and is a Contingent Payment Product under the Assignment Agreement

- 11 -

thereby entitling him to additional consideration from Defendants.  The Assignment Agreement requires that for a product to qualify as a Contingent Payment Product, such product must be covered by a valid claim of the patents.

13.     Plaintiff has offered claim constructions for the asserted claims in this case during *Markman* proceedings in 2013 that Defendants believe would render the asserted claims invalid under 35 U.S.C. §§ 102 and 112.

14.     Therefore, an actual controversy exists as to whether Defendants' Express stent product is covered by a valid claim of the '021 and '743 patents or whether those claims are invalid in light of Plaintiff's claim constructions.

15.     Accordingly, Defendants seek a declaration that Claims 1, 6, 7, 8, and 17 of the '021 patent and claims 1, 10, 11, 13, and 16-20 of the '743 patent are invalid under Plaintiff's claim constructions under 35 U.S.C. §§ 102 and 112.

**WHEREFORE**, Defendants pray the Court enter judgment against Plaintiff for the following relief:

A.     Judgment that Claims 1, 6, 7, 8, and 17 of the '021 patent and claims 1, 10, 11, 13, and 16-20 of the '743 patent  are invalid under 35 U.S.C. § 102;

B.     Judgment that Claims 1, 6, 7, 8, and 17 of the '021 patent and claims 1, 10, 11, 13, and 16-20 of the '743 patent  are invalid under 35 U.S.C. § 112;

C.     Such other relief as this Court deems proper.

Dated:  October 28, 2013                    ARNOLD & PORTER LLP

                                            By: */s/ Brian Martinez*
                                            Brian Martinez
                                            Attorney for Defendants

- 12 -

1                           **DEMAND FOR JURY TRIAL**

2            Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendants

3 demand a trial by jury of all issues so triable in this matter, and respectfully requests

4 that this matter be placed on the jury docket.

5 Dated:  October 28, 2013                 ARNOLD & PORTER LLP

6

7

8                         By: *_/s/ Brian Martinez_____*
                             Brian Martinez

9                         Attorney for Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AMENDED ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT**   CASE NO. 05-00426 VAP (MRW)
**AND COUNTERCLAIMS [DEMAND FOR JURY TRIAL]**

Exhibit  A

## ASSIGNMENT AGREEMENT

This Assignment Agreement (*Agreement*) is entered into as of June 3, 2002 (*Effective Date*) between G. David Jang, M.D., an individual residing at 30725 Eastbern Lane, Redlands, California (*Jang*) and Scimed Life Systems, Inc., a Minnesota corporation (*Scimed*).

### Background:

Jang has designed and developed certain stent technology. Scimed desires to acquire such technology. Scimed and Jang desire to have Scimed's sole shareholder, Boston Scientific Corporation (*BSC*), enter into a part time employment arrangement with Jang to facilitate the development and commercialization of the stent technology. Scimed also desires an option to obtain exclusive rights to pacemaker delivery technology of Jang. The parties contemplate entering into an Employment Agreement in substantially the form of **Exhibit 4.2(g)** to this Agreement (the *Employment Agreement*).

This Agreement sets forth the terms under which Jang assigns to Scimed such technology in exchange for payment at assignment of certain amounts and the obligation to make certain earn out payments as well as certain compensation obligations as specified in the Employment Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises and agreements hereinafter set forth, the parties hereto agree as follows:

### Agreement

## 1. DEFINITIONS.

**1.1 Defined Terms.** Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning set forth below.

*Affiliate* means with respect to either party, any Person that, directly or indirectly, is controlled by, controls or is under common control with such party. For purposes of this Agreement, "*control*" means, with respect to any Person, the direct or indirect ownership of more than fifty percent (50%) of the voting or income interest in such Person or the possession otherwise, directly or indirectly, of the power to direct the management or policies of such Person.

*Confidential Information* means all technical and commercial information and data which either party (the *Disclosing Party*) has or may disclose to the other party (the *Receiving Party*) pursuant to this Agreement useful in, the development or commercialization of Technology (as defined below) or Improvements (as defined below), excluding any portion thereof which: (a) is known to the Receiving Party before receipt thereof under this Agreement; (b) is disclosed to the Receiving Party by a third person who is under no obligation of confidentiality to the Disclosing Party hereunder with respect to such information and who otherwise has a right to make such disclosure; (c) is or becomes generally known in the trade through no fault of the Receiving Party; (d) is independently developed by the Receiving Party, as evidenced by the Receiving Party's written records, without use of such information; or (e) is approved for release by written

authorization of the original Disclosing Party.

*Contingent Payment Products* means any stent, including any stent pre-mounted on a delivery system or any stent with coatings, coverings or other features, manufactured by or for Scimed or any of its Affiliates the development, manufacture, use, or sale of which is covered by one or more Valid Claims of the Patents in the jurisdiction in which such stent is manufactured or sold or which, but for the assignment made pursuant to this Agreement, would infringe one or more Valid Claims of the Patents.  For the avoidance of doubt, for stents pre-mounted on delivery systems or stents with coatings, coverings or other features, the price of the stent together with such features constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales.  For example, in the case of a stent pre-mounted on a delivery system, the price of the stent and the delivery system together constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales.  Similarly, in the case of a stent with a coating, the price of the stent and coating together constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales.  Conversely, if a stent pre-mounted on a delivery system is sold together with a distal protection device, only the price of the stent and the delivery system is included in calculating Net Sales and not the price of the distal protection device.

*Contractual Obligation* means, with respect to any Person(s), any contract, agreement, purchase order, deed, mortgage, lease, license, indenture, other instrument, policy, commitment, undertaking, arrangement or understanding, written or oral, or other document, to which or by which any such Person is a party or otherwise subject or bound or to which or by which any property or right of any such Person is subject or bound.

*Design(s)* means any information used or useful in the design, development, delivery, manufacture or testing of stents for any medical application(s) (including Pacemaker Lead Technology but excluding Pacemaker Delivery Technology (subject to the limitations described in the definition therefor)) as well as any coatings, coverings, drug delivery mechanisms and other features used or useful in relation to the use of such stents, including but not limited to those stent designs identified in Schedule 1.

*First Commercial Sale* means the first sale of any Contingent Payment Product to a third party in the United States after such Contingent Payment Product has been granted all regulatory approvals required for importation, promotion, pricing, marketing and sale of such Contingent Payment Product in the United States.

*Legal Requirement* means any federal, state, local or foreign law, statute, standard, ordinance, code, order, rule, regulation, resolution, promulgation, or any order, judgment or decree of any court, arbitrator, tribunal or governmental authority, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force and effect of law as in effect on or prior to the Effective Date.

*Lien* means (a) any encumbrance, mortgage, pledge, lien, liability, charge or other security interest of any kind (whether absolute, accrued, contingent or otherwise) upon any property or assets of any character, or upon the income or profits therefrom; or (b) any arrangement or

2

agreement which prohibits the creation of such encumbrances, mortgages, pledges, liens, liabilities, charges or other security interests of any kind or which restricts transfer of capital stock (other than restrictions on transfer imposed by applicable securities laws) or other property or assets, except any assets or property held under a Contractual Obligation.

*Net Sales* means the net sales of Contingent Payment Products in amounts reported on BSC's consolidated financial statements in accordance with United States generally accepted accounting principles (as specified by the American Institute of Certified Public Accountants), consistently applied, and generally defined as the aggregate invoiced gross revenue received by Scimed or any of its Affiliates from the sale of Contingent Payment Products to a non-affiliated third party less only the following *Deductions*: (i) amounts repaid or credited by reason of defects, returns, rejections, rebates, wholesale chargebacks, retroactive price reductions or allowances, (ii) sales, excise, value added, purchase, turnover, use, and other like taxes, and customs duties, paid, (iii) fees or commissions paid to "buyer-side" intermediaries, brokers or agents, (iv) shipping charges (including freight and insurance), and (v) cash, trade and quantity discounts actually allowed (and taken) to the extent customary in the trade.

With respect to products that are sold as part of a package that includes Contingent Payment Product(s) and products that are not Contingent Payment Products, Net Sales shall equal the product of (X) the gross sales of such combined products billed to customers by Scimed, its Affiliates or sublicensees, less Deductions, calculated in accordance with the procedure specified above, multiplied by (Y) a fraction the numerator of which shall be the per unit average selling price of the Contingent Payment Product sold separately, and the denominator of which shall be the per unit average selling price of package product sold in such combined form. If there is no established average selling price of the Contingent Payment Product sold separately, then Scimed's (or its Affilates') standard cost of manufacturing of the single active Contingent Payment Product and of the package product sold in such combined form, shall be used to determine (Y).

Net Sales are calculated on sales to independent third parties and shall not include revenue received by Scimed (or any of its Affiliates) from transactions with an Affiliate; provided, that Net Sales will be calculated on the sales by Affiliates to a non-Affiliate third party.

*Pacemaker Lead Field* means the use of stents that are a pre-attached component of pacemaker leads or the leads of similar devices and which are promoted, labeled, marketed and sold exclusively for the purpose of serving as the point for terminal conduction of pacemaker impulses and not for purposes of scaffolding or stenting any body lumen, whether or not such scaffolding or stenting of any body lumen is performed in conjunction with angioplasty procedures.

*Pacemaker Delivery Technology* means systems that allow a physician to place and anchor a conductive electrode to the heart muscle, which electrode is attached to an insulated wire lead that carries a small electric impulse generated by a pacemaker to the electrode, including without limitation devices having one or more of the following components: (1) a coronary sinus selecting catheter; (2) a guiding receptacle; or (3) a pacemaker lead delivery system. The

3

pacemaker lead delivery system in turn may include components such as: (a) a delivery (balloon) catheter; (b) a pacemaker lead wire; or (c) a detachable connecting junction. Pacemaker Delivery Technology may be used in conjunction with Pacemaker Lead Technology. Pacemaker Delivery Technology includes without limitation that certain patent application entitled "Method of Using a Stent-like Lead System in Pacemaker Devices" to be filed by Jang to the extent containing claims covering the use of stents generally as leads in pacemaker devices and not covering any particular stent design. Pacemaker Delivery Technology does not include Pacemaker Lead Technology.

*Pacemaker Lead Technology* means an implantable stent-like electrode; provided any such stent-like electrode is promoted, labeled, marketed and sold exclusively for the purpose of serving as the point for terminal conduction of pacemaker impulses and not for purposes of scaffolding or stenting any body lumen, whether or not such scaffolding or stenting of any body lumen is performed in conjunction with angioplasty procedures.

*Person* means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, limited liability partnership, unincorporated organization, government (or any agency or political subdivision thereof) or other legal entity or organization.

*Technology* means individually and collectively the intellectual property rights embodied or disclosed in (a) all inventions, patents, patent applications and rights to file patent applications owned or controlled, directly or indirectly, by Jang relating to any Designs, including but not limited to (i) the invention disclosures, patent application(s) and patents listed in Schedule 2.1(a); (ii) any patent application filed in respect of an invention disclosure described in clause (a)(i); (iii) any patent application filed as a continuation, division, or continuation-in-part of the application(s) described in clauses (a)(i)-(ii), patents issuing therefrom and reissues, reexaminations and extensions of such patents; and (iv) any foreign counterpart to the application(s) described in clauses (a)(i)-(iii) (including divisions, continuations, confirmations, additions, renewals or continuations-in-part of such patent application), patents issuing therefrom and extensions thereof; and (b) all other disclosures, discoveries, inventions, know-how, techniques, methodologies, modifications, improvements, works of authorship, designs and data (whether or not protectable under patent, copyright, trade secrecy or similar laws) that are conceived, discovered, developed, created or reduced to practice or tangible medium of expression by Jang or any of his agents, consultants or employees at any time prior to the Effective Date or at any time in the course of Jang's employment, as further described in Section 3.2, or at any time during the Inclusion Period specified in Section 7.1 (regardless of whether or not within the course of Jang's employment). Technology includes Pacemaker Lead Technology but excludes Pacemaker Delivery Technology.

*Valid Claim* means (a) a claim of any issued patent which is contained within the Patents (defined below) and which has not expired, lapsed, or been held invalid, unpatentable or unenforceable by a final decision, which is unappealed or unappealable, of a court of competent jurisdiction or of an administrative agency having authority over patents; (b) a claim in any patent application which is contained within the Patents which patent application is less than

4

three (3) years old (measured from the original filing date) and has not been the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired; (c) a claim of any issued patent owned or controlled by Scimed that claims an invention included in Improvements (defined below); or (d) a claim in any patent application owned or controlled by Scimed that claims an invention included in Improvements and which patent application is less than three (3) years old (measured from the original filing date) and has not been the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired.

**1.2  Other Defined Terms.** Each of the following terms have the meanings ascribed to it in the section set forth opposite such term:

| | |
|---|---|
| *Agreement* | Recitals |
| *Closing* | Section 4.1 |
| *Effective Date* | Recitals |
| *Employment Agreement* | Recitals |
| *Improvements* | Section 7.1 |
| *Inclusion Period* | Section 7.1 |
| *Indemnified Party* | Section 9.3 |
| *Indemnifying Party* | Section 9.3 |
| *Intellectual Property Rights* | Section 5.6 |
| *Jang* | Recitals |
| *Jang Assets* | Section 2.1 |
| *License Agreement* | Recitals |
| *Licensed Rights* | Section 2.2 |
| *Loss(es)* | Section 9.2 |
| *Omitted Item* | Section 7.4 |
| *Option Period* | Section 2.3 |
| *Patents* | Section 2.1 |
| *Performance Period* | Section 3.1 |
| *Prosecution* | Section 7.2 |
| *Purchase Price* | Section 3.1 |
| *Schneider Agreement* | Section 2.1(c) |
| *Scimed* | Recitals |
| *Technical Information* | Section 2.1(b) |

## 2. ASSIGNMENT.

**2.1  Assignment of Technology.** Upon the terms and subject to the conditions set forth in this Agreement, Jang shall sell, assign, transfer, convey and deliver to Scimed, and Scimed shall purchase from Jang, all and every right, title and interest of Jang in and to the following (collectively, the *Jang Assets*):

(a)  All of Jang's worldwide rights and interests existing on the Effective Date in and to all Designs and all Technology, and all registrations, applications for registration and licenses for

the Designs or the Technology, together with all ancillary rights thereto, including the right to sue for damages by reason of past infringement of any such rights, including: (i) the patent(s), patent application(s) and invention disclosure(s) listed in <u>Schedule 2.1(a)</u>; (ii) any patent application(s) filed as a continuation, division, or continuation-in-part of the patent application(s) described in clause 2.1(a)(i), patents issuing therefrom and reissues, reexaminations and extensions of such patents; (iii) any patent application(s) filed in respect of the inventions that are the subject of the invention disclosures listed in <u>Schedule 2.1(a)</u>; and (iv) any foreign counterpart to the patent(s) and patent application(s) described in clauses 2.1(a)(i)-(iii) (including divisions, continuations, confirmations, additions, renewals or continuations-in-part of such patent applications), patents issuing therefrom and extensions thereof (collectively, the *Patents*). For the avoidance of doubt, Jang has no obligation to assign to Scimed hereunder any Pacemaker Delivery Technology except as described in Section 2.3.

(b)  All of Jang's worldwide rights and interests existing on the Effective Date in and to all information relating to the Designs or the Technology or otherwise required or useful for or incident to the performance of Jang's activities related to the Designs or the Technology, together with all ancillary rights thereto (collectively, the *Technical Information*), including all notebooks and other media listed in <u>Schedule 2.1(b)</u> embodying (i) the Technology or the Designs; (ii) all prior versions of the Technology or the Designs; and (iii) all other data, information and know-how, that has been developed by or for Jang and is necessary or useful to design, manufacture, use or test the Design(s) and develop enhanced or new Designs.

(c)  All of Jang's claims and rights under Section 3 of the certain Assignment and License Contract dated May 8, 1998 between Jang and Schneider (Europe) GmbH (the *Schneider Agreement*).

2.2  **Future License or Supply Arrangement.** In the event the parties do not enter into an exclusive license agreement within the 60-day period following Scimed's notice as described in Section 2.3(b), then upon Jang's request, Scimed shall either, as determined in Scimed's sole and absolute discretion, (i) enter into a license agreement in substantially the form attached as <u>Exhibit 4.2(f)</u> to this Agreement (the *License Agreement*) pursuant to which Scimed will grant to Jang a non-exclusive right and license to (a) use the Jang Assets (including Improvements) solely for purposes of developing products in the Pacemaker Lead Field; and (b) make, have made, use, import, export and sell products in the Pacemaker Lead Field that embody or use the Jang Assets (including Improvements) (collectively, the *Licensed Rights*) or (ii) enter into a supply agreement on commercially reasonable terms acceptable to Scimed in its sole discretion (the *Supply Agreement*) pursuant to which Scimed (or any of its affiliates as appropriate) shall sell to Jang stent products that incorporate the Technology to be used by Jang solely for the purpose of developing products in the Pacemaker Lead Field. Notwithstanding anything to the contrary herein, in the event that the parties are not able to agree on the terms of the Supply Agreement within thirty (30) days after Scimed's election to pursue a supply arrangement, Scimed and Jang shall enter into the License Agreement on the terms set forth therein. The parties acknowledge and agree that Scimed nor any of affiliate of Scimed is obligated, nor will it or any affiliate become obligated, (x) to supply any products to Jang in the absence of a fully

6

executed and delivered Supply Agreement or (y) to license to Jang any technology, intellectual property or product other than the Licensed Rights pursuant to a fully executed and delivered License Agreement.

2.3 **Scimed Option.** (a) During the period from the Effective Date until 11:59 PM California time on the fourth anniversary of the First Commercial Sale of any Contingent Payment Product (the *Option Period*), Scimed shall have an option to acquire from Jang an exclusive license to practice the Pacemaker Delivery Technology owned or controlled (whether directly or indirectly and whether by ownership, license or otherwise) by Jang within the Pacemaker Lead Field. Accordingly, during the Option Period, Jang shall not enter into any agreement with a third party relating to commercialization (including research, development, marketing or distribution) of products that embody or use all or any portion of the Pacemaker Delivery Technology or the Pacemaker Lead Technology (including the Improvements) for any applications, unless Jang shall first offer such opportunity to Scimed and provide Scimed and its Affiliates an opportunity to obtain an exclusive license for development and commercialization within such field. For purposes of offering Scimed and its Affiliates any such opportunity, Jang shall provide Scimed with notice, including sufficient technical detail to permit Scimed to evaluate its interest in the opportunity and shall meet with Scimed within thirty (30) days following such notice to discuss the technical features of the opportunity. Scimed shall treat all information relating to the Pacemaker Lead Field disclosed by Jang in connection with this Section 2.3 as Confidential Information of Jang.

(b) Scimed shall notify Jang within sixty (60) days following receipt of Jang's notice of Scimed's (or its Affiliates') interest (or lack of interest) in pursuing such opportunity. If Scimed indicates that it or one of its Affiliates wishes to pursue such opportunity, then the parties shall within sixty (60) days following Scimed's notice engage in good faith negotiation of terms for a license and/or development agreement. If the parties cannot negotiate mutually acceptable terms for an agreement within such 60-day period, and the parties are not willing to extend the period for negotiation, then Scimed's option shall expire with respect to such opportunity and Jang may negotiate with a third party concerning such research and development opportunity; provided, however, that (i) Jang shall not provide any such third party with information or materials concerning such opportunity that are superior to the information and materials provided to Scimed; and (ii) any such agreement shall contain terms that are in the aggregate no more favorable to such third party than those offered to Scimed. If Jang wishes to offer such opportunity to a third party on terms that are in the aggregate more favorable than those offered to Scimed and/or any of its Affiliates, Jang shall first make an offer on such "improved" terms to Scimed in accordance with the procedure specified in this Section 2.3.

(c) Notwithstanding the provisions of Section 2.3(a), it is understood and agreed that Jang may contract with independent consultants to perform services with respect to Jang's efforts to develop products in the Pacemaker Lead Field; provided that Jang shall adopt and utilize written agreements with all such independent contractors and any employees Jang, directly or indirectly, retains to perform such services that include nondisclosure and invention assignment provisions that enable Jang to obtain and perfect proprietary rights in all work product undertaken on Jang's behalf in a manner consistent with the provisions of this Section 2.3. Jang shall not contract with

7

any consultants directly or indirectly affiliated with any Person that sells products that are competitive with the Designs or the Technology (or has publicly announced its intention to do so) prior to securing such written agreements with those consultants.

(d) Jang shall not, until after the expiration of the Option Period, directly or indirectly, sell, transfer, lease or license the Pacemaker Delivery Technology or encumber, mortgage, pledge, or place any other lien, liability, charge or other security interest of any kind (whether absolute, accrued, contingent or otherwise) upon the Pacemaker Delivery Technology, unless Jang shall have first complied with Sections 2.3(a) and (b).

3. **CONSIDERATION.** In consideration of the sale and transfer by Jang of the Jang Assets to Scimed and of the agreement by Jang to perform each of its other obligations hereunder, Scimed will pay to Jang, in the form of an up front payment and contingent "earn out" payments an amount determined as set forth in Section 3.1(a)–(e):

3.1 **Purchase Price.** The aggregate purchase price for the Assets (the *Purchase Price*) shall be not less than $50,000,000 nor more than $160,000,000, payable as follows:

(a) BSC has previously paid Jang $1,000,000 pursuant to the certain Term Sheet entered into as of March 14, 2001 by and between the BSC and Jang, and $10,000,000 pursuant to the certain Option Agreement entered into as of May 4, 2001 by and between BSC and Jang.

(b) At the Closing, Scimed shall pay to Jang by certified bank or cashier's check or wire transfer of immediately available funds, the sum of $39,651,574.00 as consideration for the assignment to Scimed of all Intellectual Property Rights existing as of the Effective Date as well as Jang's covenant to assign to Scimed all intellectual property in Improvements conceived during the Inclusion Period.

(c) During the period commencing on the Effective Date and ending on the expiration date of the last-to-expire of the Patents that have issued or are the subject of a filed patent application as of the Effective Date, Scimed shall pay to Jang on a quarterly basis in accordance with Section 3.5, as additional consideration for the purchase of the Assets, an additional purchase price amount equal to ten percent (10%) of Net Sales in respect of Contingent Payment Products. Notwithstanding any provision of this Agreement to the contrary, the maximum aggregate contingent payment due Jang under this Section 3.1(c) shall not exceed $60,000,000 (the amounts payable under this Section 3.1(c) are the *Earn Out*).

(d) In addition to the contingent payment due Jang pursuant to Section 3.1(c), Scimed shall pay to Jang as additional consideration for the purchase of the Assets, an additional purchase price amount equal to $50,000,000 if the aggregate Net Sales of Contingent Payment Products on a worldwide basis during the period commencing on the date of the First Commercial Sale of Contingent Payment products in the United States and ending at 11:59 PM on the fifth anniversary of the date of the First Commercial Sale of Contingent Payment Products in the United States (the *Performance Period*) equals or exceeds $2,500,000,000.

8

(e)   Scimed shall pay to Jang as additional consideration for the purchase of the Assets, an additional purchase price amount equal to $10,000,000 if Scimed has not received a CE mark for any Contingent Payment Product by 11:59 PM Boston time on July 31, 2004.  Any payment pursuant to this Section 3.1(e) shall be credited against the Earn Out payments due under Section 3.1(c) for purposes of applying the cap on such payments.

**3.2   Employment Agreement.** BSC and Jang shall enter into the Employment Agreement as of the Effective Date, pursuant to which BSC shall pay Jang, $100,000 per year for a period of three (3) years as a part-time employee working on all technical and clinical areas of vascular stents and stent design.

**3.3   Stock Option Grant.**  Pursuant to the Employment Agreement, BSC shall grant to Jang a stock option to purchase 100,000 shares of BSC Common Stock in accordance with the terms of the Stock Option Agreement attached as an exhibit to the Employment Agreement.

**3.4   Remittance; Foreign Exchange.** (a) Scimed shall make payments required under Section 3.1(b)-(e) by wire transfer of immediately available funds delivered to the U.S. bank account identified by Jang in accordance with Section 11.6.  All payments shall be stated and paid in U.S. Dollars.  For purposes of payments due under Section 3.1(c)-(d), Net Sales revenue received in currencies other than U.S. Dollars shall be converted into U.S. Dollars, in accordance with BSC's ordinary business practices, when calculating the amount of Net Sales.

(b)   With respect to Net Sales of Contingent Payment Products that are covered by a patent application but not an issued patent, Scimed's payment obligations under Sections 3.1(c)-(d) shall be subject to adjustment in the following manner to account for Net Sales made during the period prior to the issuance of a patent or the rejection of a patent application that contains the claims upon which the Valid Claims determination is made at the time such Net Sales are recorded:  (i) if Scimed ceases payment under Section 3.1(c) in respect of a Contingent Payment Product based upon the expiration of the 3-year period specified in the Valid Claims definition and a patent subsequently issues that includes such claim, then Scimed shall (1) commence making contingent payments in respect of such Contingent Payment Products and (2) pay Jang in respect of sales of such Contingent Payment Product during the period between the expiration of the 3-year period and the date a patent issues that includes such claim; and (ii) if a Contingent Payment Product with Valid Claims based solely upon a patent application that is subsequently the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired or which patent application does not issue as a patent that includes such claim, then Scimed shall be entitled to a credit as of the date of such determination equal to the amounts (if any) paid by Scimed in respect of Net Sales of such Contingent Payment Products during the period prior to the date of such determination.  If a claim that is substantially similar to a Valid Claim described in Section 3.4(b)(ii) above issues subsequent to Scimed's application of any credit against payments made to Jang as described in Section 3.4(b)(ii) above, then Scimed shall promptly pay Jang all such amounts previously credited against contingent payments otherwise due Jang pursuant to Section 3.4(b)(ii).  Any credits applied in favor of Scimed under Section 3.4(b)(ii) will be made with any corresponding reduction in the calculation

9

of aggregate Net Sales of Contingent Payment Products for the purposes of Section 3.1(d) unless and until such credit is subsequently reversed pursuant to the immediately preceding sentence of this Section 3.4(b); provided that if Net Sales of Contingent Payment Products on a worldwide basis equals or exceeds $2,500,000,000 as of 11:59 PM California time on the final day of the Performance Period, Scimed shall pay to Jang the amount set forth in Section 3.1(d), regardless of whether Net Sales are subsequently reduced by any such credits.

3.5   **Reports.**  Scimed shall keep and maintain, during the term of this Agreement and, for a period of at least three (3) years following each calendar year in which the payment obligation accrued, records sufficient to determine the Net Sales and payments due under Section 3.1(c)-(d). Within sixty (60) days following each March 31, June 30, September 30 and December 31 in which payments are due under Section 3.1(c)-(d), Scimed shall provide Jang with a report including at least:  (a) the Net Sales (in U.S. Dollars) of Contingent Payment Products that Scimed (including its Affiliates) sold during the preceding quarter; (b) identification of Contingent Payment Products consisting of systems that incorporate stents and Contingent Payment Products consisting of stand-alone stent products; (c) the calculation of contingent payments thereon; and (e) the total contingent payments so computed and due Jang. Such reports shall be submitted if sales of Contingent Payment Products have been made during a period. Upon delivery of the report due for the period ending December 31 of each year, Scimed shall also report to Jang the contingent payments due Jang for the entire preceding year.

3.6   **Audits.**  Jang shall have the right, not more than once in any twelve (12) month period, to have Scimed's relevant books and records for the calendar year in which the audited payment obligations accrued and for up to three (3) calendar years following that year audited by an independent certified public accountant of Jang's choosing and reasonably acceptable to Scimed, to ascertain the accuracy of Scimed's reports under Section 3.5 in respect of Net Sales. Such audit shall be scheduled within thirty (30) days following delivery of notice by Jang requesting such audit to Scimed, and conducted during Scimed's normal business hours, in a manner that does not unreasonably interfere with Scimed's normal business activities. If any audit discloses underpayment of contingent payments under Section 3.1(c) or Section 3.1(d), Scimed shall promptly pay Jang the amount due. Jang shall be responsible for all expenses it incurs in connection with any audit; provided, that if any audit determines that the reported total contingent payments were less than ninety percent (90%) of the actual total amount due for the period in question, the actual out-of-pocket cost of such audit shall be borne by Scimed. Jang will hold in strict confidence, and will require any certified public accountant it retains to perform an audit to hold in strict confidence, all information learned in the course of any audit, except to the extent necessary for Jang to enforce his rights under this Agreement.

3.7   **Taxes.**  In the event Scimed is required to withhold taxes or charges from the amounts paid to Jang hereunder and to pay the taxes or charges for the account of Jang, Scimed shall deliver to Jang true copies of the receipts or returns covering each such payment. The parties shall cooperate to minimize, to the extent legally permissible, the aggregate tax liabilities related to this Agreement. Notwithstanding the foregoing, such cooperation shall not cause any adverse tax consequences to be incurred by either party which would not have been incurred under the terms and conditions as described in this Agreement.

10

## 4. THE CLOSING

**4.1   Time and Place.**  The closing of the transactions which are the subject of this Agreement (the *Closing*) shall take place at 10:00 A.M., local time, on the Effective Date, at the offices of Bingham Dana LLP, 150 Federal Street, Boston, Massachusetts 02110 or at such other time and place as Jang and Scimed may agree upon.

**4.2   Jang's Obligations at Closing.**  At the Closing Jang shall:  (a) execute and deliver to Scimed (i) one or more assignments of patents under the Patents in the United States and registrations therefor, in substantially the form of **Exhibit 4.2(a)(i)**; and (ii) a bill of sale, in substantially the form of **Exhibit 4.2(a)(ii)**;

(b) execute and deliver to Scimed such other good and sufficient instruments of conveyance, assignment and transfer in form and substance reasonably satisfactory to Scimed's counsel as shall be effective to vest in Scimed all rights and interests in, and subject to the Liens, good and marketable title to, the Jang Assets, including, without limitation, assignments of Patents and applications for registration thereof;

(c) deliver to Scimed all documents, certificates, consents, undertakings and assignments required to be delivered to Scimed under the provisions of this Agreement;

(d) commence delivering to Scimed physical possession of adequate copies of all media embodying the Designs and the Technology;

(e) deliver to Scimed physical possession of adequate copies of all media embodying prior versions of the Designs and the Technology and related documentation that are in Jang's possession or under the direct or indirect control of Jang;

(g) execute and deliver to BSC an Employment Agreement in substantially the form of **Exhibit 4.2(g)**; and

(h) deliver to Scimed original executed copies of instruments releasing all Liens other than those arising under the Schneider Agreement (if any).

**4.3   Scimed's Obligations and Closing.**  At the Closing, Scimed shall: (a) deliver to Jang a check or wire transfer in the amount of $39,651,574.00 payable to Jang;

(b) cause BSC to execute and deliver to Jang an Employment Agreement in substantially the form of **Exhibit 4.2(g)**, including a Stock Option Agreement in the form attached to **Exhibit 4.2(g)**.

## 5.   REPRESENTATIONS AND WARRANTIES OF JANG.  In order to induce Scimed to

11

purchase the Jang Assets, Jang hereby represents and warrants to Scimed and its Affiliates as follows:

**5.1  Authority.** (a) Jang has all requisite power and authority to enter into this Agreement and consummate the transactions contemplated hereby; (b) this Agreement is a valid and binding obligation of Jang enforceable against Jang in accordance with its terms; and (c) neither the execution, delivery and performance of this Agreement and the other agreements and instruments contemplated hereunder by Jang nor the consummation by Jang of the transactions contemplated hereby and thereby will violate or conflict with or constitute a default under any Contractual Obligation applicable to Jang.

**5.2  Jang Assets.** (a)  Jang has and will deliver to Scimed at the Closing, good and marketable title to all of the Jang Assets.

(b)  The Jang Assets are not subject to any Lien except those arising under the Schneider Agreement.

(c)  The transfer to Scimed at the Closing of the Jang Assets will not be subject to, nor will such transfer to the best of Jang's knowledge, subject Scimed to, any liability in respect of any taxes under any Legal Requirement arising from or relating to the ownership or use of the Jang Assets on or prior to the Closing.

**5.3  Rights of Third Parties, etc.** (a)  Neither the execution and delivery of this Agreement by Jang nor the consummation by Jang of any transaction contemplated hereby does or will constitute, result in or give rise to, nor to Jang's knowledge has any other event occurred nor does any other condition exist which does or will constitute, result in or give rise to the imposition of any Lien upon, or the arising of any cause of action with respect to, any Jang Asset.

(b)  Other than the assignment of the Patents as required hereunder, or as set forth on Schedule 5.3, no approval, consent, waiver, authorization or other order of, and no declaration, filing, registration, qualification or recording with, any governmental authority is required to be obtained or made by or on behalf of Jang in connection with the execution, delivery or performance of this Agreement and the transactions contemplated hereby, except as will have been obtained or made and be in full force and effect at the Closing.

**5.4  Compliance.** (a)  To the best of Jang's knowledge, neither the execution and delivery of this Agreement by Jang nor the consummation by Jang of any transactions contemplated hereby does or will violate or give rise to any violation or default under any Legal Requirement or Contractual Obligation of Jang.  Other than as set forth on Schedule 5.4, Jang has not granted to any other Person any license, option or other rights to develop, use, sell or exploit in any manner the Designs or the Technology, whether requiring the payment of royalties or not; and Jang is not obligated to grant to any other Person any license, option or other rights to develop, use, sell or exploit in any manner the Designs or the Technology, whether requiring the payment of royalties or not.

12

(b)  There is no litigation, at law or in equity, or any proceeding before or investigation by any foreign, federal, state or municipal board or other governmental or administrative agency or any arbitrator, against Jang in connection with the Jang Assets, filed (or to the best of Jang's knowledge, threatened or any reasonable factual basis therefor).  There is no litigation at law or in equity, or any proceeding before or investigation by any foreign, federal, state or municipal board or other governmental or administrative agency or any arbitrator, filed (or to the best of Jang's knowledge threatened or any reasonable factual basis therefor), which seeks rescission of, seeks to enjoin the consummation of, or which questions the validity of, this Agreement or any of the transactions contemplated hereby.  No judgment, decree or order of any foreign, federal, state or municipal court, board or other governmental or administrative agency or any arbitrator has been issued against Jang or (to the best of Jang's knowledge) any Person other than Jang which could have any material adverse effect on the Jang Assets.

(c)  To the best of Jang's knowledge, neither this Agreement (including the Schedules), nor any certificate, or other information furnished or to be furnished by Jang, contains or will contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein not misleading.

**5.5  List of Jang Assets.**  The Schedules set forth complete and accurate lists of all of the Jang Assets.  Specifically, Schedule 2.1(a) sets forth all Patents, and Jang has delivered to Scimed copies of the certificates of registration for all such Patents which are registered and copies of all filed patent applications, and completed invention disclosures for all inventions for which a patent application has not yet been filed, and Jang has delivered to Scimed copies of all Technology and Technical Information embodied in tangible media.

**5.6  Intellectual Property Rights.**  Schedule 2.1(a) lists all patents (and all applications therefor that are pending or in the process of preparation and all invention disclosures), in the United States and in foreign jurisdictions, relating to the Designs and the Technology (collectively, *Intellectual Property Rights*), that are directly or indirectly owned or controlled in whole or in part by Jang.  Except as disclosed in Schedule 2.1(a):

(a)  Jang is the sole and exclusive owner of the Intellectual Property Rights, free and clear of all claims, Liens, licenses, sublicenses, charges or encumbrances and no governmental registration of any of the Intellectual Property Rights has lapsed, expired or been cancelled, abandoned, opposed or the subject of a reexamination request.

(b)  There have been no claims, and, to the best knowledge of Jang, there is no basis for any claim, challenging the scope, validity or enforceability of any of the Intellectual Property Rights.

(c)  There are no instances where it has been held, claimed or alleged, whether directly or indirectly, and, to the best knowledge of Jang, there is no basis upon which a claim may be made, that any activity of Jang relating to the Jang Assets infringes or may infringe upon or is in violation of any of the intellectual property rights of a third party, or that any activity of a third party infringes or may infringe upon or is in violation of any of the Intellectual Property

13

Agreement, including without limitation all required board approvals; (c) Scimed is duly authorized to execute and deliver this Agreement and to perform its obligations hereunder and consummate the transactions contemplated hereby; and (d) this Agreement is a valid and binding obligation of Scimed enforceable against Scimed in accordance with its terms.

**6.2 Defaults; Consents; etc.** No approval, consent, waiver, authorization or other order of, and no declaration, filing, registration, qualification or recording with, any governmental authority is required to be obtained or made by or on behalf of Scimed for the execution, delivery or performance of this Agreement by Scimed.

**6.3 No Broker's or Finder's Fees.** No agent, broker, Person or firm acting on behalf of Scimed or any of its Affiliates is, or shall be, entitled to any commission or broker's or finder's fees from Jang in connection with any of the transactions contemplated herein.

## 7. CERTAIN AGREEMENTS OF THE PARTIES.

**7.1 Improvements.** (a) Jang hereby assigns, agrees to assign and transfers to (and the following shall be the exclusive property of) Scimed, the entire right, title and interest of Jang in and to all ideas, discoveries, improvements, inventions (including without limitation discoveries of new technology and improvements to existing technology), Confidential Information, know-how, innovations, writings, works of authorship, compilations and other developments or improvements, whether or not patented or patentable, copyrightable, or reduced to practice or writing, made, discovered, invented, authored, created, developed, originated or conceived by Jang, solely or jointly, during the period from the Effective Date until 11:59 PM on the third anniversary of the Effective Date (the *Inclusion Period*) and which relate, directly or indirectly, to the Designs or any Technology (collectively, *Improvements*), whether or not such Improvements arise out of any activity (i) conducted by, for or under the direction of Scimed or (ii) conducted at Scimed's facilities, during working hours or using Scimed assets. It is understood and agreed that (A) any of the foregoing that are within the scope of the Pacemaker Delivery Technology are expressly excluded from Improvements and (B) any of the foregoing that are within the scope of Pacemaker Lead Technology are expressly included in Improvements. In the event that any Improvements are licensed to Jang pursuant to the License Agreement, such licensed Improvements shall be subject to the option granted Scimed under Section 2.3 of this Agreement.

(b) Jang shall communicate promptly and disclose to Scimed, in such form as Scimed may reasonably request, all information, details and data pertaining to any such Improvements, and Jang shall execute and deliver to Scimed or its designee such formal transfers and assignments and such other papers and documents and shall give such testimony as may be deemed necessary or required of Jang by Scimed or its designee to develop, preserve or extend Scimed's rights relating to any Improvements and to permit Scimed or its designee to file and prosecute patent applications and, as to copyrightable material, to obtain copyright registrations thereof.

**7.2 Patent Prosecution; Maintenance.** On and after the Effective Date, Scimed will be

15

responsible for and will, at its expense and discretion, use commercially reasonable efforts to prepare, file (including foreign filing decisions), prosecute and maintain the Patents (including patent applications) (collectively, *Prosecution*) that relate to the Technology and any Improvements. Scimed will give such Prosecution a priority which is consistent with Scimed's efforts for other technology that is at similar stages of evolution and similar applicability, undertaken using good business judgment by Scimed. Scimed may determine that it is not commercially reasonable to pursue patent coverage for particular claims, in cases where the difficulty, expense and probability of obtaining coverage cannot be justified in comparison to the profits that sales of Contingent Payment Products that are the subject of such coverage are likely to yield; provided, that Scimed shall not accord undue weight to the amounts payable to Jang under this Agreement when making such determination.   Jang shall cooperate with Scimed to respond to office actions and complete all related applications and continuations currently in process or initiated following the Effective for no additional consideration.

7.3  **Infringement.** (a) Jang shall promptly inform Scimed in writing of any infringement of Intellectual Property Rights by a third party of which he has knowledge and shall provide Scimed with any readily available information relating to such infringement.

(b) Scimed shall have the right, but not the obligation, to institute, prosecute and control legal proceedings to prevent or restrain such infringement. Jang agrees to assist Scimed in any infringement suit as Scimed may institute to enforce Intellectual Property Rights, or in any declaratory judgment action alleging invalidity or non-infringement of any Intellectual Property Rights brought against Jang or Scimed, at the request and expense of Scimed, and Jang will cooperate and assist in all reasonable respects, including testifying and making available relevant records, papers, information, specimens and the like. Scimed shall reimburse Jang for all reasonable expenses incurred in providing such assistance.

(c) Any recovery of damages by Scimed in a suit brought pursuant to the provisions of this Section 7.3 shall be applied first in satisfaction of any unreimbursed expenses and legal fees of Scimed relating to the suit or settlement thereof. The balance, if any, remaining after Scimed has been compensated for expenses shall be retained by Scimed; provided, that any recovery of ordinary damages based upon such infringement shall be deemed to be "Net Sales" and upon receipt of such recovery amount, Scimed shall pay Jang as additional Earn Out from such recovery amount an amount calculated in accordance with Section 3.1(c) to reimburse Jang for payments due in respect of lost sales of Contingent Payment Products. Any such recovery shall be count towards Net Sales as of the date of the infringement for purposes of Section 3.1(d). The allocation described in this Section 7.3(c) shall not apply as to special or punitive damages.

7.4  **Non-competition.** For a period of seven (7) years after the Effective Date, Jang shall not directly or indirectly, (i) own, manage, operate, control or participate in any manner in the ownership, management, operation or control of, or be connected as an officer, employee, partner, director, principal, consultant, agent or otherwise with, or have any financial interest in, or aid or assist anyone else in the conduct of, any business, venture or activity relating to the Designs; or (ii) offer employment to, or recruit or otherwise seek to induce any employee of Scimed or any of its Affiliates to terminate his or her employment or to violate any agreement

16

with or duty to Scimed or any of its Affiliates, or (iii) solicit or encourage any Person who is a customer or supplier of Scimed or any of its Affiliates to terminate its relationship with Scimed or such Affiliate. The limitation set forth in this Section 7.4 shall not prevent Jang from: 1) holding ownership interests in mutual funds, venture capital funds, or any other similar passive investment vehicles where Jang has no decision making authority; 2) owning 2% or less of any company's securities where such securities are listed on a stock exchange or a national market system; 3) owning 5% or less of any private company's securities as a "passive" investor where Jang has no decision making authority; or 4) exploiting the Pacemaker Lead Technology in accordance with the provisions of Section 2.3.

**7.5. Further Assurances.** (a) At any time and from time to time, each party hereto, without further consideration, shall cooperate, take such further action and execute and deliver such further instruments and documents as may be reasonably requested by any other parties in order to carry out the provisions and purposes of this Agreement including, without limitation, (i) to execute one or more further assignments covering any of the Jang Assets constituting Intellectual Property Rights in form acceptable for recordation and (ii) in the case of Jang, to complete his obligations under Section 7.1 and Section 7.2.

(b) Subject to the terms of this Section 7.5, the parties agree that in the event and to the extent that any Technology or Designs existing as of the Effective Date and excluded from the schedules to this Agreement describing Technology or Designs (each, an *Omitted Item*), then Jang shall provide Scimed with a description of such Omitted Item(s) promptly upon determining that they are within the scope of Technology or Designs and Jang shall be deemed to have assigned all his right title and interest in such Omitted Item(s) as of the Effective Date without any additional consideration and the provisions of Sections 7.1-7.4, 9 and 10 shall apply to such Omitted Items. Jang shall execute and deliver such documents as Scimed may reasonably require in order to perfect or record the assignment of such Omitted Items to Scimed in accordance with the provisions of this Agreement.

(c) Jang acknowledges and agrees that, because the legal remedies of Scimed may be inadequate in the event of Jang's breach of, or other failure to perform, any of the covenants and obligations set forth in Section 2.3, Section 7.1, Section 7.2, Section 7.3 or Section 7.4, Scimed may, in addition to obtaining any other remedy or relief available to it (including without limitation consequential and other damages at law), seek to enforce the provisions of Section 2.3, Section 7.1, Section 7.2, Section 7.3 or this Section 7.4 by injunction and other equitable remedies without the requirement of posting bond.

## 8. RISK ALLOCATION

17

**8.1   Limitation of Liability.**   EXCEPT FOR BREACH OF OBLIGATIONS UNDER SECTIONS 7.1-7.3 OR SECTION 9.1 AND EXCEPT AS OTHERWISE PROVIDED IN SECTION 8.2, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR LOST PROFITS OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, HOWEVER CAUSED, UNDER ANY THEORY OF LIABILITY.

**8.2   Indemnification. (a)**  Subject to the provisions of Section 8.3, Jang hereby indemnifies Scimed and its Affiliates against and agrees to hold each of them harmless from any and all damage, loss, liability and expense (including, without limitation, reasonable attorneys' fees and expenses in connection with any action, suit or proceeding) (collectively, *Losses*) incurred or suffered by Scimed or any of its Affiliates arising out of: (i) any misrepresentation or breach of warranty, covenant or agreement made or to be performed by Jang pursuant to this Agreement (whether or not discovered by Scimed prior to Closing); or (ii) Jang's ownership or use of the Jang Assets prior to the Closing; or (iii) Jang's ownership or use of the Pacemaker Lead Technology (including the ownership or use of the Pacemaker Lead Technology by any Affiliate or sublicensee of Jang). The foregoing indemnification action shall not apply in the event and to the extent such Losses arose as a result of any Scimed Indemnified Party's negligence, intentional misconduct or breach of this Agreement.

(b)  Subject to the provisions of Section 8.3, Scimed hereby indemnifies Jang against and agrees to Jang harmless from any and all Loss incurred or suffered by Jang arising out of: (i) any misrepresentation or breach of warranty, covenant or agreement made or to be performed by the Scimed pursuant to this Agreement; or (ii) Scimed's ownership or use of the Jang Assets following the Closing, including without limitation any product liability claim (such as any claim relating to medical malpractice by customers of Contingent Payment Products other than Jang, breach of express or implied warranty, negligence or strict liability) and any claim of infringement of intellectual property rights. The foregoing indemnification action shall not apply in the event and to the extent that such Losses arose as a result of Jang's negligence, intentional misconduct or breach of this Agreement. It is understood that Scimed's indemnification obligation shall not apply to Losses resulting from Jang's (including any Affiliate's or sublicensee's) activities with respect to the Pacemaker Lead Technology or with respect to the License Agreement, if applicable.

**8.3   Procedures.** To receive the benefit of indemnification under Section 8.2, the party seeking indemnification (the *Indemnified Party*) must promptly notify the party against whom indemnity is sought (the *Indemnifying Party*) in writing of any claim, or the commencement of any suit, action or proceeding in respect of which indemnity may be sought under Section 8.2 and provide reasonable cooperation (at the Indemnifying Party's expense) and tender to the Indemnifying Party (and its insurer) full authority to defend or settle the claim or suit. Neither party has any obligation to indemnify the other party in connection with any settlement made without the Indemnifying Party's written consent. The Indemnifying Party has the right to participate at its own expense in the claim or suit and in selecting counsel therefor. The Indemnified Party shall cooperate with Indemnifying Party (and its insurer), as reasonably requested, at Indemnifying

18

Party's sole cost and expense.

**8.4  Set-Off.** Jang hereby acknowledges and agrees that Scimed shall have the right at any time to set off, against any amount owed by Scimed to Jang under Section 3.1, any and all Losses (including Losses incurred pursuant to Section 7.2 of the License Agreement, if applicable, but excluding Losses for which Jang has paid or reimbursed Scimed), whether or not such inaccuracy, breach, nonfulfillment, misrepresentation or omission was or should have been known by Scimed on the Effective Date, it being agreed that the intention of the parties is that Jang shall be completely responsible for, and Scimed shall be conclusively deemed to have relied upon such representations warranties, agreements and instruments. Any party to which Jang assigns the right to receive payment under this Agreement shall also be subject to this Section 8.4.

## 9.  MISCELLANEOUS

**9.1  Protection of Confidential Information.**  (a) For a period ending on the later of (i) three (3) years from the date of the expiration or termination of Jang's employment with BSC, or (ii) the expiration of the Inclusion Period, Jang and Scimed (each, as a Receiving Party) shall limit access to Confidential Information received from the other party (each, a Disclosing Party) pursuant to this Agreement, to those of their employees, consultants and agents who need to have access to such information or material and who are obligated to maintain confidentiality sufficient to protect the other party's rights in its Confidential Information, and shall not use or permit to be used such Confidential Information by or for the benefit of itself (except as anticipated by this Agreement) or any independent third party.

(b) Each party shall exercise at least the same reasonable care it uses to protect its own valuable, proprietary Confidential Information in order to prevent the disclosure of the other party's Confidential Information to independent third parties. Each party shall promptly notify the other party of any actual or suspected unauthorized use or disclosure of the other party's Confidential Information of which it has knowledge and will cooperate in the investigation of and appropriate actions with respect to such unauthorized use or disclosure. Each party shall include the other party's reasonable proprietary rights notices on any media embodying the other party's Confidential Information, including partial copies thereof, which are circulated within that party.

**9.2  Publicity.** Scimed and its Affiliates on the one hand and Jang on the other shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement and the transactions contemplated hereby and shall not issue any such press release or make any such public statement except as they may mutually agree, except as is necessary for governmental notification purposes or to comply with applicable laws and regulations.

**9.3  Independent Contractors.** Each party represents that it is acting on its own behalf as an independent contractor and is not acting as an agent for or on behalf of any third party. This Agreement and the relations hereby established by and between Jang and Scimed do not constitute a partnership, joint venture, franchise, agency or contract of employment. Scimed is

19

One Boston Scientific Place
Natick, MA 01760-1537
Attention: Lawrence C. Best
Phone: 508.650.8567
Fax: 508.650.8960

With a copy to:
Boston Scientific Corporation
One Boston Scientific Place
Natick, MA 01760-1537
Attention: General Counsel
Phone: 508.650.8567
Fax: 508.650.8960

or to such other place as either party may designate as to itself by written notice to the other party.

**9.7 Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts, United States of America, to the exclusion of both its rules on conflicts of laws and the provisions of the United Nations Convention on Contracts for the International Sale of Goods.

**9.8 Amendment and Waiver.** No provision of or right under this Agreement shall be deemed to have been waived by any act or acquiescence on the part of either party, its agents or employees, but only by an instrument in writing signed by an authorized officer of each party. Scimed and Jang may, by written notice to the other party, (a) extend the time for the performance of any of the obligations or other actions of the others under this Agreement; (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement or in any document delivered pursuant to this Agreement; (c) waive compliance with any of the conditions to their obligations contained in this Agreement; or (d) waive or modify performance of any of the obligations of the other party under this Agreement. Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of Scimed or Jang, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained in this Agreement. The waiver by Scimed or Jang of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**9.9 Severability.** In the event any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof. The parties agree that they will negotiate in good faith or will permit a court or arbitrator to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision which is as similar as possible in substance to the invalid,

21

illegal or unenforceable provision.

**9.10   Entire Agreement.** The terms and provisions contained in this Agreement (including the schedules and exhibits) and the Employment Agreement constitute the entire understanding of the parties with respect to the transactions and matters contemplated hereby and supersede all previous communications, representations, agreements and understandings relating to the subject matter hereof.   Except for the Employment Agreement, no representations, inducements, promises or agreements, whether oral or otherwise, between the parties not contained in this Agreement, the License Agreement or the Employment Agreement or incorporated by reference in this Agreement or the Employment Agreement shall be of any force or effect.  No agreement or understanding extending this Agreement or varying its terms (including any inconsistent terms in any purchase order, acknowledgment or similar form) shall be binding upon either party unless it is in a writing specifically referring to this Agreement and signed by the duly authorized representative of the applicable party.

**9.11   Captions.** Captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement and shall not limit or affect the meaning or construction of the terms and conditions hereof.

**9.12   Word Meanings.** Words such as *herein, hereinafter, hereof* and *hereunder* refer to this Agreement as a whole and not merely to a section or paragraph in which such words appear, unless the context otherwise requires.  The singular shall include the plural, and each masculine, feminine and neuter reference shall include and refer also to the others, unless the context otherwise requires.

**9.13   Rules of Construction.** The parties agree that they have participated equally in the formation of this Agreement and that the language and terms of this Agreement shall not be construed against either party by reason of the extent to which such party or its professional advisors participated in the preparation of this Agreement.

**9.14   Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

**[rest of this page intentionally left blank]**

IN WITNESS WHEREOF, Scimed and Jang have duly executed this Assignment Agreement as of the Effective Date, intending it to take effect as an instrument under seal.

SCIMED LIFE SYSTEMS, INC.

By: _____

Name:   Lawrence C. Best                             Name: G. David Jang, M.D.
Title:    Chief Financial Officer

**Exhibit 4.2(a)(i):   Assignment of Patents**
**Exhibit 4.2(a)(ii):   Bill of Sale**
**Exhibit 4.2(f):  License Agreement**
**Exhibit 4.2(g):  Employment Agreement**

IN WITNESS WHEREOF, Scimed and Jang have duly executed this Assignment Agreement as of the Effective Date, intending it to take effect as an instrument under seal.

SCIMED LIFE SYSTEMS, INC.

By: _____
Name:  Lawrence C. Best
Title:  Chief Financial Officer

Name: G. David Jang, M.D.

**Exhibit 4.2(a)(i):   Assignment of Patents**
**Exhibit 4.2(a)(ii):   Bill of Sale**
**Exhibit 4.2(f):  License Agreement**
**Exhibit 4.2(g):  Employment Agreement**