1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ARNOLD & PORTER LLP**
Brian Martinez (CA SBN: 274210)
Brian.Martinez@aporter.com
777 South Figueroa Street
Los Angeles, California  90017-5844
Tel:  (213) 243-4000;  Fax: (213) 243-4199

Matthew Wolf (*pro hac vice*)
Matthew.Wolf@aporter.com
Edward Han (*pro hac vice*)
Ed.Han@aporter.com
John Nilsson *(pro hac vice)*
John.Nilsson@aporter.com
Sara P. Zogg *(pro hac vice)*
Sara.Zogg@aporter.com
555 Twelfth Street NW
Washington, DC  20004-1206
Tel:  (202) 942-5000; Fax:  (202) 942-5999

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| G. DAVID JANG, M.D.,<br><br>                    Plaintiff,<br><br>          v.<br><br>BOSTON SCIENTIFIC CORPORATION, a Delaware corporation; and SCIMED LIFE SYSTEMS, INC., a Minnesota corporation,<br><br>                    Defendants. | Case No.  EDCV 05-00426-VAP-MRW<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER (DKT. # 456)**<br><br>**Hon. Virginia A. Phillips** |

# TABLE OF CONTENTS

I.   Preliminary Statement ......................................................................... 1

II.  Factual Background ............................................................................. 1

III. Argument .............................................................................................. 5

     A.  Dr. Jang Has Not Met His Burden In Demonstrating That He Is
         Entitled To The Extraordinary Remedy Of *Ex Parte* Relief ................... 7

     B.  This Court May Not Direct BSC's Activities In The USPTO
         Reexamination Proceedings ........................................................ 9

     C.  Dr. Jang's Requests Are Procedurally Improper Because They Do
         Not Relate To His Claims In This Case ...................................... 10

     D.  Dr. Jang Has Not Met The Burdens Imposed For Justifying A
         Preliminary Injunction Or Temporary Restraining Order ..................... 11

         1.  Dr. Jang Cannot Demonstrate A Likelihood Of Success ............. 12

             a.  The License Agreement Was Never Executed And
                 Thus Does Not Entitle Dr. Jang To Any Relief ................. 12

             b.  The Assignment Agreement Does Not Give Dr. Jang
                 Any Right To Participate In the Reexamination
                 Proceedings ......................................................... 14

         2.  Dr. Jang Has Not Demonstrated Irreparable Harm ..................... 17

         3.  Dr. Jang Has Not Shown The Balance Of Equities Or
             Public Interest Factors .............................................. 18

     E.  Dr. Jang Should Be Sanctioned For His Abuse Of The *Ex Parte*
         Application Process ................................................................ 19

IV.  Conclusion ...................................................................................... 20

**TABLE OF AUTHORITIES**

**Cases**

*Capital Bank PLC v. M/Y Birgitta,* No. CV 08-5893 PSG (SSx),
2010 WL 2132473 (C.D. Cal. May 24, 2010)......................................................8

*Charley v. Chevron U.S.A.,*
No. CV 10-5063-ODW (SSx), 2010 WL 2792486 (C.D. Cal. July 13,
2010) ........................................................................................................................8

*Emerson Electric Co. v. Davoil, Inc.,*
88 F.3d 1051 (Fed. Cir. 1996) ....................................................................9, 10

*Graham v. Am. Home Mortg.,*
No. C 13-03322 RS, 2013 WL 3989676 (N.D. Cal. Aug. 2, 2013)................17

*Henderson v. Axiam, Inc.,*
962572D, 1999 WL 33587312 (Mass. Super. June 22, 1999)........................16

*Horne v. Wells Fargo Bank, N.A.,*
No. CV 13-04911-MMM JCX, 2013 WL 4807166 (C.D. Cal. Sept. 6,
2013).........................................................................................................................6

*In re Intermagnetics Am., Inc.,*
101 B.R. 191 (C.D. Cal. 1989) .....................................................................6

*In re Walter,*
83 B.R. 14 (C.D. Cal. 1988) ........................................................................19

*Jackmon v. Am. Serv. Co.,*
No. C 11-03884 CRB, 2011 WL 3667478 (N.D. Cal. Aug. 22, 2011)............17

*Massillon-Cleveland-Akron Sign Co. v. Golden State Adver. Co.,*
444 F.2d 425 (9th Cir. 1971) .......................................................................16

*Medicis Pharm. Corp. v. Upsher-Smith Labs, Inc.,*
486 F. Supp. 2d 990 (D. Ariz. 2007) ......................................................9, 10

*Medimmune, Inc. v. Genentech, Inc.,*
549 U.S. 118 (2007) .....................................................................................16

*Mehr v. County of Orange,*
484 Fed. Appx. 162 (9th Cir. 2012) .............................................................19

*Mission Power Eng'g Co. v. Cont'l Cas. Co.*,
    883 F. Supp. 488 (C.D. Cal. 1995) ............................................................7, 9, 17

*Occupy Sacramento v. City of Sacramento*,
    No. 2:11-cv-02873-MCE-GGH, 2011 WL 5374748 (N.D. Cal. Nov. 4,
    2011) ..................................................................................................................11

*Rampp v. Ocwen Fin. Co.*,
    No. 11cv3017 BTM(NLS), 2012 WL 2995066 (S.D. Cal. July 23, 2012) .......17

*Reno Air Racing Ass'n Inc. v. McCord*,
    452 F.3d 1126 (9th Cir. 2006) ..........................................................................12

*Robinson v. Delicious Vinyl Records, Inc.*,
    No.cv 13-4111-CAS (PLAx), 2013 WL 3983014 (C.D. Cal. Aug. 1,
    2013) ..................................................................................................................17

*Shukh v. Seagate Tech., LLC*,
    Civ. No. 10-404 (JRT/JJK), 2011 WL 1258510 (D. Minn. Mar. 30,
    2011) ..............................................................................................................9, 10

*Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*,
    441 Mass. 376, 805 N.E.2d 957 (2004) .............................................................17

*Weatherford Intern. Inc. v. Casetech Intern. Inc.*,
    No. Civ. A.H 03 5383, 2006 WL 581270 (S.D. Tex. Mar. 8, 2006) ...............10

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................11

**Other Authorities**

MANUAL OF PATENT EXAMINING PROCEDURES § 2500 et. seq. ...................................15

- 3 -

Defendants Boston Scientific Corporation and Boston Scientific Scimed, Inc. (formerly Scimed Life Systems, Inc.) (collectively, "BSC") respectfully submit this opposition to Plaintiff G. David Jang, M.D.'s ("Dr. Jang") *Ex Parte* Application For Temporary Restraining Order.  (Dkt. # 456.)

## I.   PRELIMINARY STATEMENT

This Court has made it plain that *ex parte* applications are "solely for extraordinary relief."  (Standing Order at 8.)  Notwithstanding that admonition, this is the third *ex parte* application advanced by Dr. Jang in less than two months.[1]  Like the first two, this *ex parte* application is without merit and should be denied.  Indeed, the present application is so clearly groundless – both with respect to its invocation of this Court's emergency *ex parte* procedure and with respect to its underlying requests for relief – that BSC asks that Dr. Jang be sanctioned for bringing it.

Specifically, as explained below, Dr. Jang's application:

- Fails to explain why Dr. Jang waited until less than week before the United States Patent and Trademark Office's ("USPTO's") deadline to seek to intervene in the reexamination proceedings;

- Asks the Court to intervene in those proceedings in a manner that contravenes Federal Circuit precedent;

- Seeks this relief on the basis of contractual claims that Dr. Jang has not even pled; and

- Bases those claims in large part on a contract (the Non-Exclusive License Agreement) that was never executed and never went into effect.

## II.   FACTUAL BACKGROUND

Dr. Jang has no justifiable basis for waiting until now – two business days before the Patent Owner response would be due in the pending reexaminations – to

---

[1] On October 16, 2013, BSC filed its own *ex parte* application to compel the deposition of Dr. Jang, which Dr. Jang had refused to provide.  Magistrate Judge Wilner granted that application on October 22, 2013 (Dkt. # 405).

1    seek "emergency" relief from the Court.  He has known of the reexamination

2    proceedings since early October of 2013.  On October 8, 2013, BSC filed requests

3    with the USPTO for reexamination of U.S. Patent Nos. 5,922,021 and 5,954,743 (the

4    "Patents-in-Suit").  BSC filed a notice with this Court on October 11, 2013, attaching

5    copies of those requests.  (Dkt. # 387.)

6            On October 16, 2013, at the claim construction hearing in this case, BSC

7    informed the Court and Dr. Jang of the requests and their import:  "I want to make

8    Your Honor aware that we filed an ex-parte re-exam last week.  We submitted it to

9    the Court – I don't know if it's hit your desk yet – that said that under Dr. Jang's

10   construction that the patents would be invalid."  (Zogg Decl., Ex. 1 [Oct. 16, 2013

11   Markman Hearing Tr.] at 33:2-5.)  Dr. Jang did not mention (either at or following

12   the hearing) any desire to intervene in the reexamination proceedings, should the

13   PTO grant BSC's requests, or that the reexamination proceedings would be a

14   purported breach of any provisions of the Assignment Agreement or the (non-

15   executed) Non-Exclusive License Agreement.

16           On November 3, 2013, the USPTO granted BSC's requests and opened

17   reexaminations of the asserted claims of both Patents-in-Suit.  BSC produced a copy

18   of the PTO's decision to Dr. Jang on November 5, 2013.  (Zogg Decl., Ex. 2 [Nov. 5,

19   2013 letter from B. Martinez to Dr. Jang's counsel].)  BSC also promptly notified this

20   Court and Dr. Jang that the USPTO had granted the reexamination requests, filing a

21   notice attaching the USPTO's decision.  (Dkt. # 428.)  Dr. Jang did not respond, let

22   alone suggest that he had an alleged "right" to participate.

23           Shortly before the USPTO's decision (on October 29, 2013), BSC filed a

24   motion to amend its answer to assert a counterclaim seeking a declaratory judgment

25   of invalidity with respect to the asserted claims.  (Dkt. # 414.)  In it, BSC noted that it

26   had "initiated ex parte reexamination proceedings before the [USPTO], asking the

27   USPTO to consider whether – under Dr. Jang's proposed claim constructions – the

28   asserted claims are valid."  (*Id.* at 1.)  BSC further noted that its submission

- 2 -

1   "describe[-d] in detail how the claims as construed by Dr. Jang here read on the prior

2   art." (*Id.*)  In his opposition, Dr. Jang stated that "BSC's new validity defenses, even

3   if successful, would not affect its contractual payment obligations at issue." (Dkt.

4   # 425 at 2.)  In reply, BSC noted that the USPTO had "signaled its agreement with

5   BSC that the three prior art references identified by BSC invalidate the asserted

6   claims" and that "the Patent Office itself mapped the elements of the asserted claims

7   on figures from the three patents." (Dkt. # 431 at 1.)  At no point during the briefing

8   on BSC's motion to amend did Dr. Jang express any interest in participating in the

9   reexamination proceedings.

10         On November 21, 2013, BSC took Dr. Jang's deposition.  During the

11   deposition, BSC's counsel asked Dr. Jang, "[a]re you aware that the Patent Office has

12   granted reexamination of certain claims of the '021 patent and the '743 patent,

13   including Claim 1 of the '021 patent?" (Zogg Decl., Ex. 3 [Jang Tr.] at 465:21-24.)

14   Dr. Jang responded "So? They didn't make any decision." (*Id.* at 465:25.)  Once

15   again, Dr. Jang failed to indicate any desire whatsoever to participate in the

16   reexamination proceedings.

17         On November 25, 2013, the USPTO issued office actions rejecting all of the

18   asserted claims as invalid. (Zogg Decl., Ex. 4 ['021 and '743 Office Actions].)  The

19   USPTO stated clearly that "35 U.S.C. § 305 requires that reexamination proceedings

20   be conducted with special dispatch." (*Id.*, '021 Office Action at p. 2.)  Pursuant to

21   PTO regulations cited in the office actions, the deadline for any response from the

22   patent owner was January 21, 2014.  In the absence of a response, the office actions

23   would become final. (*Id.*)

24         At the hearing on BSC's motion to amend held the same day, BSC notified

25   both the Court and Dr. Jang of the office actions, emphasizing that it was now a

26   matter of certainty that the asserted claims would be invalidated.  As Dr. Jang

27   concedes, BSC also informed the Court and him that it had "waived its rights to file

28   Patent Owner statements to defend the Patents and distinguish prior art." (App. at 7.)

In response, Dr. Jang's counsel did not suggest that Dr. Jang wished to intervene in the reexamination proceeding or to submit any response to the USPTO.  Instead, Dr. Jang's counsel maintained that any determination by the USPTO that the claims of the patent were invalid was without import in the instant litigation.

On January 9, 2014, at the deposition of Michael Lee, one of Dr. Jang's expert witnesses, Dr. Jang's counsel indicated *for the very first time* that Dr. Jang would like to confer regarding the January 21, 2014 deadline for submission of responses to the USPTO office actions.  (*See* App. at 7 (confirming that counsel for the parties had very limited discussion on January 9, 2014); Zogg Decl. ¶ 7.)  On Saturday, January 11, 2014, Dr. Jang's counsel emailed counsel for BSC, regarding such a conference: "Following up on my request for a conference concerning the upcoming deadlines in the ex parte proceedings before the USPTO, can you speak early Monday, 1/13?" (Zogg Decl., Ex. 5 [Jan. 13, 2014 email from J. Toney to M. Wolf].)  The parties conferred on January 14, 2014, only one week in advance of the January 21, 2014 deadline for submitting responses to the USPTO.  (Zogg Decl. ¶ 9.)  During that conference, Dr. Jang's counsel indicated for the first time that Dr. Jang would seek emergency relief from this Court unless BSC requested an extension of the USPTO's deadline and gave Dr. Jang power of attorney allowing him to submit a response to the office actions.  BSC pointed out that Dr. Jang had waited months before raising these issues and that, in any event, it could not submit information to the USPTO that it believed to be inaccurate or without merit.  (Zogg Decl. ¶ 10.)[2]

---

[2] Dr. Jang complains in his recitation of facts that BSC has refused to submit the December 20, 2013 expert report of Mr. Michael Lee to the USPTO.  (App. at 14.)  BSC believes that Mr. Lee's report's analyses of the prior art and the manner in which the claims as construed by the Court relate to the prior art are inaccurate and misleading.  As a result, BSC believes it would be a violation of its duty of candor to submit the report to the USPTO.  (*See also* Zogg Decl., Ex. 6 [Jan. 15, 2014 email from M. Wolf to N. Minnear].)  In any case, Mr. Lee merely points to various portions of the three prior art references already before the USPTO and makes assertions based on them and based upon the Patents-In-Suit and the Court's

Footnote continued on next page

BSC's counsel followed up on the conversation with an email on January 15, 2014, stating that "[w]e have openly stated from the beginning of this case that the claim construction[s] advocated by Dr. Jang would render the claims at issue invalid. The PTO has now agreed.  We have timely informed Dr. Jang of BSC's activities in the PTO and the PTO's responses."  (Zogg Decl., Ex. 6 [Jan. 15, 2014 email from M. Wolf to N. Minnear].)  BSC further reminded Dr. Jang that "at no time prior to last Thursday did Dr. Jang indicate any interest in the PTO proceedings whatsoever.  To suggest any exigency now is belied by Dr. Jang's inactivity to date."  (*Id*.)  BSC continued, "we don't believe that there is any procedurally proper way for you to seek the relief you described in the current case.  To the extent that Dr. Jang intends to file a new complaint for breach of the provision(s) you identified, or to seek to amend the current complaint to add such a claim, BSC would clearly be entitled to the ordinary time allotted under the rules to respond."  (*Id*.)

Later that same day, Dr. Jang's counsel responded that "we will proceed with our application for a TRO and a preliminary injunction as discussed.  As you and your team are aware, BSC will have 24 hours to respond to our ex parte application after fax service."  (Zogg Decl., Ex. 7 [Jan. 15, 2014 email from N. Minnear to M. Wolf].)  Dr. Jang's counsel did not explain why Dr. Jang had waited until less than a week before the USPTO's response deadline to seek such relief.  (*Id*.)  Nor did he cite any precedent supporting the proposition that this Court can and should influence the USPTO reexamination proceedings in the radical manner that Dr. Jang now requests.  (*Id*.)

## III.   ARGUMENT

This Court has made clear that "[t]he 'opportunities for legitimate *ex parte* applications are extremely limited.'"  *Horne v. Wells Fargo Bank, N.A.*, No. CV 13-

---

Footnote continued from previous page

constructions.  All of these materials are before the USPTO, and the USPTO is perfectly competent to make its own determinations as to them.

04911-MMM JCX, 2013 WL 4807166, at *1 (C.D. Cal. Sept. 6, 2013).  Such applications "are nearly always improper."  *In re Intermagnetics Am., Inc.*, 101 B.R. 191, 192 (C.D. Cal. 1989).  The present one is no exception.  In rejecting Dr. Jang's *ex parte* application to modify case deadlines, this Court pointed out that "it cannot be said that [Dr. Jang] is without fault in creating the crisis."  (Dkt. # 449 at 3.)  Here, Dr. Jang's supposed "crisis" is entirely of his own making.  He has chosen to ignore the reexamination proceedings since learning of them in early October.  Now, two business days before the Patent Office's deadline, he seeks emergency relief from the Court compelling BSC to seek an extension, to substitute him for BSC in the reexamination proceedings, and to refrain from participating in the reexamination proceedings in the future.

As further explained below, not only is this request unjustified because of Dr. Jang's failure to make it earlier, it also asks the Court to do something that precedent instructs not to do.  In particular, as the Federal Circuit has advised, a district court may not direct a party's conduct before the USPTO.  Moreover, Dr. Jang's request is also procedurally improper insofar as it seeks a preliminary injunction and temporary restraining order with respect to: (1) a provision of the Assignment Agreement not even mentioned in Dr. Jang's complaint; and (2) a provision of another contract (the Non-Exclusive License Agreement) that had never been at issue in the case, *and which was never executed*.

Moreover, even if the Court possessed authority to direct BSC's conduct before the USPTO (it does not), and even if Dr. Jang were seeking relief with respect to a claim that he had actually pled (he is not), he has failed to meet the burdens imposed on him to warrant a temporary restraining order and/or preliminary injunction.  Dr. Jang cannot succeed on the merits of his claims of breach (if they are ever pled) because: (1) *the License Agreement on which he primarily relied was never executed and never took effect*; and (2) the Assignment Agreement clearly vests BSC with all ownership interests in the Patents-in-Suit and all rights with respect to patent

prosecution, but provides no right to Dr. Jang to participate (let alone to intervene in BSC's place). Nor can he demonstrate any "irreparable harm" if the relief sought is not granted. Indeed, the "harms" invoked by Dr. Jang in his application are either: (1) counter-factual (in the case of lost sub-license royalties from the unexecuted Non-Exclusive License Agreement); or (2) utterly conjectural. For all of these reasons, Dr. Jang's *ex parte* application should be denied. And because Dr. Jang's application is so groundless, he should be sanctioned for bringing it.

### A.    Dr. Jang Has Not Met His Burden In Demonstrating That He Is Entitled To The Extraordinary Remedy Of *Ex Parte* Relief

To justify the extraordinary remedy of *ex parte* relief, the movant must show that the moving party's cause will be irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures ***and*** that "the moving party ***is without fault*** in creating the crisis that requires ex parte relief." *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995) (emphasis added). Thus, even if Dr. Jang could demonstrate that he would be irreparably harmed in the absence of the requested relief (which he cannot, as explained below), he would still have to demonstrate that he was "without fault in creating the crisis" requiring the extraordinary measure of an *ex parte* application.

Dr. Jang simply cannot overcome this deficiency in his *ex parte* application. Since October of last year, Dr. Jang has known of the reexamination proceedings and BSC's assertions to the USPTO as to the invalidity of the claims under his proposed claim constructions. He has known since November 25, 2013 that the USPTO agreed with BSC and that it had rejected the claims as invalid. (*See* Zogg Decl., Ex. 4 ['021 and '743 Office Actions].) The very same orders make plain that the period to respond will elapse on January 21, 2014, as Dr. Jang himself acknowledges. (App. at 3.) Yet he inexplicably waited until less than a week before that deadline to seek the relief that he now requests. This is a paradigmatic case of a party creating the very crisis it asks the Court to avert. *See Charley v. Chevron U.S.A.*, No. CV 10-5063-

- 7 -

ODW (SSx), 2010 WL 2792486, *2 (C.D. Cal. July 13, 2010) ("Plaintiff knew since January 12, 2010 or shortly thereafter that termination of the Supply Contract is imminent because the Notice provided a termination date of April 19, 2010 …. Based on Plaintiff's papers, the Court cannot say that Plaintiff is without fault in creating the crisis that requires ex parte relief.").

Dr. Jang's only explanation for his months-long inaction is that he and his counsel believed (with no basis whatsoever) that, after the Court denied BSC's motion to amend on December 23, 2013, BSC would suspend the reexamination proceedings. (App. at 14 ("After the Court's December 23, 2014 Order … Dr. Jang and counsel believed that BSC would stop trying to sabotage the asserted claims at the PTO.").) This assertion defies all logic. Despite Dr. Jang's claim that "BSC has suddenly challenged the validity of its own patents" (App. at 10), this Court itself has pointed out that "BSC has been diligent in pursuing its patent invalidity theory. BSC noted in its first round of claim construction briefing in 2006 that Dr. Jang's proposed constructions could undermine the validity of the patents." (Dkt. # 455 at 5.) BSC raised the same points in its briefs submitted to the United States Court of Appeals for the Federal Circuit. (*See* Dkt. # 431 at 7 (BSC's reply in support of its motion to amend, citing Brief of Defendants-Appellees at 39, 41, *G. David Jang, M.D. v. Boston Scientific Corp.*, No. 2011-1633, 2012 WL 476450 (Fed. Cir. Jan. 24, 2012).) The notion that BSC would simply relinquish its position and suspend the reexamination proceedings is incredible. Certainly, if Dr. Jang actually had such an expectation, he would have been expected to contact BSC shortly after the Court's December 23, 2014 order and communicate it. In actuality, there is no credible explanation for Dr. Jang's failure to seek to intervene in the reexamination proceedings until a week before the USPTO's deadline. *See Capital Bank PLC v. M/Y Birgitta,* No. CV 08-5893 PSG (SSx), 2010 WL 2132473 (C.D. Cal. May 24, 2010) ("Plaintiff has not explained why it delayed in seeking an interlocutory sale or why its request could not be addressed as a regularly noticed motion.").

As the *Mission Power* court emphasized, "[l]awyers must understand that filing an ex parte motion … is the forensic equivalent of standing in a crowded theater and shouting, 'Fire!'" 883 F. Supp. at 491-92.  Here, if there is any sort of "fire" Dr. Jang has been watching it burn since October of last year.  Under this Court's rules, standing orders and precedent, he cannot justifiably seek the extraordinary relief of an *ex parte* ruling to put it out now.

### B. This Court May Not Direct BSC's Activities In The USPTO Reexamination Proceedings

Moreover, precedent establishes that what Dr. Jang asks this Court to do is improper.  Dr. Jang asks this Court to command BSC "to grant Dr. Jang power of attorney" in the USPTO reexamination proceedings, thereby "granting him exclusive power to defend the patents before the Patent Office" so that he may "terminate Defendants' challenges to the patents."  (App. at 4.)  He further asks that the Court order BSC "[to] refrain from further prosecution or participation in the ex parte reexaminations[.]"  (*Id.*)  As the United States Court of Appeals for the Federal Circuit has advised, however, "[a] party's choice of what, if anything, to file with the patent office in a reexamination proceeding ***should remain undisturbed by the courts***."  *Emerson Electric Co. v. Davoil, Inc.*, 88 F.3d 1051,1054 (Fed. Cir. 1996) (emphasis added).  Thus, for instance, a district court may not order a party to disclose prior art in a parallel reexamination proceeding.  *See Shukh v. Seagate Tech., LLC*, Civ. No. 10-404 (JRT/JJK), 2011 WL 1258510, at *16 (D. Minn. Mar. 30, 2011) ("The Federal Circuit has previously found that a district court exceeded its authority when it ordered parties to disclose information to the PTO in the context of a reexamination proceeding.").

*Ex parte* reexamination proceedings are no exception to this rule.  To the contrary, courts have recognized that it would be improper to interfere in such USPTO proceedings precisely because of their *ex parte* nature.  *See Medicis Pharm. Corp. v. Upsher-Smith Labs, Inc.*, 486 F. Supp. 2d 990, 995 (D. Ariz. 2007)

- 9 -

1

2

3

4

5

6

(declining to order a party to provide a copy of a motion filed in the district court to the PTO "because to do so would require the Court to improperly involve itself in the necessarily *ex parte* process of the PTO's reexamination."); *Weatherford Intern. Inc. v. Casetech Intern. Inc.*, No. Civ. A.H. 03 5383, 2006 WL 581270, at *1 (S.D. Tex. Mar. 8, 2006) ("Defendant's [proposal] would require the Court improperly to involve itself in the necessarily *ex parte* process of the PTO's reexamination.").

7

8

9

10

11

12

13

14

15

16

17

Moreover, Dr. Jang does not simply ask the Court to order BSC to submit certain information to the USPTO (itself improper under the precedent cited above). He asks the Court to command BSC to substitute Dr. Jang for itself in the reexamination proceedings and to give up its own rights to participate in them. To BSC's knowledge, these requests themselves are unprecedented. It thus goes without saying that there is absolutely no precedent supporting the proposition that a Court may commandeer a reexamination proceeding in such a fashion. This Court should decline Dr. Jang's entreaty "to improperly involve itself" in the USPTO reexamination proceedings. *See Emerson Electric*, 88 F.3d at 1053-54; *Shuk,* 2011 WL 1258510 at *16; *Medicis*, 486 F. Supp. 2d at 995; *Weatherford,* 2006 WL 581270 at *1.

18

19

### C.   Dr. Jang's Requests Are Procedurally Improper Because They Do Not Relate To His Claims In This Case

20

21

22

23

24

25

26

27

28

Even if the Court had the authority to influence the USPTO reexamination proceedings in the manner requested by Dr. Jang (which it does not), doing so would be improper here. This is because the supposed "contractual violations" that form the basis of Dr. Jang's preliminary injunction and temporary restraining order requests have never been pled in the nearly nine-year history of this case. Dr. Jang claims that, in undertaking the *ex parte* reexamination proceedings, BSC has violated: (1) Section 7.2 of the Assignment Agreement; and (2) certain provisions of the non-executed "License Agreement." Section 7.2 is not mentioned in Dr. Jang's Complaint or First Amended Complaint, and he certainly has not pled a claim for

- 10 -

breach of that provision of the agreement.  Nor has he mentioned or pled a claim for

breach of any provision of the License Agreement.  In a footnote, Dr. Jang himself

acknowledges this deficiency, pledging "to promptly file a Motion to Supplement his

First Amended Complaint to add claims addressing BSC's breaches of its contractual

obligations and its violation of the implied covenant of good faith and fair dealing[.]"

(App. at 9 n.1.)  To the extent Dr. Jang carries through on this pledge, BSC will

oppose the motion on the grounds that it is untimely (*see infra* Part III.A) and futile

(*see supra* Part III.D.1).  In any case, no motion to amend has been brought or

briefed, let alone allowed.[3]  There simply is no precedent for the issuance of a

temporary restraining order or preliminary injunction in the absence of a pleading

giving rise to the requested relief.

### D.   Dr. Jang Has Not Met The Burdens Imposed For Justifying A Preliminary Injunction Or Temporary Restraining Order

"A plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction

is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

(2008).[4]  Dr. Jang has not made, and cannot make, any of these showings.

---

[3] Dr. Jang ventures that "these additional claims [would] require limited additional discovery – if any – and does not believe the proposed supplemental claims will warrant delaying the current trial date."  (App. at 9 n. 1.)  This is difficult to believe. This case has passed both the fact and expert discovery phases, and it is approaching deadlines for summary judgment motions and, subsequently, pretrial filings.  (Dkt. # 321 at 1-2.)  The notion that the possible addition of entirely new claims based on newly alleged facts, different contractual provisions and alternative legal theories would not require revisions to the Court's case schedule is far-fetched.

[4] "In general, the showing required for a temporary restraining order and a preliminary injunction are the same."  *Occupy Sacramento v. City of Sacramento*, No. 2:11-cv-02873-MCE-GGH, 2011 WL 5374748 (N.D. Cal. Nov. 4, 2011) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 839 n. 7 (9th Cir.2001).  Under Federal Rule of Civil Procedure 65, TROs "should be

Footnote continued on next page

### 1.   Dr. Jang Cannot Demonstrate A Likelihood Of Success

Dr. Jang cannot demonstrate a likelihood of success here because: (1) the Non-Exclusive License Agreement (on which he primarily relies) was never executed, never came into effect and so cannot be breached; and (2) the Assignment Agreement does not provide for any right for Dr. Jang to participate in or be consulted as to the reexamination proceedings.

### a.   The License Agreement Was Never Executed And Thus Does Not Entitle Dr. Jang To Any Relief

Dr. Jang's *ex parte* application is premised upon a supposed "property right" that he claims to have in the Patents-in-Suit by virtue of a Non-Exclusive License Agreement, which was attached as an exhibit to the Assignment Agreement.  What Dr. Jang and his counsel fail to bring to the Court's attention is that ***the Non-Exclusive License Agreement was a form agreement only – the parties never executed it because the conditions precedent for it to go into effect never happened***.[5]  As described below, Dr. Jang has no license to the Patents-in-Suit, and thus (i) has no protectable "property right" in the patent claims that the PTO has deemed invalid under Dr. Jang's own claim constructions and (ii) cannot compel BSC to "consult" with him vis-à-vis reexamination of those patents.

---

Footnote continued from previous page

restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."  *Reno Air Racing Ass'n Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).

[5] This glaring deficiency should have been readily apparent to Dr. Jang's counsel and is likely why Dr. Jang failed to attach a copy of the form Non-Exclusive License Agreement to his *ex parte* application.  Even a cursory glance reveals that the form Non-Exclusive License Agreement is not complete (*e.g.*, Dr. Jang and BSC never inserted an Effective Date in the opening paragraph and it was never signed by either BSC or Dr. Jang).

The (non-executed) Non-Exclusive License Agreement and the Assignment Agreement make clear that the parties might, in the future, execute a license in the form provided in Exhibit 4.2(f) to the Assignment Agreement only if certain contingencies occurred:

- *If*, during a four-year Option Period, BSC exercised its option to acquire from Dr. Jang an exclusive license to practice Pacemaker Delivery Technology (*see* Zogg Decl., Ex. 8 [Assignment Agreement] § 2.3(a), (b)),

- *Only then* would BSC and Dr. Jang negotiate "a license and/or development agreement" (*id*. § 2.3(b)),

- *And only if* BSC and Dr. Jang were unable to negotiate "mutually acceptable terms" within a 60-day period (*id*.),

- *Then as one option,* and only if specifically requested by Dr. Jang, *BSC might at its sole discretion*, enter into a non-exclusive license with Dr. Jang "in substantially the form attached as Exhibit 4.2(f)," *i.e.*, the Non-Exclusive License Agreement (*id*. § 2.2).

Because none of these contingencies ever occurred, the parties did not execute the Non-Exclusive License.  (*See also* Zogg Decl., Ex. 10 [Non-Exclusive License Agreement] at 1("The Assignment Agreement provides, *in the event certain conditions are met*, that Jang may acquire from Scimed a non-exclusive license … to develop and commercialize pacemaker lead products.") (emphasis added).)  Thus, the Non-Exclusive License cannot give rise to the relief Dr. Jang seeks, nor can it form the basis of purported "harm" to Dr. Jang in the form of theoretically lost "benefits" as a licensee, diminished sub-licensing or royalty opportunities, or on any other alleged grounds.[6]  (*Contra* App. at 20.)

---

[6] Under Dr. Jang's theories in this case, the four-year Option Period has already expired.  Pursuant to Section 2.3(a) of the Assignment Agreement, the period begins on the Effective Date (June 3, 2002) and ends "on the fourth anniversary of the First Commercial Sale of any Contingent Payment Product."  If Dr. Jang is correct that BSC's Express stents are Contingent Payment Products (they are not), then the

Footnote continued on next page

- 13 -

Indeed, while Dr. Jang accuses BSC of attempting to "sabotage the valuable assets in which Dr. Jang owns a valuable interest" (App. at 12), the facts clearly show that it is Dr. Jang who has destroyed the value of the patent claims he sold, in their entirety, to BSC for more than $60 million. In his relentless quest to extract even more money from BSC, Dr. Jang advanced a claim construction that – as BSC has consistently argued, and the USPTO has now confirmed – render the patent claims at issue invalid and worthless.

**b.     The Assignment Agreement Does Not Give Dr. Jang Any Right To Participate In the Reexamination Proceedings**

Dr. Jang *sold* his patents in their entirety to BSC. As he admits, "Dr. Jang assigned all of his rights, title and interest to the patents and applications[.]" (App. at 2; *see also* Zogg Decl., Ex. 8 [Assignment Agreement] § 2.1.) In seeking to avoid this clear relinquishment of rights – for which Dr. Jang was paid more than $60 million already (*see id.* §§ 3.1(a), (b), (e)) – Dr. Jang points to Section 7.2 of the Assignment Agreement as indicating that Dr. Jang retained the right to participate in the reexamination proceeding. That provision reads:

> On and after the Effective Date, ***Scimed will be responsible for and will, at its expense and discretion,*** use commercially reasonable efforts to prepare, file (including foreign filing decisions), prosecute and ***maintain the Patents*** (including patent applications) (collectively, Prosecution) that relate to the Technology and any Improvements. Scimed will give such Prosecution a priority which is consistent with Scimed's efforts for other technology that is similar stages of evolution and similar applicability, undertaken, using good business judgment by Scimed. Scimed may determine that is not commercially reasonable to pursue patent coverage for particular claims, in cases where the difficulty, expense and probability of obtaining coverage cannot be justified in comparison to the profits that sales of

---

Footnote continued from previous page

Option Period ended in fall 2005, and there is no longer any possibility of BSC and Dr. Jang entering into a Non-Exclusive License Agreement like that attached as Exhibit 4.2(f) to the Assignment Agreement.

> Contingent Payment Products that are the subject of such coverage are likely to yield; provided, that Scimed shall not accord undue weight to the amounts payable to Jang under this Agreement when making such determination.  Jang shall cooperate with Scimed to respond to office actions and complete all related applications and continuations currently in process or initiated following the Effective [date] for no additional consideration.

(*Id*. § 7.2 (emphasis added).)  Section 7.2 thus vests BSC with full rights to control prosecution of the Patents-in-Suit.  As provided in the last sentence of Section 7.2, BSC has the right, but not the obligation, to seek Dr. Jang's cooperation in the prosecution of relevant patents.  Nothing in the agreement gives Dr. Jang any right to participate in the prosecution of the patents.[7]

Dr. Jang appears to argue that, purely by challenging the validity of the patent claims, BSC violated Section 7.2.  (*See* App. at 3 ("BSC's deliberate and affirmative steps to destroy the value of the very same patents that BSC agreed to prosecute and maintain constitute a clear breach of BSC's contractual duties to Dr. Jang under the Assignment Agreement").)  Nothing in the provision so constrains BSC, especially insofar as BSC pressed since 2006 for constructions under which the claims would likely have remained valid.

---

[7] Dr. Jang notes that the provision obligates BSC to "use commercially reasonable efforts to prepare, file…, prosecute and maintain the Patents."  The terms "prepare," "file," and "prosecute" all refer to steps in the patent application process.  The Patents at issue here were issued years ago, before the parties executed the Assignment Agreement.  In addition, the term "maintain" refers specifically to the payment of fees to prevent the expiration of a patent.  *See generally*, MANUAL OF PATENT EXAMINING PROCEDURES § 2500 et. seq.  BSC has complied with its obligations under this section to "use commercially reasonable efforts to prepare, file…, prosecute and maintain the Patents."  (*See* Zogg Decl., Ex. 9 (reflecting payment of maintenance fees for the Patents-in-Suit).)

- 15 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), the Supreme Court confronted a similar provision. The Court noted that, "[t]rue, the license requires petitioner to pay royalties until a patent claim has been held invalid by a competent body, and the Cabilly II patent has not. But the license at issue in *Lear, Inc. v. Adkins*, 395 U.S. 653, 673, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), similarly provided that 'royalties are to be paid until such time as the 'patent ... is held invalid,' and we rejected the argument that a repudiating licensee must comply with its contract and pay royalties until its claim is vindicated in court." *Id*. at 124. In any case, however, if there were a contractual provision preventing BSC from challenging the validity of the patents it would be "void on its face and unenforceable." *Massillon-Cleveland-Akron Sign Co. v. Golden State Adver. Co.*, 444 F.2d 425, 427 (9th Cir. 1971) ("the rationale of *Lear* requires us to hold that the covenant of Golden State and Gold … not to contest the validity of MCA's patent, is void on its face and unenforceable"). Simply put, Dr. Jang's assertions that BSC has breached the Assignment Agreement are entirely without merit.

Dr. Jang's heavy reliance on *Henderson v. Axiam, Inc.* (App. at 22-24) is unavailing. Unlike here, where there is no breach of the Assignment Agreement in the first instance because there is no provision that can reasonably be read to preclude BSC from challenging the validity of the asserted claims in a reexamination, *Henderson* actually involved a breach of a specific provision in a contract. *See Henderson v. Axiam, Inc.*, 962572D, 1999 WL 33587312, at *46 (Mass. Super. June 22, 1999), *aff'd*, 59 Mass. App. Ct. 1107, 797 N.E.2d 502 (2003) ("Under the Security Agreement, Axiam is required to 'take all such actions as may be ***reasonably requested by the Secured Part[ies]*** to carry out the intent and purposes of [the

- 16 -

Security Agreement].'  [ ] The purpose of the Security Agreement is to provide and

preserve a valuable interest in the collateral to the noteholders, as security for

Axiam's debt to them.  The ***noteholders' request that Axiam seek patent protection***

for its intellectual property was a reasonable request aimed at carrying out the intent

and purposes of the Security Agreement.") (emphasis added).  Furthermore, because

there is no breach of contract here, there can be no breach of the covenant of good

faith and fair dealing under Massachusetts law.  *See Uno Restaurants, Inc. v. Boston*

*Kenmore Realty Corp.*, 441 Mass. 376, 385, 805 N.E.2d 957, 964 (2004) ("The

covenant may not, however, be invoked to create rights and duties not otherwise

provided for in the existing contractual relationship, as the purpose of the covenant is

to guarantee that the parties remain faithful to the intended and agreed expectations of

the parties in their performance.").

### 2.      Dr. Jang Has Not Demonstrated Irreparable Harm

Because Dr. Jang's underlying (though still unpled) claims are without merit,

he cannot demonstrate "irreparable injury" or "irreparable prejudice."  *Mission*

*Power*, 883 F. Supp. at 492 ("To show irreparable prejudice, it will usually be

necessary to refer to the merits of the accompanying proposed motion, because if it is

meritless, failure to hear it cannot be prejudicial.").  And even if there were some

merit to his claims, Dr. Jang's assertions of "irreparable injury" would fail.[8]

---

[8] Many of the cases Dr. Jang cites in support of his irreparable harm arguments deal
with requests for TROs to stop home foreclosures until a plaintiff's claim can be
heard.  *Jackmon v. Am. Serv. Co.*, No. C 11-03884 CRB, 2011 WL 3667478 (N.D.
Cal. Aug. 22, 2011); *Graham v. Am. Home Mortg.*, No. C 13-03322 RS, 2013 WL
3989676 (N.D. Cal. Aug. 2, 2013); *Robinson v. Delicious Vinyl Records, Inc.*, No.cv
13-4111-CAS (PLAx), 2013 WL 3983014 (C.D. Cal. Aug. 1, 2013); *Rampp v.
Ocwen Fin. Co.*, No. 11cv3017 BTM(NLS), 2012 WL 2995066 (S.D. Cal. July 23,
2012).  These property rights cases are inapposite because, as explained in Part

Footnote continued on next page

1   The only tangible injury identified by Dr. Jang is a supposed loss of potential

2   revenue from royalties under the Non-Exclusive License Agreement.[9]  (App. at 25-

3   26.)  As explained above, the Non-Exclusive License Agreement was never executed

4   and never came into effect, so this "injury" is fictional.  Dr. Jang also claims he will

5   suffer injury because he will not be able to "offer alternative constructions" to the

6   USPTO that might salvage his claims.  (App. at 3, 8.)  It strains credulity, not to

7   mention good faith, to suppose that Dr. Jang would successfully press for one set of

8   broad constructions in this Court and then wish to preserve the option to offer

9   "alternative constructions" to the USPTO that would allow him to avoid the prior art.

10   During *Markman* proceedings, BSC insisted that Dr. Jang's constructions would

11   cover the prior art.  The USPTO has agreed, as BSC informed Dr. Jang and the Court

12   in October and November of last year.  This injury, like Dr. Jang's "crisis," is of his

13   own making.

### 3.    Dr. Jang Has Not Shown The Balance Of Equities Or Public Interest Factors

16   In his motion, Dr. Jang spends one paragraph on each of the last two elements

17   necessary for him to establish that a TRO is appropriate, the balancing of the equities,

18   and the public interest.  Both consist entirely of attorney argument.

19   Dr. Jang's primary arguments with respect to the "balance of equities" appear

20   to be: (1) that absent the requested relief, "the only effect will be to erode Dr. Jang's

21   interest in the Patents as a licensee"; and (2) invalidation of the patent claims will

---

Footnote continued from previous page

III(D)(1),Dr. Jang has no property rights in the patents as a result of the Assignment Agreement or (non-executed) Non-Exclusive License Agreement.

[9] Dr. Jang also claims that there may be some unidentified, unsubstantiated harm to his reputation (*see, e.g.*, App. at 3) if claims of the Patents-in-Suit are invalidated. But, two claims (23 and 24) of the '021 patent were cancelled in 2012 as a result of a prior reexamination, and Dr. Jang made no allegation then of harm to his reputation. In any event, if additional claims are invalidated by USPTO, such invalidation is based on Dr. Jang's own proposed claim constructions.

negatively impact "his reputation as an inventor."  (App. at 28.)[10]  The first wrongly assumes the license is in effect; the second is entirely speculative, as discussed above.

With respect to the public interest factor, Dr, Jang merely makes generalized statements regarding the need to discourage assignees from destroying their own assets.  The real public interest here, if there is one, is the interest of the public in maintaining the independence of proceedings before the USPTO.  Perhaps equally important is the Court's interest in discouraging groundless applications for *ex parte* relief.  Dr. Jang's application threatens both.

> **E.      Dr. Jang Should Be Sanctioned For His Abuse Of The *Ex Parte* Application Process**

The present *ex parte* application should not have been brought.  Dr. Jang was fully aware of his supposed "crisis" by November 25, 2013.  Yet he waited a month and half to seek to intervene in the USPTO reexamination proceedings, burdening BSC and the Court with his third *ex parte* application in two months.   Moreover, even if the application had been timely, it would be without merit.  It asks the Court to intervene in a USPTO proceeding in a manner that contravenes precedent, it asks for injunctive relief with respect to claims never pled, and – on the merits – it largely turns on alleged breaches of an agreement never executed and never in effect.  For these reasons, BSC asks that the Court sanction Dr. Jang for bringing the *ex parte* application, at a minimum awarding BSC its fees and costs in opposing the application.  *See, e.g.*, *Mehr v. County of Orange*, 484 Fed. Appx. 162, 163 (9th Cir. 2012) (imposing sanctions for misuse of the *ex parte* application procedures); *In re Walter*, 83 B.R. 14, 18 (C.D. Cal. 1988) (same).

---

[10] Remarkably, Dr. Jang also suggests that the relief he is seeking is in BSC's favor as well: "[T]he equitable relief that Dr. Jang requests would benefit BSC in preventing the waste of its own assets, and in avoiding the fees and time required to invalidate its own patents."  (Mot. at 28.)  BSC, of course, disagrees.

## IV.    CONCLUSION

For the reasons set forth above, BSC respectfully requests that Dr. Jang's *ex parte* application for a temporary restraining order be denied.

Dated:  January 16, 2014

By: /s/ *Brian Martinez*

Brian Martinez (State Bar No. 274210)
Brian.Martinez@aporter.com
ARNOLD & PORTER LLP
777 South Figueroa Street
Los Angeles, California 90017-5844
Telephone: 213.243.4000
Facsimile: 213.243.4199

Matthew Wolf (*pro hac vice*)
Matthew.Wolf@aporter.com
Edward Han (*pro hac vice*)
Ed.Han@aporter.com
John Nilsson (*pro hac vice*)
John.Nilsson@aporter.com
Sara Zogg (*pro hac vice*)
Sara.Zogg@aporter.com
ARNOLD & PORTER LLP
555 Twelfth Street NW
Washington, DC 20004-1206
Telephone: 202.942.5000
Facsimile: 202.942.5999

*Attorneys for Defendants*
*Boston Scientific Corporation and*
*Scimed Life Systems, Inc.*

- 20 -