# Exhibit 8

## ASSIGNMENT AGREEMENT

This Assignment Agreement (*Agreement*) is entered into as of June 3, 2002 (*Effective Date*) between G. David Jang, M.D., an individual residing at 30725 Eastbern Lane, Redlands, California (*Jang*) and Scimed Life Systems, Inc., a Minnesota corporation (*Scimed*).

### Background:

Jang has designed and developed certain stent technology.  Scimed desires to acquire such technology. Scimed and Jang desire to have Scimed's sole shareholder, Boston Scientific Corporation (*BSC*), enter into a part time employment arrangement with Jang to facilitate the development and commercialization of the stent technology.  Scimed also desires an option to obtain exclusive rights to pacemaker delivery technology of Jang. The parties contemplate entering into an Employment Agreement in substantially the form of **Exhibit 4.2(g)** to this Agreement (the *Employment Agreement*).

This Agreement sets forth the terms under which Jang assigns to Scimed such technology in exchange for payment at assignment of certain amounts and the obligation to make certain earn out payments as well as certain compensation obligations as specified in the Employment Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises and agreements hereinafter set forth, the parties hereto agree as follows:

### Agreement

### 1. DEFINITIONS.

**1.1 Defined Terms.**  Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning set forth below.

*Affiliate* means with respect to either party, any Person that, directly or indirectly, is controlled by, controls or is under common control with such party.  For purposes of this Agreement, "*control*" means, with respect to any Person, the direct or indirect ownership of more than fifty percent (50%) of the voting or income interest in such Person or the possession otherwise, directly or indirectly, of the power to direct the management or policies of such Person.

*Confidential Information*  means all technical and commercial information and data which either party (the *Disclosing Party*) has or may disclose to the other party (the *Receiving Party*) pursuant to this Agreement useful in, the development or commercialization of Technology (as defined below) or Improvements (as defined below), excluding any portion thereof which: (a) is known to the Receiving Party before receipt thereof under this Agreement; (b) is disclosed to the Receiving Party by a third person who is under no obligation of confidentiality to the Disclosing Party hereunder with respect to such information and who otherwise has a right to make such disclosure; (c) is or becomes generally known in the trade through no fault of the Receiving Party; (d) is independently developed by the Receiving Party, as evidenced by the Receiving Party's written records, without use of such information; or (e) is approved for release by written

BUSDOCS:994381.7



EXHIBIT
Defendants'
Ex- 1007
Jang 10-19-06

CONFIDENTIAL                                                       BSC-0002052

authorization of the original Disclosing Party.

***Contingent Payment Products*** means any stent, including any stent pre-mounted on a delivery system or any stent with coatings, coverings or other features, manufactured by or for Scimed or any of its Affiliates the development, manufacture, use, or sale of which is covered by one or more Valid Claims of the Patents in the jurisdiction in which such stent is manufactured or sold or which, but for the assignment made pursuant to this Agreement, would infringe one or more Valid Claims of the Patents.  For the avoidance of doubt, for stents pre-mounted on delivery systems or stents with coatings, coverings or other features, the price of the stent together with such features constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales.  For example, in the case of a stent pre-mounted on a delivery system, the price of the stent and the delivery system together constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales.  Similarly, in the case of a stent with a coating, the price of the stent and coating together constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales.  Conversely, if a stent pre-mounted on a delivery system is sold together with a distal protection device, only the price of the stent and the delivery system is included in calculating Net Sales and not the price of the distal protection device.

***Contractual Obligation*** means, with respect to any Person(s), any contract, agreement, purchase order, deed, mortgage, lease, license, indenture, other instrument, policy, commitment, undertaking, arrangement or understanding, written or oral, or other document, to which or by which any such Person is a party or otherwise subject or bound or to which or by which any property or right of any such Person is subject or bound.

***Design(s)*** means any information used or useful in the design, development, delivery, manufacture or testing of stents for any medical application(s) (including Pacemaker Lead Technology but excluding Pacemaker Delivery Technology (subject to the limitations described in the definition therefor)) as well as any coatings, coverings, drug delivery mechanisms and other features used or useful in relation to the use of such stents, including but not limited to those stent designs identified in <u>Schedule 1</u>.

***First Commercial Sale*** means the first sale of any Contingent Payment Product to a third party in the United States after such Contingent Payment Product has been granted all regulatory approvals required for importation, promotion, pricing, marketing and sale of such Contingent Payment Product in the United States.

***Legal Requirement*** means any federal, state, local or foreign law, statute, standard, ordinance, code, order, rule, regulation, resolution, promulgation, or any order, judgment or decree of any court, arbitrator, tribunal or governmental authority, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force and effect of law as in effect on or prior to the Effective Date.

***Lien*** means (a) any encumbrance, mortgage, pledge, lien, liability, charge or other security interest of any kind (whether absolute, accrued, contingent or otherwise) upon any property or assets of any character, or upon the income or profits therefrom; or (b) any arrangement or

2

BSC-0002053

agreement which prohibits the creation of such encumbrances, mortgages, pledges, liens, liabilities, charges or other security interests of any kind or which restricts transfer of capital stock (other than restrictions on transfer imposed by applicable securities laws) or other property or assets, except any assets or property held under a Contractual Obligation.

*Net Sales* means the net sales of Contingent Payment Products in amounts reported on BSC's consolidated financial statements in accordance with United States generally accepted accounting principles (as specified by the American Institute of Certified Public Accountants), consistently applied, and generally defined as the aggregate invoiced gross revenue received by Scimed or any of its Affiliates from the sale of Contingent Payment Products to a non-affiliated third party less only the following *Deductions*: (i) amounts repaid or credited by reason of defects, returns, rejections, rebates, wholesale chargebacks, retroactive price reductions or allowances, (ii) sales, excise, value added, purchase, turnover, use, and other like taxes, and customs duties, paid, (iii) fees or commissions paid to "buyer-side" intermediaries, brokers or agents, (iv) shipping charges (including freight and insurance), and (v) cash, trade and quantity discounts actually allowed (and taken) to the extent customary in the trade.

With respect to products that are sold as part of a package that includes Contingent Payment Product(s) and products that are not Contingent Payment Products, Net Sales shall equal the product of (X) the gross sales of such combined products billed to customers by Scimed, its Affiliates or sublicensees, less Deductions, calculated in accordance with the procedure specified above, multiplied by (Y) a fraction the numerator of which shall be the per unit average selling price of the Contingent Payment Product sold separately, and the denominator of which shall be the per unit average selling price of package product sold in such combined form. If there is no established average selling price of the Contingent Payment Product sold separately, then Scimed's (or its Affiliates') standard cost of manufacturing of the single active Contingent Payment Product and of the package product sold in such combined form, shall be used to determine (Y).

Net Sales are calculated on sales to independent third parties and shall not include revenue received by Scimed (or any of its Affiliates) from transactions with an Affiliate; provided, that Net Sales will be calculated on the sales by Affiliates to a non-Affiliate third party.

*Pacemaker Lead Field* means the use of stents that are a pre-attached component of pacemaker leads or the leads of similar devices and which are promoted, labeled, marketed and sold exclusively for the purpose of serving as the point for terminal conduction of pacemaker impulses and not for purposes of scaffolding or stenting any body lumen, whether or not such scaffolding or stenting of any body lumen is performed in conjunction with angioplasty procedures.

*Pacemaker Delivery Technology* means systems that allow a physician to place and anchor a conductive electrode to the heart muscle, which electrode is attached to an insulated wire lead that carries a small electric impulse generated by a pacemaker to the electrode, including without limitation devices having one or more of the following components: (1) a coronary sinus selecting catheter; (2) a guiding receptacle; or (3) a pacemaker lead delivery system. The

3

CONFIDENTIAL

pacemaker lead delivery system in turn may include components such as: (a) a delivery (balloon) catheter; (b) a pacemaker lead wire; or (c) a detachable connecting junction. Pacemaker Delivery Technology may be used in conjunction with Pacemaker Lead Technology. Pacemaker Delivery Technology includes without limitation that certain patent application entitled "Method of Using a Stent-like Lead System in Pacemaker Devices" to be filed by Jang to the extent containing claims covering the use of stents generally as leads in pacemaker devices and not covering any particular stent design. Pacemaker Delivery Technology does not include Pacemaker Lead Technology.

*Pacemaker Lead Technology* means an implantable stent-like electrode; provided any such stent-like electrode is promoted, labeled, marketed and sold exclusively for the purpose of serving as the point for terminal conduction of pacemaker impulses and not for purposes of scaffolding or stenting any body lumen, whether or not such scaffolding or stenting of any body lumen is performed in conjunction with angioplasty procedures.

*Person* means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, limited liability partnership, unincorporated organization, government (or any agency or political subdivision thereof) or other legal entity or organization.

*Technology* means individually and collectively the intellectual property rights embodied or disclosed in (a) all inventions, patents, patent applications and rights to file patent applications owned or controlled, directly or indirectly, by Jang relating to any Designs, including but not limited to (i) the invention disclosures, patent application(s) and patents listed in Schedule 2.1(a); (ii) any patent application filed in respect of an invention disclosure described in clause (a)(i); (iii) any patent application filed as a continuation, division, or continuation-in-part of the application(s) described in clauses (a)(i)-(ii), patents issuing therefrom and reissues, reexaminations and extensions of such patents; and (iv) any foreign counterpart to the application(s) described in clauses (a)(i)-(iii) (including divisions, continuations, confirmations, additions, renewals or continuations-in-part of such patent application), patents issuing therefrom and extensions thereof; and (b) all other disclosures, discoveries, inventions, know-how, techniques, methodologies, modifications, improvements, works of authorship, designs and data (whether or not protectable under patent, copyright, trade secrecy or similar laws) that are conceived, discovered, developed, created or reduced to practice or tangible medium of expression by Jang or any of his agents, consultants or employees at any time prior to the Effective Date or at any time in the course of Jang's employment, as further described in Section 3.2, or at any time during the Inclusion Period specified in Section 7.1 (regardless of whether or not within the course of Jang's employment). Technology includes Pacemaker Lead Technology but excludes Pacemaker Delivery Technology.

*Valid Claim* means (a) a claim of any issued patent which is contained within the Patents (defined below) and which has not expired, lapsed, or been held invalid, unpatentable or unenforceable by a final decision, which is unappealed or unappealable, of a court of competent jurisdiction or of an administrative agency having authority over patents; (b) a claim in any patent application which is contained within the Patents which patent application is less than

4

BSC-0002055

three (3) years old (measured from the original filing date) and has not been the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired; (c) a claim of any issued patent owned or controlled by Scimed that claims an invention included in Improvements (defined below); or (d) a claim in any patent application owned or controlled by Scimed that claims an invention included in Improvements and which patent application is less than three (3) years old (measured from the original filing date) and has not been the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired.

**1.2  Other Defined Terms.** Each of the following terms have the meanings ascribed to it in the section set forth opposite such term:

| | |
|---|---|
| *Agreement* | Recitals |
| *Closing* | Section 4.1 |
| *Effective Date* | Recitals |
| *Employment Agreement* | Recitals |
| *Improvements* | Section 7.1 |
| *Inclusion Period* | Section 7.1 |
| *Indemnified Party* | Section 9.3 |
| *Indemnifying Party* | Section 9.3 |
| *Intellectual Property Rights* | Section 5.6 |
| *Jang* | Recitals |
| *Jang Assets* | Section 2.1 |
| *License Agreement* | Recitals |
| *Licensed Rights* | Section 2.2 |
| *Loss(es)* | Section 9.2 |
| *Omitted Item* | Section 7.4 |
| *Option Period* | Section 2.3 |
| *Patents* | Section 2.1 |
| *Performance Period* | Section 3.1 |
| *Prosecution* | Section 7.2 |
| *Purchase Price* | Section 3.1 |
| *Schneider Agreement* | Section 2.1(c) |
| *Scimed* | Recitals |
| *Technical Information* | Section 2.1(b) |

## 2. ASSIGNMENT.

**2.1  Assignment of Technology.** Upon the terms and subject to the conditions set forth in this Agreement, Jang shall sell, assign, transfer, convey and deliver to Scimed, and Scimed shall purchase from Jang, all and every right, title and interest of Jang in and to the following (collectively, the *Jang Assets*):

(a)  All of Jang's worldwide rights and interests existing on the Effective Date in and to all Designs and all Technology, and all registrations, applications for registration and licenses for the Designs or the Technology, together with all ancillary rights thereto, including the right to

CONFIDENTIAL

BSC-0002056

sue for damages by reason of past infringement of any such rights, including: (i) the patent(s), patent application(s) and invention disclosure(s) listed in <u>Schedule 2.1(a)</u>; (ii) any patent application(s) filed as a continuation, division, or continuation-in-part of the patent application(s) described in clause 2.1(a)(i), patents issuing therefrom and reissues, reexaminations and extensions of such patents; (iii) any patent application(s) filed in respect of the inventions that are the subject of the invention disclosures listed in <u>Schedule 2.1(a)</u>; and (iv) any foreign counterpart to the patent(s) and patent application(s) described in clauses 2.1(a)(i)-(iii) (including divisions, continuations, confirmations, additions, renewals or continuations-in-part of such patent applications), patents issuing therefrom and extensions thereof (collectively, the *Patents*). For the avoidance of doubt, Jang has no obligation to assign to Scimed hereunder any Pacemaker Delivery Technology except as described in Section 2.3.

(b)  All of Jang's worldwide rights and interests existing on the Effective Date in and to all information relating to the Designs or the Technology or otherwise required or useful for or incident to the performance of Jang's activities related to the Designs or the Technology, together with all ancillary rights thereto (collectively, the *Technical Information*), including all notebooks and other media listed in <u>Schedule 2.1(b)</u> embodying (i) the Technology or the Designs; (ii) all prior versions of the Technology or the Designs; and (iii) all other data, information and know-how, that has been developed by or for Jang and is necessary or useful to design, manufacture, use or test the Design(s) and develop enhanced or new Designs.

(c)  All of Jang's claims and rights under Section 3 of the certain Assignment and License Contract dated May 8, 1998 between Jang and Schneider (Europe) GmbH (the *Schneider Agreement*).

**2.2   Future License or Supply Arrangement.** In the event the parties do not enter into an exclusive license agreement within the 60-day period following Scimed's notice as described in Section 2.3(b), then upon Jang's request, Scimed shall either, as determined in Scimed's sole and absolute discretion, (i) enter into a license agreement in substantially the form attached as <u>**Exhibit 4.2(f)**</u> to this Agreement (the *License Agreement*) pursuant to which Scimed will grant to Jang a non-exclusive right and license to (a) use the Jang Assets (including Improvements) solely for purposes of developing products in the Pacemaker Lead Field; and (b) make, have made, use, import, export and sell products in the Pacemaker Lead Field that embody or use the Jang Assets (including Improvements) (collectively, the *Licensed Rights*) or (ii) enter into a supply agreement on commercially reasonable terms acceptable to Scimed in its sole discretion (the *Supply Agreement*) pursuant to which Scimed (or any of its affiliates as appropriate) shall sell to Jang stent products that incorporate the Technology to be used by Jang solely for the purpose of developing products in the Pacemaker Lead Field. Notwithstanding anything to the contrary herein, in the event that the parties are not able to agree on the terms of the Supply Agreement within thirty (30) days after Scimed's election to pursue a supply arrangement, Scimed and Jang shall enter into the License Agreement on the terms set forth therein. The parties acknowledge and agree that Scimed nor any of affiliate of Scimed is obligated, nor will it or any affiliate become obligated, (x) to supply any products to Jang in the absence of a fully executed and delivered Supply Agreement or (y) to license to Jang any technology, intellectual property or product other than the Licensed Rights pursuant to a fully executed and delivered

6

BSC-0002057

License Agreement.

**2.3  Scimed Option.**  (a)  During the period from the Effective Date until 11:59 PM California time on the fourth anniversary of the First Commercial Sale of any Contingent Payment Product (the *Option Period*), Scimed shall have an option to acquire from Jang an exclusive license to practice the Pacemaker Delivery Technology owned or controlled (whether directly or indirectly and whether by ownership, license or otherwise) by Jang within the Pacemaker Lead Field. Accordingly, during the Option Period, Jang shall not enter into any agreement with a third party relating to commercialization (including research, development, marketing or distribution) of products that embody or use all or any portion of the Pacemaker Delivery Technology or the Pacemaker Lead Technology (including the Improvements) for any applications, unless Jang shall first offer such opportunity to Scimed and provide Scimed and its Affiliates an opportunity to obtain an exclusive license for development and commercialization within such field.  For purposes of offering Scimed and its Affiliates any such opportunity, Jang shall provide Scimed with notice, including sufficient technical detail to permit Scimed to evaluate its interest in the opportunity and shall meet with Scimed within thirty (30) days following such notice to discuss the technical features of the opportunity.  Scimed shall treat all information relating to the Pacemaker Lead Field disclosed by Jang in connection with this Section 2.3 as Confidential Information of Jang.

(b)  Scimed shall notify Jang within sixty (60) days following receipt of Jang's notice of Scimed's (or its Affiliates') interest (or lack of interest) in pursuing such opportunity.  If Scimed indicates that it or one of its Affiliates wishes to pursue such opportunity, then the parties shall within sixty (60) days following Scimed's notice engage in good faith negotiation of terms for a license and/or development agreement.  If the parties cannot negotiate mutually acceptable terms for an agreement within such 60-day period, and the parties are not willing to extend the period for negotiation, then Scimed's option shall expire with respect to such opportunity and Jang may negotiate with a third party concerning such research and development opportunity; provided, however, that (i) Jang shall not provide any such third party with information or materials concerning such opportunity that are superior to the information and materials provided to Scimed; and (ii) any such agreement shall contain terms that are in the aggregate no more favorable to such third party than those offered to Scimed.  If Jang wishes to offer such opportunity to a third party on terms that are in the aggregate more favorable than those offered to Scimed and/or any of its Affiliates, Jang shall first make an offer on such "improved" terms to Scimed in accordance with the procedure specified in this Section 2.3.

(c)  Notwithstanding the provisions of Section 2.3(a), it is understood and agreed that Jang may contract with independent consultants to perform services with respect to Jang's efforts to develop products in the Pacemaker Lead Field; provided that Jang shall adopt and utilize written agreements with all such independent contractors and any employees Jang, directly or indirectly, retains to perform such services that include nondisclosure and invention assignment provisions that enable Jang to obtain and perfect proprietary rights in all work product undertaken on Jang's behalf in a manner consistent with the provisions of this Section 2.3.  Jang shall not contract with any consultants directly or indirectly affiliated with any Person that sells products that are competitive with the Designs or the Technology (or has publicly announced its intention to do

7

BSC-0002058

so) prior to securing such written agreements with those consultants.

(d) Jang shall not, until after the expiration of the Option Period, directly or indirectly, sell, transfer, lease or license the Pacemaker Delivery Technology or encumber, mortgage, pledge, or place any other lien, liability, charge or other security interest of any kind (whether absolute, accrued, contingent or otherwise) upon the Pacemaker Delivery Technology, unless Jang shall have first complied with Sections 2.3(a) and (b).

3.  CONSIDERATION.  In consideration of the sale and transfer by Jang of the Jang Assets to Scimed and of the agreement by Jang to perform each of its other obligations hereunder, Scimed will pay to Jang, in the form of an up front payment and contingent "earn out" payments an amount determined as set forth in Section 3.1(a)-(e):

**3.1 Purchase Price.**  The aggregate purchase price for the Assets (the *Purchase Price*) shall be not less than $50,000,000 nor more than $160,000,000, payable as follows:

(a)  BSC has previously paid Jang $1,000,000 pursuant to the certain Term Sheet entered into as of March 14, 2001 by and between the BSC and Jang, and $10,000,000 pursuant to the certain Option Agreement entered into as of May 4, 2001 by and between BSC and Jang.

(b)  At the Closing, Scimed shall pay to Jang by certified bank or cashier's check or wire transfer of immediately available funds, the sum of $39,651,574.00 as consideration for the assignment to Scimed of all Intellectual Property Rights existing as of the Effective Date as well as Jang's covenant to assign to Scimed all intellectual property in Improvements conceived during the Inclusion Period.

(c)  During the period commencing on the Effective Date and ending on the expiration date of the last-to-expire of the Patents that have issued or are the subject of a filed patent application as of the Effective Date, Scimed shall pay to Jang on a quarterly basis in accordance with Section 3.5, as additional consideration for the purchase of the Assets, an additional purchase price amount equal to ten percent (10%) of Net Sales in respect of Contingent Payment Products. Notwithstanding any provision of this Agreement to the contrary, the maximum aggregate contingent payment due Jang under this Section 3.1(c) shall not exceed $60,000,000 (the amounts payable under this Section 3.1(c) are the *Earn Out*).

(d)  In addition to the contingent payment due Jang pursuant to Section 3.1(c), Scimed shall pay to Jang as additional consideration for the purchase of the Assets, an additional purchase price amount equal to $50,000,000 if the aggregate Net Sales of Contingent Payment Products on a worldwide basis during the period commencing on the date of the First Commercial Sale of Contingent Payment products in the United States and ending at 11:59 PM on the fifth anniversary of the date of the First Commercial Sale of Contingent Payment Products in the United States (the *Performance Period*) equals or exceeds $2,500,000,000.

(e)  Scimed shall pay to Jang as additional consideration for the purchase of the Assets, an

8

additional purchase price amount equal to $10,000,000 if Scimed has not received a CE mark for any Contingent Payment Product by 11:59 PM Boston time on July 31, 2004.  Any payment pursuant to this Section 3.1(e) shall be credited against the Earn Out payments due under Section 3.1(c) for purposes of applying the cap on such payments.

**3.2   Employment Agreement.** BSC and Jang shall enter into the Employment Agreement as of the Effective Date, pursuant to which BSC shall pay Jang, $100,000 per year for a period of three (3) years as a part-time employee working on all technical and clinical areas of vascular stents and stent design.

**3.3   Stock Option Grant.**  Pursuant to the Employment Agreement, BSC shall grant to Jang a stock option to purchase 100,000 shares of BSC Common Stock in accordance with the terms of the Stock Option Agreement attached as an exhibit to the Employment Agreement.

**3.4   Remittance; Foreign Exchange.** (a) Scimed shall make payments required under Section 3.1(b)-(e) by wire transfer of immediately available funds delivered to the U.S. bank account identified by Jang in accordance with Section 11.6.  All payments shall be stated and paid in U.S. Dollars.  For purposes of payments due under Section 3.1(c)-(d), Net Sales revenue received in currencies other than U.S. Dollars shall be converted into U.S. Dollars, in accordance with BSC's ordinary business practices, when calculating the amount of Net Sales.

   (b)  With respect to Net Sales of Contingent Payment Products that are covered by a patent application but not an issued patent, Scimed's payment obligations under Sections 3.1(c)-(d) shall be subject to adjustment in the following manner to account for Net Sales made during the period prior to the issuance of a patent or the rejection of a patent application that contains the claims upon which the Valid Claims determination is made at the time such Net Sales are recorded:  (i) if Scimed ceases payment under Section 3.1(c) in respect of a Contingent Payment Product based upon the expiration of the 3-year period specified in the Valid Claims definition and a patent subsequently issues that includes such claim, then Scimed shall (1) commence making contingent payments in respect of such Contingent Payment Products and (2) pay Jang in respect of sales of such Contingent Payment Product during the period between the expiration of the 3-year period and the date a patent issues that includes such claim; and (ii) if a Contingent Payment Product with Valid Claims based solely upon a patent application that is subsequently the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired or which patent application does not issue as a patent that includes such claim, then Scimed shall be entitled to a credit as of the date of such determination equal to the amounts (if any) paid by Scimed in respect of Net Sales of such Contingent Payment Products during the period prior to the date of such determination.  If a claim that is substantially similar to a Valid Claim described in Section 3.4(b)(ii) above issues subsequent to Scimed's application of any credit against payments made to Jang as described in Section 3.4(b)(ii) above, then Scimed shall promptly pay Jang all such amounts previously credited against contingent payments otherwise due Jang pursuant to Section 3.4(b)(ii).  Any credits applied in favor of Scimed under Section 3.4(b)(ii) will be made with any corresponding reduction in the calculation of aggregate Net Sales of Contingent Payment Products for the purposes of Section 3.1(d) unless and until such credit is subsequently reversed pursuant to the immediately preceding sentence of

9

CONFIDENTIAL

BSC-0002060

this Section 3.4(b); provided that if Net Sales of Contingent Payment Products on a worldwide basis equals or exceeds $2,500,000,000 as of 11:59 PM California time on the final day of the Performance Period, Scimed shall pay to Jang the amount set forth in Section 3.1(d), regardless of whether Net Sales are subsequently reduced by any such credits.

**3.5  Reports.**  Scimed shall keep and maintain, during the term of this Agreement and for a period of at least three (3) years following each calendar year in which the payment obligation accrued, records sufficient to determine the Net Sales and payments due under Section 3.1(c)-(d). Within sixty (60) days following each March 31, June 30, September 30 and December 31 in which payments are due under Section 3.1(c)-(d), Scimed shall provide Jang with a report including at least:  (a) the Net Sales (in U.S. Dollars) of Contingent Payment Products that Scimed (including its Affiliates) sold during the preceding quarter; (b) identification of Contingent Payment Products consisting of systems that incorporate stents and Contingent Payment Products consisting of stand-alone stent products; (c) the calculation of contingent payments thereon; and (e) the total contingent payments so computed and due Jang. Such reports shall be submitted if sales of Contingent Payment Products have been made during a period. Upon delivery of the report due for the period ending December 31 of each year, Scimed shall also report to Jang the contingent payments due Jang for the entire preceding year.

**3.6  Audits.**  Jang shall have the right, not more than once in any twelve (12) month period, to have Scimed's relevant books and records for the calendar year in which the audited payment obligations accrued and for up to three (3) calendar years following that year audited by an independent certified public accountant of Jang's choosing and reasonably acceptable to Scimed, to ascertain the accuracy of Scimed's reports under Section 3.5 in respect of Net Sales. Such audit shall be scheduled within thirty (30) days following delivery of notice by Jang requesting such audit to Scimed, and conducted during Scimed's normal business hours, in a manner that does not unreasonably interfere with Scimed's normal business activities. If any audit discloses underpayment of contingent payments under Section 3.1(c) or Section 3.1(d), Scimed shall promptly pay Jang the amount due. Jang shall be responsible for all expenses it incurs in connection with any audit; provided, that if any audit determines that the reported total contingent payments were less than ninety percent (90%) of the actual total amount due for the period in question, the actual out-of-pocket cost of such audit shall be borne by Scimed. Jang will hold in strict confidence, and will require any certified public accountant it retains to perform an audit to hold in strict confidence, all information learned in the course of any audit, except to the extent necessary for Jang to enforce his rights under this Agreement.

**3.7  Taxes.**  In the event Scimed is required to withhold taxes or charges from the amounts paid to Jang hereunder and to pay the taxes or charges for the account of Jang, Scimed shall deliver to Jang true copies of the receipts or returns covering each such payment. The parties shall cooperate to minimize, to the extent legally permissible, the aggregate tax liabilities related to this Agreement. Notwithstanding the foregoing, such cooperation shall not cause any adverse tax consequences to be incurred by either party which would not have been incurred under the terms and conditions as described in this Agreement.

CONFIDENTIAL

BSC-0002061

## 4. THE CLOSING

**4.1 Time and Place.** The closing of the transactions which are the subject of this Agreement (the *Closing*) shall take place at 10:00 A.M., local time, on the Effective Date, at the offices of Bingham Dana LLP, 150 Federal Street, Boston, Massachusetts 02110 or at such other time and place as Jang and Scimed may agree upon.

**4.2 Jang's Obligations at Closing.** At the Closing Jang shall: (a) execute and deliver to Scimed (i) one or more assignments of patents under the Patents in the United States and registrations therefor, in substantially the form of <u>Exhibit 4.2(a)(i)</u>; and (ii) a bill of sale, in substantially the form of <u>Exhibit 4.2(a)(ii)</u>;

(b) execute and deliver to Scimed such other good and sufficient instruments of conveyance, assignment and transfer in form and substance reasonably satisfactory to Scimed's counsel as shall be effective to vest in Scimed all rights and interests in, and subject to the Liens, good and marketable title to, the Jang Assets, including, without limitation, assignments of Patents and applications for registration thereof;

(c) deliver to Scimed all documents, certificates, consents, undertakings and assignments required to be delivered to Scimed under the provisions of this Agreement;

(d) commence delivering to Scimed physical possession of adequate copies of all media embodying the Designs and the Technology;

(e) deliver to Scimed physical possession of adequate copies of all media embodying prior versions of the Designs and the Technology and related documentation that are in Jang's possession or under the direct or indirect control of Jang;

(g) execute and deliver to BSC an Employment Agreement in substantially the form of <u>Exhibit 4.2(g)</u>; and

(h) deliver to Scimed original executed copies of instruments releasing all Liens other than those arising under the Schneider Agreement (if any).

**4.3 Scimed's Obligations and Closing.** At the Closing, Scimed shall: (a) deliver to Jang a check or wire transfer in the amount of $39,651,574.00 payable to Jang;

(b) cause BSC to execute and deliver to Jang an Employment Agreement in substantially the form of <u>Exhibit 4.2(g)</u>, including a Stock Option Agreement in the form attached to <u>Exhibit 4.2(g)</u>.

## 5. REPRESENTATIONS AND WARRANTIES OF JANG.

In order to induce Scimed to purchase the Jang Assets, Jang hereby represents and warrants to Scimed and its Affiliates as follows:

11

CONFIDENTIAL

BSC-0002062

**5.1  Authority.** (a) Jang has all requisite power and authority to enter into this Agreement and consummate the transactions contemplated hereby; (b) this Agreement is a valid and binding obligation of Jang enforceable against Jang in accordance with its terms; and (c) neither the execution, delivery and performance of this Agreement and the other agreements and instruments contemplated hereunder by Jang nor the consummation by Jang of the transactions contemplated hereby and thereby will violate or conflict with or constitute a default under any Contractual Obligation applicable to Jang.

**5.2  Jang Assets.** (a) Jang has and will deliver to Scimed at the Closing, good and marketable title to all of the Jang Assets.

(b)  The Jang Assets are not subject to any Lien except those arising under the Schneider Agreement.

(c)  The transfer to Scimed at the Closing of the Jang Assets will not be subject to, nor will such transfer to the best of Jang's knowledge, subject Scimed to, any liability in respect of any taxes under any Legal Requirement arising from or relating to the ownership or use of the Jang Assets on or prior to the Closing.

**5.3  Rights of Third Parties, etc.** (a)  Neither the execution and delivery of this Agreement by Jang nor the consummation by Jang of any transaction contemplated hereby does or will constitute, result in or give rise to, nor to Jang's knowledge has any other event occurred nor does any other condition exist which does or will constitute, result in or give rise to the imposition of any Lien upon, or the arising of any cause of action with respect to, any Jang Asset.

(b) Other than the assignment of the Patents as required hereunder, or as set forth on Schedule 5.3, no approval, consent, waiver, authorization or other order of, and no declaration, filing, registration, qualification or recording with, any governmental authority is required to be obtained or made by or on behalf of Jang in connection with the execution, delivery or performance of this Agreement and the transactions contemplated hereby, except as will have been obtained or made and be in full force and effect at the Closing.

**5.4 Compliance.** (a)  To the best of Jang's knowledge, neither the execution and delivery of this Agreement by Jang nor the consummation by Jang of any transactions contemplated hereby does or will violate or give rise to any violation or default under any Legal Requirement or Contractual Obligation of Jang.  Other than as set forth on Schedule 5.4, Jang has not granted to any other Person any license, option or other rights to develop, use, sell or exploit in any manner the Designs or the Technology, whether requiring the payment of royalties or not; and Jang is not obligated to grant to any other Person any license, option or other rights to develop, use, sell or exploit in any manner the Designs or the Technology, whether requiring the payment of royalties or not.

(b)  There is no litigation, at law or in equity, or any proceeding before or investigation by any foreign, federal, state or municipal board or other governmental or administrative agency or

12

CONFIDENTIAL

BSC-0002063

any arbitrator, against Jang in connection with the Jang Assets, filed (or to the best of Jang's knowledge, threatened or any reasonable factual basis therefor). There is no litigation at law or in equity, or any proceeding before or investigation by any foreign, federal, state or municipal board or other governmental or administrative agency or any arbitrator, filed (or to the best of Jang's knowledge threatened or any reasonable factual basis therefor), which seeks rescission of, seeks to enjoin the consummation of, or which questions the validity of, this Agreement or any of the transactions contemplated hereby. No judgment, decree or order of any foreign, federal, state or municipal court, board or other governmental or administrative agency or any arbitrator has been issued against Jang or (to the best of Jang's knowledge) any Person other than Jang which could have any material adverse effect on the Jang Assets.

(c)  To the best of Jang's knowledge, neither this Agreement (including the Schedules), nor any certificate, or other information furnished or to be furnished by Jang, contains or will contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein not misleading.

**5.5  List of Jang Assets.**  The Schedules set forth complete and accurate lists of all of the Jang Assets.  Specifically, Schedule 2.1(a) sets forth all Patents, and Jang has delivered to Scimed copies of the certificates of registration for all such Patents which are registered and copies of all filed patent applications, and completed invention disclosures for all inventions for which a patent application has not yet been filed, and Jang has delivered to Scimed copies of all Technology and Technical Information embodied in tangible media.

**5.6  Intellectual Property Rights.**  Schedule 2.1(a) lists all patents (and all applications therefor that are pending or in the process of preparation and all invention disclosures), in the United States and in foreign jurisdictions, relating to the Designs and the Technology (collectively, *Intellectual Property Rights*), that are directly or indirectly owned or controlled in whole or in part by Jang.  Except as disclosed in Schedule 2.1(a):

(a)  Jang is the sole and exclusive owner of the Intellectual Property Rights, free and clear of all claims, Liens, licenses, sublicenses, charges or encumbrances and no governmental registration of any of the Intellectual Property Rights has lapsed, expired or been cancelled, abandoned, opposed or the subject of a reexamination request.

(b)  There have been no claims, and, to the best knowledge of Jang, there is no basis for any claim, challenging the scope, validity or enforceability of any of the Intellectual Property Rights.

(c)  There are no instances where it has been held, claimed or alleged, whether directly or indirectly, and, to the best knowledge of Jang, there is no basis upon which a claim may be made, that any activity of Jang relating to the Jang Assets infringes or may infringe upon or is in violation of any of the intellectual property rights of a third party, or that any activity of a third party infringes or may infringe upon or is in violation of any of the Intellectual Property Rights.

13

BSC-0002064

(d) To the best knowledge of Jang, Scimed has no obligation to compensate any Person for the development, use, sale or exploitation of the Designs or the Technology or otherwise as a condition to the assignment of the Jang Assets to Scimed.

(e) Jang has kept secret and has not disclosed any Design(s), Technology or Technical Information that is not the subject of an issued patent to any Person other than his patent attorney or Scimed except under a written confidentiality agreement imposing an appropriate duty of confidentiality on such Person. Jang has taken appropriate measures to protect the confidential and proprietary nature of the Design(s), Technology and Technical Information that is not the subject of an issued patent, including the use of written confidentiality agreements with any person receiving same. There have been no patents or copyrights applied for or registered for any part of the Designs or the Technology other than as expressly disclosed in the Schedules.

**5.7  Enhancements, New Designs.**  Neither Jang nor to Jang's knowledge any employee or agent of Jang has (a) developed or assisted in the development of enhancements of the Designs or the Technology except for enhancements included in the Designs and Technology as delivered to Scimed pursuant hereto or (b) assisted in the development by any third party of any products or technology based upon the Designs or the Technology or any part thereof.

**5.8  No Broker's or Finder's Fees.**  No agent, broker, Person or firm acting on behalf of Jang is, or shall be, entitled to any commission or broker's or finder's fees from Scimed, or from any Person controlling, controlled by or under common control with Scimed, in connection with any of the transactions contemplated herein.

**5.9  Disclaimer.**  EXCEPT AS EXPRESSLY PROVIDED HEREIN, JANG MAKES NO EXPRESS OR IMPLIED WARRANTY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE DESIGNS OR TECHNOLOGY AND HEREBY DISCLAIMS THE SAME. JANG MAKES NO EXPRESS OR IMPLIED WARRANTY THAT THE USE OR SALE OF PRODUCTS EMBODYING THE DESIGNS OR TECHNOLOGY WILL NOT INFRINGE PATENTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES AND HEREBY DISCLAIMS THE SAME.

**6.  REPRESENTATIONS AND WARRANTIES OF SCIMED.**  In order to induce Jang to enter into and perform this Agreement and to assign and transfer the Jang Assets, and in the case of the representation set forth in Section 6.2, in reliance upon the representations and warranties made by Jang herein, Scimed represents and warrants to Jang as follows:

**6.1  Corporate Matters.**  (a) Scimed is duly organized and validly existing under the laws of its incorporating jurisdiction; (b) Scimed has all requisite power and authority to enter into this Agreement, including without limitation all required board approvals; (c) Scimed is duly authorized to execute and deliver this Agreement and to perform its obligations hereunder and

CONFIDENTIAL

BSC-0002065

consummate the transactions contemplated hereby; and (d) this Agreement is a valid and binding obligation of Scimed enforceable against Scimed in accordance with its terms.

**6.2 Defaults; Consents; etc.** No approval, consent, waiver, authorization or other order of, and no declaration, filing, registration, qualification or recording with, any governmental authority is required to be obtained or made by or on behalf of Scimed for the execution, delivery or performance of this Agreement by Scimed.

**6.3 No Broker's or Finder's Fees.** No agent, broker, Person or firm acting on behalf of Scimed or any of its Affiliates is, or shall be, entitled to any commission or broker's or finder's fees from Jang in connection with any of the transactions contemplated herein.

## 7. CERTAIN AGREEMENTS OF THE PARTIES.

**7.1 Improvements.** (a) Jang hereby assigns, agrees to assign and transfers to (and the following shall be the exclusive property of) Scimed, the entire right, title and interest of Jang in and to all ideas, discoveries, improvements, inventions (including without limitation discoveries of new technology and improvements to existing technology), Confidential Information, know-how, innovations, writings, works of authorship, compilations and other developments or improvements, whether or not patented or patentable, copyrightable, or reduced to practice or writing, made, discovered, invented, authored, created, developed, originated or conceived by Jang, solely or jointly, during the period from the Effective Date until 11:59 PM on the third anniversary of the Effective Date (the *Inclusion Period*) and which relate, directly or indirectly, to the Designs or any Technology (collectively, *Improvements*), whether or not such Improvements arise out of any activity (i) conducted by, for or under the direction of Scimed or (ii) conducted at Scimed's facilities, during working hours or using Scimed assets.   It is understood and agreed that (A) any of the foregoing that are within the scope of the Pacemaker Delivery Technology are expressly excluded from Improvements and (B) any of the foregoing that are within the scope of Pacemaker Lead Technology are expressly included in Improvements.  In the event that any Improvements are licensed to Jang pursuant to the License Agreement, such licensed Improvements shall be subject to the option granted Scimed under Section 2.3 of this Agreement.

(b) Jang shall communicate promptly and disclose to Scimed, in such form as Scimed may reasonably request, all information, details and data pertaining to any such Improvements, and Jang shall execute and deliver to Scimed or its designee such formal transfers and assignments and such other papers and documents and shall give such testimony as may be deemed necessary or required of Jang by Scimed or its designee to develop, preserve or extend Scimed's rights relating to any Improvements and to permit Scimed or its designee to file and prosecute patent applications and, as to copyrightable material, to obtain copyright registrations thereof.

**7.2 Patent Prosecution; Maintenance.** On and after the Effective Date, Scimed will be responsible for and will, at its expense and discretion, use commercially reasonable efforts to prepare, file (including foreign filing decisions), prosecute and maintain the Patents (including patent applications) (collectively, *Prosecution*) that relate to the Technology and any

15

BSC-0002066

Improvements. Scimed will give such Prosecution a priority which is consistent with Scimed's efforts for other technology that is at similar stages of evolution and similar applicability, undertaken using good business judgment by Scimed. Scimed may determine that it is not commercially reasonable to pursue patent coverage for particular claims, in cases where the difficulty, expense and probability of obtaining coverage cannot be justified in comparison to the profits that sales of Contingent Payment Products that are the subject of such coverage are likely to yield; provided, that Scimed shall not accord undue weight to the amounts payable to Jang under this Agreement when making such determination. Jang shall cooperate with Scimed to respond to office actions and complete all related applications and continuations currently in process or initiated following the Effective for no additional consideration.

7.3  **Infringement.** (a) Jang shall promptly inform Scimed in writing of any infringement of Intellectual Property Rights by a third party of which he has knowledge and shall provide Scimed with any readily available information relating to such infringement.

(b)  Scimed shall have the right, but not the obligation, to institute, prosecute and control legal proceedings to prevent or restrain such infringement. Jang agrees to assist Scimed in any infringement suit as Scimed may institute to enforce Intellectual Property Rights, or in any declaratory judgment action alleging invalidity or non-infringement of any Intellectual Property Rights brought against Jang or Scimed, at the request and expense of Scimed, and Jang will cooperate and assist in all reasonable respects, including testifying and making available relevant records, papers, information, specimens and the like. Scimed shall reimburse Jang for all reasonable expenses incurred in providing such assistance.

(c)  Any recovery of damages by Scimed in a suit brought pursuant to the provisions of this Section 7.3 shall be applied first in satisfaction of any unreimbursed expenses and legal fees of Scimed relating to the suit or settlement thereof. The balance, if any, remaining after Scimed has been compensated for expenses shall be retained by Scimed; provided, that any recovery of ordinary damages based upon such infringement shall be deemed to be "Net Sales" and upon receipt of such recovery amount, Scimed shall pay Jang as additional Earn Out from such recovery amount an amount calculated in accordance with Section 3.1(c) to reimburse Jang for payments due in respect of lost sales of Contingent Payment Products. Any such recovery shall be count towards Net Sales as of the date of the infringement for purposes of Section 3.1(d). The allocation described in this Section 7.3(c) shall not apply as to special or punitive damages.

7.4  **Non-competition.** For a period of seven (7) years after the Effective Date, Jang shall not directly or indirectly, (i) own, manage, operate, control or participate in any manner in the ownership, management, operation or control of, or be connected as an officer, employee, partner, director, principal, consultant, agent or otherwise with, or have any financial interest in, or aid or assist anyone else in the conduct of, any business, venture or activity relating to the Designs; or (ii) offer employment to, or recruit or otherwise seek to induce any employee of Scimed or any of its Affiliates to terminate his or her employment or to violate any agreement with or duty to Scimed or any of its Affiliates, or (iii) solicit or encourage any Person who is a customer or supplier of Scimed or any of its Affiliates to terminate its relationship with Scimed or such Affiliate. The limitation set forth in this Section 7.4 shall not prevent Jang from: 1)

16

CONFIDENTIAL

BSC-0002067

holding ownership interests in mutual funds, venture capital funds, or any other similar passive investment vehicles where Jang has no decision making authority; 2) owning 2% or less of any company's securities where such securities are listed on a stock exchange or a national market system; 3) owning 5% or less of any private company's securities as a "passive" investor where Jang has no decision making authority; or 4) exploiting the Pacemaker Lead Technology in accordance with the provisions of Section 2.3.

**7.5. Further Assurances.**  (a)  At any time and from time to time, each party hereto, without further consideration, shall cooperate, take such further action and execute and deliver such further instruments and documents as may be reasonably requested by any other parties in order to carry out the provisions and purposes of this Agreement including, without limitation, (i) to execute one or more further assignments covering any of the Jang Assets constituting Intellectual Property Rights in form acceptable for recordation and (ii) in the case of Jang, to complete his obligations under Section 7.1 and Section 7.2.

(b)  Subject to the terms of this Section 7.5, the parties agree that in the event and to the extent that any Technology or Designs existing as of the Effective Date and excluded from the schedules to this Agreement describing Technology or Designs (each, an *Omitted Item*), then Jang shall provide Scimed with a description of such Omitted Item(s) promptly upon determining that they are within the scope of Technology or Designs and Jang shall be deemed to have assigned all his right title and interest in such Omitted Item(s) as of the Effective Date without any additional consideration and the provisions of Sections 7.1-7.4, 9 and 10 shall apply to such Omitted Items.  Jang shall execute and deliver such documents as Scimed may reasonably require in order to perfect or record the assignment of such Omitted Items to Scimed in accordance with the provisions of this Agreement.

(c)  Jang acknowledges and agrees that, because the legal remedies of Scimed may be inadequate in the event of Jang's breach of, or other failure to perform, any of the covenants and obligations set forth in Section 2.3, Section 7.1, Section 7.2, Section 7.3 or Section 7.4, Scimed may, in addition to obtaining any other remedy or relief available to it (including without limitation consequential and other damages at law), seek to enforce the provisions of Section 2.3, Section 7.1, Section 7.2, Section 7.3 or this Section 7.4 by injunction and other equitable remedies without the requirement of posting bond.

## 8. RISK ALLOCATION
**8.1   Limitation of Liability.**   EXCEPT FOR BREACH OF OBLIGATIONS UNDER SECTIONS 7.1-7.3 OR SECTION 9.1 AND EXCEPT AS OTHERWISE PROVIDED IN SECTION 8.2, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR LOST PROFITS OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, HOWEVER CAUSED, UNDER ANY THEORY OF LIABILITY.

**8.2   Indemnification.** (a)  Subject to the provisions of Section 8.3, Jang hereby indemnifies

17

CONFIDENTIAL                                                         BSC-0002068

Scimed and its Affiliates against and agrees to hold each of them harmless from any and all damage, loss, liability and expense (including, without limitation, reasonable attorneys' fees and expenses in connection with any action, suit or proceeding) (collectively, *Losses*) incurred or suffered by Scimed or any of its Affiliates arising out of:  (i) any misrepresentation or breach of warranty, covenant or agreement made or to be performed by Jang pursuant to this Agreement (whether or not discovered by Scimed prior to Closing); or (ii) Jang's ownership or use of the Jang Assets prior to the Closing; or (iii) Jang's ownership or use of the Pacemaker Lead Technology (including the ownership or use of the Pacemaker Lead Technology by any Affiliate or sublicensee of Jang).  The foregoing indemnification action shall not apply in the event and to the extent such Losses arose as a result of any Scimed Indemnified Party's negligence, intentional misconduct or breach of this Agreement.

(b)  Subject to the provisions of Section 8.3, Scimed hereby indemnifies Jang against and agrees to hold Jang harmless from any and all Loss incurred or suffered by Jang arising out of: (i) any misrepresentation or breach of warranty, covenant or agreement made or to be performed by the Scimed pursuant to this Agreement; or (ii) Scimed's ownership or use of the Jang Assets following the Closing, including, without limitation any product liability claim (such as any claim relating to medical malpractice by customers of Contingent Payment Products other than Jang, breach of express or implied warranty, negligence or strict liability) and any claim of infringement of intellectual property rights.  The foregoing indemnification action shall not apply in the event and to the extent that such Losses arose as a result of Jang's negligence, intentional misconduct or breach of this Agreement.  It is understood that Scimed's indemnification obligation shall not apply to Losses resulting from Jang's (including any Affiliate's or sublicensee's) activities with respect to the Pacemaker Lead Technology or with respect to the License Agreement, if applicable.

**8.3  Procedures.**  To receive the benefit of indemnification under Section 8.2, the party seeking indemnification (the *Indemnified Party*) must promptly notify the party against whom indemnity is sought (the *Indemnifying Party*) in writing of any claim, or the commencement of any suit, action or proceeding in respect of which indemnity may be sought under Section 8.2 and provide reasonable cooperation (at the Indemnifying Party's expense) and tender to the Indemnifying Party (and its insurer) full authority to defend or settle the claim or suit.  Neither party has any obligation to indemnify the other party in connection with any settlement made without the Indemnifying Party's written consent.  The Indemnified Party has the right to participate at its own expense in the claim or suit and in selecting counsel therefor.  The Indemnified Party shall cooperate with Indemnifying Party (and its insurer), as reasonably requested, at Indemnifying Party's sole cost and expense.

**8.4  Set-Off.**  Jang hereby acknowledges and agrees that Scimed shall have the right at any time to set off, against any amount owed by Scimed to Jang under Section 3.1, any and all Losses (including Losses incurred pursuant to Section 7.2 of the License Agreement, if applicable, but excluding Losses for which Jang has paid or reimbursed Scimed), whether or not such inaccuracy, breach, nonfulfillment, misrepresentation or omission was or should have been known by Scimed on the Effective Date, it being agreed that the intention of the parties is that Jang shall be completely responsible for, and Scimed shall be conclusively deemed to have relied

18

BSC-0002069

upon such representations warranties, agreements and instruments. Any party to which Jang assigns the right to receive payment under this Agreement shall also be subject to this Section 8.4.

## 9. MISCELLANEOUS

**9.1 Protection of Confidential Information.** (a) For a period ending on the later of (i) three (3) years from the date of the expiration or termination of Jang's employment with BSC, or (ii) the expiration of the Inclusion Period, Jang and Scimed (each, as a Receiving Party) shall limit access to Confidential Information received from the other party (each, a Disclosing Party) pursuant to this Agreement, to those of their employees, consultants and agents who need to have access to such information or material and who are obligated to maintain confidentiality sufficient to protect the other party's rights in its Confidential Information, and shall not use or permit to be used such Confidential Information by or for the benefit of itself (except as anticipated by this Agreement) or any independent third party.

(b) Each party shall exercise at least the same reasonable care it uses to protect its own valuable, proprietary Confidential Information in order to prevent the disclosure of the other party's Confidential Information to independent third parties. Each party shall promptly notify the other party of any actual or suspected unauthorized use or disclosure of the other party's Confidential Information of which it has knowledge and will cooperate in the investigation of and appropriate actions with respect to such unauthorized use or disclosure. Each party shall include the other party's reasonable proprietary rights notices on any media embodying the other party's Confidential Information, including partial copies thereof, which are circulated within that party.

**9.2 Publicity.** Scimed and its Affiliates on the one hand and Jang on the other shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement and the transactions contemplated hereby and shall not issue any such press release or make any such public statement except as they may mutually agree, except as is necessary for governmental notification purposes or to comply with applicable laws and regulations.

**9.3 Independent Contractors.** Each party represents that it is acting on its own behalf as an independent contractor and is not acting as an agent for or on behalf of any third party. This Agreement and the relations hereby established by and between Jang and Scimed do not constitute a partnership, joint venture, franchise, agency or contract of employment. Scimed is not granted, and shall not exercise, the right or authority to assume or create any obligation or responsibility on behalf of or in the name of Jang or its Affiliates.

**9.4 Assignment.** Except in the case of assignment by Scimed to an Affiliate or pursuant to a merger, consolidation or sale of substantially all of the assets or stock of Scimed, neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld in the case of any assignment; *provided* that the proposed assignee under this Section 9.4 agrees in writing to assume all of the obligations of the assignor party under this Agreement. Notwithstanding the foregoing, Jang may assign

19

BSC-0002070

without consent, in whole or in part, any of the rights he has to receive monetary payments under the terms of this Agreement to one or more of the following: (1) any revocable trust of which Jang is the sole trustee and the sole settlor; (2) any irrevocable trust established by Jang as the sole settlor for members of his family, whether or not Jang is the trustee of such trust; or (3) any charitable trust of which Jang is both the sole trustee and the sole settlor. Where Jang is the trustee of a trust to which an interest is assigned pursuant to this Section 9.4 and Jang later ceases to serve as trustee as a result of his death or incapacity, any such subsequent event shall not void or vitiate the assignment(s) made to the trust. No assignment otherwise permitted under this Section 9.4 shall be valid unless and until the trustee of such trust acknowledges in writing in form satisfactory to Scimed that the trustee, together with the trust, accept such assignment subject to all of the terms, conditions and provisions of this Agreement, including the right of set-off set forth in Section 9.4. It is understood that Scimed may from time to time perform some or all of its obligations hereunder through one or more of its Affiliates; provided that Scimed shall remain responsible for the performance of such obligations.

**9.5   Successors and Assigns.** This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**9.6   Notices.** Unless otherwise provided herein, any notice, report, payment or document to be given by one party to the other shall be in writing and shall be deemed given when delivered personally or mailed by certified or registered mail, postage prepaid (such mailed notice to be effective on the date which is three (3) business days after the date of mailing), or sent by nationally recognized overnight courier (such notice sent by courier to be effective one business day after it is deposited with such courier), or sent by telefax (such notice sent by telefax to be effective when sent, if confirmed by certified or registered mail or overnight courier as aforesaid) as follows:

If to Jang, addressed to:
    G. David Jang, M.D.
    30725 Eastbern Lane
    Redlands, CA 92374
    Phone: 909.794.1803
    Fax: 909.794.1938

If to Scimed, addressed to:
    Boston Scientific Corporation
    One Boston Scientific Place
    Natick, MA 01760-1537
    Attention: Lawrence C. Best
    Phone: 508.650.8567
    Fax: 508.650.8960

With a copy to:
    Boston Scientific Corporation
    One Boston Scientific Place

20

CONFIDENTIAL

Natick, MA 01760-1537
Attention: General Counsel
Phone: 508.650.8567
Fax: 508.650.8960

or to such other place as either party may designate as to itself by written notice to the other party.

**9.7  Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts, United States of America, to the exclusion of both its rules on conflicts of laws and the provisions of the United Nations Convention on Contracts for the International Sale of Goods.

**9.8  Amendment and Waiver.** No provision of or right under this Agreement shall be deemed to have been waived by any act or acquiescence on the part of either party, its agents or employees, but only by an instrument in writing signed by an authorized officer of each party. Scimed and Jang may, by written notice to the other party, (a) extend the time for the performance of any of the obligations or other actions of the others under this Agreement; (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement or in any document delivered pursuant to this Agreement; (c) waive compliance with any of the conditions to their obligations contained in this Agreement; or (d) waive or modify performance of any of the obligations of the other party under this Agreement. Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of Scimed or Jang, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained in this Agreement. The waiver by Scimed or Jang of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**9.9  Severability.** In the event any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof. The parties agree that they will negotiate in good faith or will permit a court or arbitrator to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

**9.10  Entire Agreement.** The terms and provisions contained in this Agreement (including the schedules and exhibits) and the Employment Agreement constitute the entire understanding of the parties with respect to the transactions and matters contemplated hereby and supersede all previous communications, representations, agreements and understandings relating to the subject matter hereof. Except for the Employment Agreement, no representations, inducements, promises or agreements, whether oral or otherwise, between the parties not contained in this Agreement, the License Agreement or the Employment Agreement or incorporated by reference

21

BSC-0002072

in this Agreement or the Employment Agreement shall be of any force or effect.  No agreement or understanding extending this Agreement or varying its terms (including any inconsistent terms in any purchase order, acknowledgment or similar form) shall be binding upon either party unless it is in a writing specifically referring to this Agreement and signed by the duly authorized representative of the applicable party.

**9.11   Captions.** Captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement and shall not limit or affect the meaning or construction of the terms and conditions hereof.

**9.12  Word Meanings.** Words such as *herein, hereinafter, hereof* and *hereunder* refer to this Agreement as a whole and not merely to a section or paragraph in which such words appear, unless the context otherwise requires.  The singular shall include the plural, and each masculine, feminine and neuter reference shall include and refer also to the others, unless the context otherwise requires.

**9.13   Rules of Construction.** The parties agree that they have participated equally in the formation of this Agreement and that the language and terms of this Agreement shall not be construed against either party by reason of the extent to which such party or its professional advisors participated in the preparation of this Agreement.

**9.14  Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

**[rest of this page intentionally left blank]**

CONFIDENTIAL

BSC-0002073

IN WITNESS WHEREOF, Scimed and Jang have duly executed this Assignment Agreement as of the Effective Date, intending it to take effect as an instrument under seal.

SCIMED LIFE SYSTEMS, INC.

By: _____          _____
Name: Lawrence C. Best                Name: G. David Jang, M.D.
Title: Chief Financial Officer

**Exhibit 4.2(a)(i):  Assignment of Patents**
**Exhibit 4.2(a)(ii):  Bill of Sale**
**Exhibit 4.2(f):  License Agreement**
**Exhibit 4.2(g):  Employment Agreement**

CONFIDENTIAL

IN WITNESS WHEREOF, Scimed and Jang have duly executed this Assignment Agreement as of the Effective Date, intending it to take effect as an instrument under seal.

SCIMED LIFE SYSTEMS, INC.

By: _____
Name:  Lawrence C. Best
Title:  Chief Financial Officer

Name: G. David Jang, M.D.

Exhibit 4.2(a)(f):  Assignment of Patents
Exhibit 4.2(a)(ii):  Bill of Sale
Exhibit 4.2(f):  License Agreement
Exhibit 4.2(g):  Employment Agreement

BUSDOCS:994381.7

CONFIDENTIAL                                                      BSC-0002075

## Schedule 1
### Designs

(Only ... Patents (incl. PCT Counterparts Are Not Listed)

- PSJ-10 Stent 60/234,614 (09/22/00)
- PSJ-9   Stent 60/235,164 (09/23/00)
- PSJ-11 Stent 60/235,167 (09/23/00)
- PSJ-14 Stent 60/235,115 (09/25/00)
- PSJ-15 Stent 60/235,180 (09/25/00)
- Drug-Coating Enhancement Measures 60/209,255 (06/05/00)

... incorporating PSJ Stent Platform

- PSJ-7   Stent Platform
- PSJ-8   Stent Platform
- PSJ-15   Stent Platform
- PSJ-16   Stent Platform
- PSJ-17   Stent Platform
- PSJ-18   Stent Platform
- PSJ-19   Stent Platform
- PSJ-20   Stent Platform
- PSJ-22   Stent Platform
- PSJ-23   Stent Platform
- PSJ-24   Stent Platform
- PSJ-25   Stent Platform
- PSJ-25.1  Stent Platform
- PSJ-27   Stent Platform
- PSJ-28   Stent Platform

## Schedule 2.1(a)
### Patents

| Patent/Application/Invention Disclosure Title | Serial Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|---|
| US - Intravascular Stent | 08/824,142 | 03/26/97 | Allowed | |
| US - Intravascular Stent | 08/824,866 | 03/26/97 | 5,954,743 | 09/21/99 |
| US - Intravascular Stent | 08/824,865 | 03/25/97 | 6,152,957 | 11/28/0 |

2

CONFIDENTIAL

BSC-0002076

| | | | | 0 |
|---|---|---|---|---|
| PCT – Intravascular Stent | PCT/US97/0660 9 | 04/24/97 | | |
| PCT – Intravascular Stent | PCT/US97/0661 0 | 04/24/97 | | |
| US – Intravascular Stent | 08/845,657 | 04/25/97 | 5,922,021 | 7/13/99 |
| PCT – Intravascular Stent | PCT/US97/0690 7 | 04/25/97 | | |
| US – Intravascular Stent | 08/949,865 | 10/14/97 | 6,039,756 | 03/21/0 0 |
| US – Intravascular Stent With Non-Parallel Slots | 08/936,297 | 09/25/97 | 5,948,016 | 09/07/9 9 |
| PCT – Intravascular Stent | PCT/US98/0583 5 | 03/25/98 | | |
| PCT – Intravascular Stent | PCT/US98/0585 6 | 03/25/98 | | |
| PCT – Intravascular Stent | PCT/US98/0840 8 | 04/27/98 | | |
| PCT – Intravascular Stent | PCT/US98/0841 1 | 04/27/98 | | |
| PCT – Intravascular Stent With Non-Parallel Slots | PCT/US98/1553 1 | 07/22/98 | | |
| US (PRO) Tubular Stent Consists of Chevron-Shape Expansion Struts and Contralaterally Attached Diagonal Connectors | 60/073,412 | 02/02/98 | | |
| JP – Intravascular Stent | 9-538979 | 04/24/97 | | |
| CA – Intravascular Stent | 2,252,593 | 04/24/97 | | |
| JP – Intravascular Stent | 9-538981 | 04/24/97 | | |
| CA – Intravascular Stent | 2,252,591 | 04/24/97 | | |
| EP – Intravascular Stent | 97922367.4 | 04/24/97 | | |
| EP – Intravascular Stent | 97918756.4 | 04/24/97 | | |
| CA – Intravascular Stent | 2,252,882 | 04/24/97 | | |
| JP – Intravascular Stent | 9-538980 | 04/24/97 | | |
| CA –Intravascular Stent | 2,252,596 | 04/25/97 | | |
| JP – Intravascular Stent | 9-539031 | 04/25/97 | | |
| EP – Intravascular Stent | 97918755.6 | 04/24/97 | | |
| EP – Intravascular Stent | 97926382.9 | 04/25/97 | | |
| US – Tubular Stent With Chevron Striped Expansion Struts | Open Disclosure | | | |
| US – Tubular Stent With Contralateral Attached Connecting Struts | Open Disclosure | | | |
| US – Tubular Stent Consists of Chevron-Shape Expansion Struts and | 09/237,537 | 01/26/99 | Allowed | |

3

CONFIDENTIAL

BSC-0002077

| | | | | |
|---|---|---|---|---|
| Contralaterally Attached Diagonal Connectors | | | | |
| PCT - Tubular Stent Consists of Chevron-Shape Expansion Struts and Contralaterally Attached Diagonal Connectors | PCT/US99/0205 0 | 01/28/99 | | |
| US – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | 09/241,320 | 02/01/99 | 6,113,627 | 09/05/0 0 |
| PCT - Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | PCT/US99/0217 1 | 02/02/99 | | |
| US – Tubular Stent Consists of Non-Parallel Expansion Struts and Contralaterally Attached Diagonal Connectors | 09/243,911 | 02/03/99 | 6,200,334 | 03/13/0 1 |
| PCT - Tubular Stent Consists of Non-Parallel Expansion Struts and Contralaterally Attached Diagonal Connectors | PCT/US99/0234 2 | 02/03/99 | | |
| PCT – Tubular Stent Consists of Chevron-Shape Expansion Struts and Ipsilaterally Attached M – Frame Connectors | PCT/US99/0342 8 | 02/17/99 | | |
| US – Tubular Stent Consists of Chevron-Shaped Expansion Struts And Ipsilaterally Attached M-Frame Connectors | 09/251,650 | 02/17/99 | 6,123,721 | 09/26/0 0 |
| JP – Intravascular Stent | 10-545944 | 03/25/98 | | |
| EP – Intravascular Stent | 98912026.6 | 03/25/98 | | |
| EP – Intravascular Stent | 98912031.6 | 03/25/98 | | |
| JP – Intravascular Stent | 10-545953 | 03/25/98 | | |
| EP – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | 99904533.9 | 02/02/99 | | |
| JP – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | 2000-529193 | 02/02/99 | | |
| EP – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | 99903509.0 | 01/28/99 | | |
| US (PRO) Intravascular Stent Consists of Stairstep Expansion Strut Pairs and Double Stairstep Diagonal Connecting Struts Contralaterally Extended From | 60/235,164 | 09/23/00 | | |

4

CONFIDENTIAL

BSC-0002078

| Expansion Struts | | | | |
|---|---|---|---|---|
| US -- PSJ-10 Stent | 60/234,614 | 09/22/00 | | |
| US -- PSJ-11 Stent | 60/235,167 | 09/23/00 | | |
| US -- PSJ-14 Stent | 60/235,115 | 09/25/00 | | |
| US -- PSJ-15 Stent | 60/235,180 | 09/25/00 | | |
| US -- Drug-Coating Enhancement Measures | 60/209,255 | 06/05/00 | | |

### Schedule 2.1(b)
### Technical information

(none)

### Schedule 5.2
### Liens

**The Schneider Agreement**

### Schedule 5.3
### 3rd Party Rights

**The Schneider Agreement**

### Schedule 5.4
### Previous Grants of Designs and Technology

**The Schneider Agreement**

### Schedule 5.8
### Restrictive Documents
### The Schneider Agreement

5

CONFIDENTIAL

BSC-0002079