# Exhibit 10

<u>Exhibit 4.2(f)</u>

# <u>NON-EXCLUSIVE LICENSE AGREEMENT</u>

This License Agreement (*Agreement*) is entered into as of _____, 200\_\_ (*Effective Date*) between G. David Jang, M.D., an individual residing at 30725 Eastbern Lane, Redlands, California (*Jang*) and Scimed Life Systems, Inc., a Minnesota corporation (*Scimed*).

<u>Background</u>:

The parties have entered into an Assignment Agreement dated June 3, 2002 (the *Assignment Agreement*) pursuant to which Jang has assigned to Scimed all rights Jang holds in respect of stent technology. The Assignment Agreement provides, in the event certain conditions are met, that Jang may acquire from Scimed a non-exclusive license to use the technology assigned to Scimed under the Assignment Agreement to develop and commercialize pacemaker lead products. Scimed holds an option to acquire exclusive rights to acquire other technology owned by Jang and to terminate the license granted to Jang under this Agreement, as described in the Assignment Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises and agreements hereinafter set forth, the parties hereto agree as follows:

<u>Agreement</u>

## 1. DEFINITIONS.

**1.1 Defined Terms.** Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning set forth below.

*Affiliate* means with respect to either party, any Person that, directly or indirectly, is controlled by, controls or is under common control with such party. For purposes of this Agreement, "*control*" means, with respect to any Person, the direct or indirect ownership of more than fifty percent (50%) of the voting or income interest in such Person or the possession otherwise, directly or indirectly, of the power to direct the management or policies of such Person.

*Confidential Information* means all technical and commercial information and data which either party (the *Disclosing Party*) has or may disclose to the other party (the *Receiving Party*) pursuant to this Agreement in written or other tangible medium and marked as confidential, or if disclosed orally or displayed, confirmed in writing within thirty (30) days after disclosure, excluding any portion thereof which: (a) is known to the Receiving Party before receipt thereof under this Agreement or the Assignment Agreement; (b) is disclosed to the Receiving Party by a third person who is under no obligation of confidentiality to the Disclosing Party hereunder with respect to such information and who otherwise has a right to make such disclosure; (c) is or becomes generally known in the trade through no fault of the Receiving Party; (d) is independently developed by the Receiving Party, as evidenced by the Receiving Party's written records, without access to such information; or (e) is approved for release by written authorization of the original Disclosing Party.

*Design(s)* means any information used or useful in the design, development, delivery, manufacture or testing of stents for any medical application(s) (including Pacemaker Lead

Technology (as defined in the Assignment Agreement) but excluding Pacemaker Delivery Technology (subject to the limitations described in the definition therefor)) as well as any coatings, coverings, drug delivery mechanisms and other features used or useful in relation to the use of such stents, including without limitation the designs identified in Schedule 1.

*First Commercial Sale* means the first sale of any Licensed Product to a third party in any country after such Licensed Product has been granted all regulatory approvals required for importation, promotion, pricing, marketing and sale of such Licensed product in such country.

*Improvements* means all ideas, discoveries, improvements, inventions (including without limitation discoveries of new technology and improvements to existing technology), Confidential Information, know-how, innovations, writings, works of authorship, compilations and other developments or improvements, whether or not patented or patentable, copyrightable, or reduced to practice or writing, made, discovered, invented, authored, created, developed, originated or conceived by Jang, solely or jointly, during the period from the Effective Date until 11:59 PM on the fourth anniversary of the Effective Date and which relate, directly or indirectly, to the Licensed Patents or the Licensed Technology, whether or not such Improvements arise out of any activity (i) conducted by, for or under the direction of Scimed or (ii) conducted at Scimed's facilities, during working hours or using Scimed assets. It is understood and agreed that (A) any of the foregoing that are within the scope of the Pacemaker Delivery Technology are expressly excluded from Improvements and (B) any of the foregoing that are within the scope of Pacemaker Lead Technology (as defined in the Assignment Agreement) are expressly included in Improvements.

*Licensed Field* means the development, marketing, sale and other exploitation of stents that are a pre-attached component of pacemaker leads or the leads of similar devices and which are promoted, labeled, marketed and sold exclusively for the purpose of serving as the point for terminal conduction of pacemaker impulses and not for purposes of scaffolding or stenting any body lumen, whether or not in conjunction with angioplasty.

*Licensed Patents* means (a) the Patents (as defined in the Assignment Agreement), including without limitation the Patents listed in Schedule 1 attached hereto, assigned to Scimed by Jang under the Assignment Agreement, and (b) the "Licensed Patents" (as defined in the Schneider Agreement).

*Licensed Product(s)* means any product(s) the manufacture, use, license or sale of which is covered by one or more Valid Claims or which, absent the license granted under this Agreement, would infringe one or more Valid Claims.

*Licensed Technology* means the Designs, Technology, Proprietary Information (as defined in the Schneider Agreement), and Improvements to the extent such Designs, Technology, Proprietary Information and Improvements are used or useful in development, marketing, sale and other exploitation of products in the Licensed Field.

*Net Sales* means the net sales of Licensed Products reported in accordance with United States

2

PAGE 36
EX. 2

generally accepted accounting principles as specified by the American Institute of Certified Public Accountants, consistently applied, and generally defined as the aggregate invoiced gross revenue received by Jang or any Strategic Partner from the sale of Licensed Products to a final customer who will be the end user of the Licensed Products less only the following ***Deductions***: (i) amounts repaid or credited by reason of defects, returns, rejections, rebates, wholesale chargebacks, retroactive price reductions or allowances, (ii) sales, excise, value added, purchase, turnover, use, and other like taxes, and customs duties, paid, absorbed or allowed, (iii) fees or commissions paid or actually allowed to "buyer side" intermediaries, brokers or agents, (iv) shipping charges (including freight and insurance), and (v) cash, trade and quantity discounts actually allowed (and taken) to the extent customary in the trade. Sales of Licensed Products by and between Jang and his Strategic Partners shall be excluded from Net Sales calculations for all purposes. Net Sales are calculated on sales to independent third parties at the purchaser level and shall not include revenue received by Jang (or any Strategic Partner) from transactions with another Strategic Partner; provided, that Net Sales will be calculated on the sales by such Strategic Partner to a final customer who will be the end user of the Licensed Products.

With respect to products that are sold as part of a package that includes Licensed Product(s) and products that are not Licensed Products, Net Sales shall equal the product of (X) the gross sales of such combined products billed to customers by Jang, its Affiliates or sublicensees, less Deductions, calculated in accordance with the procedure specified above, multiplied by (Y) a fraction the numerator of which shall be the per unit average selling price of the Licensed Product sold separately, and the denominator of which shall be the per unit average selling price of package product sold in such combined form. If there is no established average selling price of the Licensed Product sold separately, then Jang's standard cost of manufacturing of the single active Licensed Product and of the package product sold in such combined form shall be used to determine (Y).

For the purposes of calculating Net Sales, Licensed Product(s) include the implantable stent-like electrode portion of a pacemaker lead system together with coatings, coverings or other features but excludes pacemakers.

*Pacemaker Delivery Technology* systems that allow a physician to place and anchor a conductive electrode to the heart muscle, which electrode is attached to an insulated wire lead that carries a small electric impulse generated by a pacemaker to the electrode, including without limitation devices having one or more of the following components: (1) a coronary sinus selecting catheter; (2) a guiding receptacle; or (3) a pacemaker lead delivery system. The pacemaker lead delivery system in turn may include components such as: (a) a delivery (balloon) catheter; (b) a pacemaker lead wire; or (c) a detachable connecting junction. Pacemaker Delivery Technology may be used in conjunction with Licensed Technology. Pacemaker Delivery Technology includes without limitation that certain patent application entitled "Method of Using a Stent-like Lead System in Pacemaker Devices" to be filed by Jang and to the extent containing claims covering the use of stents generally as leads in pacemaker devices and not covering any particular stent design. Pacemaker Delivery Technology does not include Pacemaker Lead Technology (as that term is defined in the Assignment Agreement).

3

*Person* means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, limited liability partnership, unincorporated organization, government (or any agency or political subdivision thereof) or other legal entity or organization.

*Schneider Agreement* means the certain Assignment and License Contract dated May 8, 1998 between Jang and Schneider (Europe) GmbH.

*Strategic Partner* means any third party to whom Jang has granted, directly or indirectly, the right to manufacture, market, sell or distribute a Licensed Product. Strategic Partners includes Affiliates to whom Jang grants such rights.

*Technology* means individually and collectively the intellectual property rights embodied or disclosed in (a) the Licensed Patents; and (b) all other disclosures, discoveries, inventions, know-how, techniques, methodologies, modifications, improvements, works of authorship, designs and data (whether or not protectable under patent, copyright, trade secrecy or similar laws) that are conceived, discovered, developed, created or reduced to practice or tangible medium of expression by Jang or any of his agents, consultants or employees at any time prior to the Effective Date or at any time in the course of Jang's employment for Scimed as described in Section 3.2 of the Assignment Agreement or at any time from the Effective Date until 11:59 PM on the third anniversary of the Effective Date (regardless of whether or not within the course of Jang's employment). Technology includes Pacemaker Lead Technology but excludes Pacemaker Delivery Technology.

*Valid Claim* means (a) a claim of any issued patent which is contained within the Licensed Patents and which has not expired, lapsed, or been held invalid, unpatentable or unenforceable by a final decision, which is unappealed or unappealable, of a court of competent jurisdiction or of an administrative agency having authority over patents; or (b) a claim in any patent application which is contained within the Licensed Patents which patent application is less than three (3) years old (measured from the original filing date) and has not been the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired; (c) a claim of any issued patent owned or controlled by Scimed that claims an invention included in Improvements; or (d) a claim in any patent application owned or controlled by Scimed that claims an invention included in Improvements and which patent application is less than three (3) years old (measured from the original filing date) and has not been the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired.

1.2 Other Defined Terms. Each of the following terms have the meanings ascribed to it in the section set forth opposite such term:

| | |
|---|---|
| *Agreement* | Recitals |
| *Scimed* | Recitals |
| *Effective Date* | Recitals |
| *Indemnified Party* | Section 7.2 |
| *Indemnifying Party* | Section 7.2 |

4

PAGE 38
EX. 2

| | |
|---|---|
| *Jang* | Recitals |
| *Loss(es)* | Section 8.2 |
| *Prosecution* | Section 5.1 |

## 2. LICENSE.

**2.1 Grant of License.** (a) Subject to the terms and conditions of this Agreement and the Assignment Agreement, Scimed hereby grants to Jang, and Jang hereby accepts a non-exclusive, worldwide, royalty-bearing license under the Licensed Patents and Licensed Technology, including the right to grant sublicenses (in accordance with Section 2.1(c)), to develop, make, have made, use, lease, import, sell and otherwise exploit Licensed Products in the Licensed Field.

(b) Jang may sublicense his rights under this Agreement; provided, that (i) Jang provides prior written notice to Scimed of any such agreements with third parties and has first offered to enter into agreements with Scimed on terms that are in the aggregate no less favorable to Scimed as required by Section 2.3 of the Assignment Agreement; (ii) Jang obtains each third party's written agreement to be bound by provisions substantially as protective of Scimed as Sections 2.2, 2.3, 3, 5 and 7 of this Agreement; and (iii) Jang shall not be relieved of any of his obligations under this Agreement as a consequence of such agreements. Jang shall use commercially reasonable efforts to cause any such agreements to provide for termination or assignment to Scimed upon termination of this Agreement.

**2.2 Title.** This Agreement does not convey to Jang any ownership rights in any Licensed Patents or Licensed Technology by implication, estoppel or otherwise except for the rights expressly granted in this Section 2. Title to the Licensed Patents and Licensed Technology shall at all times remain vested in Scimed and Scimed retains the right to grant licenses to the Licensed Patents and Licensed Technology for all fields of use and to use the Licensed Patents and Licensed Technology for its commercial purposes.

**2.3 Proprietary Rights Notices.** (a) Jang shall to the extent legally possible mark containers of all Licensed Products on the outside label in accordance with the patent marking laws of the jurisdiction in which such Licensed Products are manufactured, used or sold. At a minimum, all containers of Licensed Products shall bear a notice on the outside label indicating that the product is the subject of a patent or pending application and identifying same.

(b) Jang shall comply with and shall use its best efforts to ensure that its sublicensees comply in all material respects with all government statutes and regulations that relate to Licensed Products, including but not limited to the Food, Drug and Cosmetic Act of 1941, as amended, and the regulations promulgated thereunder; and the Export Administration Act of 1979, as amended, and the regulations promulgated thereunder.

## 3. ROYALTIES; RECORD KEEPING; REPORTING

**3.1 Royalties.** Not later than sixty (60) days following each March 31, June 30, September 30

and December 31 commencing with the First Commercial Sale of Licensed Products in any jurisdiction, Jang shall pay to Scimed royalties by country for the most recent three-month period then ended, equal to (i) five percent (5%) of Jang's (or his Strategic Partners') Net Sales of Licensed Products. Payments shall be due on a country-by-country basis until the expiration of the last-to-expire of the patents within Licensed Patents for such country. Jang shall be obligated to make only one royalty payment for each unit of Licensed Products sold by Jang or his Strategic Partners, regardless of the number of Valid Claims from any one or more patents covering such Licensed Product or methods, processes, or assays which were used in the isolation, discovery, identification, or development of such Licensed Product.

**3.2 Remittance; Foreign Exchange.** Jang shall make payments required under Section 3.1 by check or wire transfer of immediately available funds delivered to Scimed at the address set forth below. All payments shall be stated and paid in U.S. Dollars. Net Sales revenue received in currencies other than U.S. dollars shall be converted into U.S. dollars at the New York Foreign Exchange Selling Rate for purchasing dollars with such foreign currency as of the last business day of the quarter in which such Net Revenue is received (as published in *The Wall Street Journal*).

**3.3 Reports.** Jang shall keep and maintain, during the term of this Agreement and for a period of at least three (3) years following each calendar year, records sufficient to determine the Net Sales and payments due under Section 3.1. Within sixty (60) days following each March 31, June 30, September 30 and December 31 in which payments are due under Section 3.1, Jang shall provide Scimed with a report including at least: (a) the quantities of Licensed Products that Jang, its Affiliates or sublicensees sold during the preceding quarter; (b) the U.S. dollar-equivalent of such sales; (c) the calculation of royalties thereon; and (d) the total royalties so computed and due Scimed. Such reports shall be submitted if sales of Licensed Products have been made during a period. Upon delivery of the report due for the period ending December 31 of each year, Jang shall also report to Scimed the royalties due Scimed for the entire preceding year.

**3.4 Audits.** Scimed shall have the right, not more than once in any twelve (12)-month period, to have Jang's (and Jang's Strategic Partners') relevant books and records for the then most recent three calendar years audited by an independent certified public accountant of Scimed's choosing and reasonably acceptable to Jang, to ascertain the accuracy of reports delivered pursuant to Section 3.3 in respect of Net Sales. Such audit shall be scheduled within thirty (30) days following delivery of notice by Scimed requesting such audit to Jang (or such Strategic Partner), and conducted during Jang's (or such Strategic Partner's) normal business hours, in a manner that does not unreasonably interfere with Jang (or such Strategic Partner's) normal business activities. If any audit discloses underpayment of royalties, Jang (or such Strategic Partner) shall promptly pay Scimed the royalties due. Scimed shall be responsible for all expenses it incurs in connection with any audit; provided, that if any audit determines that the reported total royalties were less than ninety percent (90%) of actual total royalties fees due for the period in question, the actual out-of-pocket cost of such audit shall be borne by Jang (or such Strategic Partner). Scimed will hold in strict confidence, and will require any certified public accountant it retains to perform an audit to hold in strict confidence, all information learned in the course of any audit,

6

except to the extent necessary for Scimed to enforce its rights under this Agreement.

**3.5 Taxes.** In the event Jang is required to withhold taxes or charges from the amounts paid to Scimed hereunder and to pay the taxes or charges for the account of Scimed, Jang shall deliver to Scimed true copies of the receipts or returns covering each such payment. The parties shall cooperate to minimize, to the extent legally permissible, the aggregate tax liabilities related to this Agreement. Notwithstanding the foregoing, such cooperation shall not cause any adverse tax consequences to be incurred by either party which would not have otherwise been incurred under the terms and conditions as described in this Agreement.

## 4. REPRESENTATIONS AND WARRANTIES

**4.1 Authority.** Each party represents and warrants to the other party that: (a) such party has all requisite power and authority to enter into this Agreement and to perform its (or his) obligations hereunder and consummate the transactions contemplated hereby; and (b) this Agreement is a valid and binding obligation of such party enforceable against such party in accordance with its terms.

**4.2 Disclaimer.** Scimed MAKES NO EXPRESS OR IMPLIED WARRANTY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO LICENSED PATENTS OR LICENSED TECHNOLOGY AND HEREBY DISCLAIMS THE SAME. Scimed MAKES NO EXPRESS OR IMPLIED WARRANTY THAT THE USE OR SALE OF PRODUCTS EMBODYING THE LICENSED PATENTS OR LICENSED TECHNOLOGY WILL NOT INFRINGE PATENTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES AND HEREBY DISCLAIMS THE SAME.

## 5. PATENTS

**5.1 Patent Prosecution; Maintenance.** Subject to Section 7.2 of the Assignment Agreement, Scimed, in consultation with Jang, shall be responsible for preparing, filing and prosecuting United States and foreign patent applications and maintaining U.S. and foreign patents (collectively, *Prosecution*) related to the Licensed Technology; provided that: (a) Scimed shall not be required to undertake any Prosecution matter with respect to the Licensed Technology that would result in the impairment of Scimed's position with respect to Prosecution matters (whether for the same invention or for another invention related to the Technology) for Technology outside the Licensed Field; (b) Scimed shall not be required to expend monies with respect to Licensed Technology where Scimed determines that such expenditure is not commercially reasonable in cases where the difficulty, expense and probability of obtaining coverage cannot be justified in comparison to the profits that sales of products that are the subject of such coverage are likely to yield; and (c) if Scimed and Jang disagree concerning Prosecution matters related to the Licensed Technology and such disagreement solely regards the costs associated with a particular proposed action, Jang may assume responsibility for such costs and the requirement that the parties agree shall not apply. As between the parties, Jang will be responsible for Prosecution matters related to any Pacemaker Delivery Technology.

PAGE 41
EX. 2

5.2 **Infringement.** (a) Each of Jang and Scimed shall promptly inform the other in writing of any infringement of Licensed Patents within the Licensed Field by a third party of which it has knowledge and shall provide the other with any readily available information relating to such infringement.

(b) Jang shall have the right, but not the obligation, to institute, prosecute and control legal proceedings to prevent or restrain such infringement solely within the Licensed Field; provided, that Jang first obtains Scimed's agreement to join as a party to such legal proceedings which agreement Scimed may withhold in Scimed's discretion. Scimed agrees to assist in the prosecution of such legal proceedings. Jang shall reimburse Scimed for all reasonable expenses incurred in providing such assistance to Jang. If Scimed agrees to join as a party to any suit initiated by Jang pursuant to this Section 5.2 Scimed may be, at its expense, represented by counsel of its choice. In the event Jang decides that he will not institute proceedings, to prevent or restrain such infringement of the Licensed Patents within the Licensed Field, Scimed shall have the right, but not the obligation to institute, prosecute and control legal proceedings to prevent or restrain such infringement utilizing counsel of its own choice. Jang agrees to assist in the prosecution of such legal proceedings. Scimed shall reimburse Jang for all reasonable expenses incurred in providing such assistance.

(c) In the event that any Person is infringing Licensed Patents within and outside the Licensed Field or any Person files a declaration of non-infringement or invalidity with respect to any Licensed Patents that would limit the use of any Licensed Patents within and outside the Licensed Field, Scimed shall have the right, but not the obligation, to institute, prosecute and control legal proceedings to prevent or restrain such infringement. Jang agrees to assist in the prosecution of such legal proceedings. Scimed shall reimburse Jang for all reasonable expenses incurred in providing such assistance to Scimed.

(d) Any recovery of damages by Scimed or Jang in a suit brought pursuant to the provisions of this Section 5.2 within the Licensed Field shall be applied first in satisfaction of any unreimbursed expenses and legal fees of the party that prosecutes such matter relating to the suit or settlement thereof; and next in satisfaction of any unreimbursed expenses and legal fees of the party that participates in the prosecution of such matter relating to the suit or settlement thereof. The balance, if any, remaining after the parties have been compensated for expenses shall be retained by the party that prosecutes such matter; provided, that (i) in the event and to the extent that the infringing party is infringing Licensed Patents both within and outside the Licensed Field, the balance shall be divided between the parties in accordance with the percentage of damages attributable to the infringing activities in the Licensed Field and infringing activities outside the Licensed Field; (ii) any recovery of ordinary damages based upon infringement of Licensed Patents outside the Licensed Field shall be deemed to be "Net Sales" and upon receipt of such recovery amount, Scimed shall pay Jang as additional Earn Out (as defined in the Assignment Agreement from such recovery amount an amount calculated in accordance with Section 3.1(c) of the Assignment Agreement to reimburse Jang for payments due in respect of lost sales of Contingent Payment Products (as defined in the Assignment Agreement); (iii) any recovery of ordinary damages based upon infringement of Licensed Patents within the Licensed Field shall be deemed to be "Net Sales" and upon receipt of such recovery amount, Jang shall pay

8

PAGE 42
EX. 2

Scimed from such recovery amount an amount calculated in accordance with Section 3.1 of this Agreement to reimburse Scimed for royalties due in respect of lost sales of Licensed Products; and (iv) the allocation described in Section 5.3(d)(ii)-(iii) shall not apply as to special or punitive damages. No settlement, or consent judgment or other voluntary final disposition of the suit that relates to the Licensed Field may be entered into without the consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed. Scimed, however, may at any time enter into any settlement, or consent judgment or other voluntary final disposition of any suit (including a suit that relates to the Licensed Field) without the consent of Jang; provided, that such settlement, or consent judgment or other voluntary final disposition relates only to matters outside the Licensed Field.

(e) Notwithstanding the provisions of Section 5.3(b), in the event that a declaratory judgment action alleging invalidity or non-infringement of any of the Licensed Patents is filed or in the event that any counterclaim or response by a Person in connection with an enforcement action undertaken by Jang pursuant to Section 5.3(b) is filed, Scimed, at its initial option, shall have the right, within thirty (30) days after notification of same, to assume defense of the action at Scimed's expense.

(f) In any infringement suit as either party may institute to enforce Licensed Patents, or in any declaratory judgment action alleging invalidity or non-infringement of any Licensed Patents brought against Jang or Scimed, the other party shall, at the request and expense of the party initiating or defending the suit or action, cooperate and assist in all reasonable respects, having its employees testify when requested and making available relevant records, papers, information, specimens and the like.

## 6. TERM; TERMINATION.

**6.1 Term.** Unless sooner terminated in accordance with this Section 6, this Agreement shall remain in effect until (a) the expiration of the term of the last to expire of the Licensed Patents or (b) ten (10) years following the First Commercial Sale of Licensed Products, whichever is later.

**6.2 Termination.** (a) Each party shall have the right to terminate this Agreement and the rights and license granted hereunder with sixty (60) days' notice to the other party in the event that the other party materially breaches any of its (or his) obligations under this Agreement unless the other party cures such breach prior to the expiration of said 60-day period, provided, however, that said sixty (60) day period shall be reduced to thirty (30) days for any breach involving a payment due under this Agreement.

(b) Jang shall have the right to terminate this Agreement and the license granted it hereunder for any reason with ninety (90) days' notice to Scimed at any time. In the event of such termination, Jang will retain no rights in the Licensed Patents or Licensed Technology.

**6.3 Effect of Termination.** Upon termination of this Agreement for any reason, nothing herein shall be construed to release either party of any obligation which matured prior to the effective date of such termination, and Jang may, after the effective date of such termination, complete

PAGE 43
EX 2

Licensed Products in the process of manufacture at the time of such termination and sell the same together with Licensed Products in inventory for a period of six (6) months; <u>provided</u> that Jang pays to Scimed royalties as required by Section 3.1 and otherwise complies with the provisions of Section 3. The provisions of Sections 1, 2.2, 4, 6, 7 and 8 shall survive any termination of this Agreement. In the event the license granted to Jang under Section 2 terminates for any reason, each of Jang's sublicensees at such time shall continue to have the rights and license set forth in their sublicense agreements; <u>provided</u> that the terms of such sublicense agreement have been consented to by Scimed and such sublicensee agrees in writing that Scimed is entitled to enforce such provisions directly against such sublicensee.

## 7. RISK ALLOCATION

**7.1 Limitation of Liability.** EXCEPT FOR BREACH OF OBLIGATIONS UNDER SECTION 8.1 AND EXCEPT AS OTHERWISE PROVIDED IN SECTION 7.2, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR LOST PROFITS OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, HOWEVER CAUSED, UNDER ANY THEORY OF LIABILITY.

**7.2 Indemnification.** (a) Subject to the provisions of Section 7.3, Jang hereby indemnifies Scimed and its Affiliates against and agrees to hold each of them harmless from any and all damage, loss, liability and expense (including, without limitation, reasonable attorneys' fees and expenses in connection with any action, suit or proceeding) (collectively, *Losses*) incurred or suffered by Scimed or any of its Affiliates arising out of or related to any (a) use by Jang, or by any party acting on behalf of or under authorization from Jang, of Licensed Technology or Licensed Patents; and (b) use, sale or other disposition by Jang or by any party acting on behalf of or under authorization from Jang, of Licensed Products. The foregoing indemnification action shall not apply in the event and to the extent such Loss(es) arose as a result of any Scimed Indemnified Party's intentional misconduct, negligence or breach of this Agreement. Jang shall require each of its sublicensees to indemnify, defend and hold harmless Scimed and its Affiliates under the same terms as stated in this Section 7.2(a).

(b) Subject to the provisions of Section 7.3, each party (each an *Indemnifying Party*) hereby indemnifies the other party and such party's Affiliates (each, an *Indemnified Party*) against and agrees to hold the Indemnified Party harmless from any and all Losses incurred or suffered by such Indemnified Party arising out of any misrepresentation or breach of warranty, covenant or agreement made or to be performed by the Indemnifying Party pursuant to this Agreement. The foregoing indemnification action shall not apply in the event and to the extent that such Losses arose as a result of the Indemnified Party's negligence, intentional misconduct or breach of this Agreement.

**7.3 Procedures.** To receive the benefit of indemnification under Section 7.2, the Indemnified Party must promptly notify the Indemnifying Party in writing of any claim, or the commencement of any suit, action or proceeding in respect of which indemnity may be sought under Section 7.2 and provide reasonable cooperation (at the Indemnifying Party's expense) and tender to the Indemnifying Party (and its insurer) full authority to defend or settle the claim or

PAGE 44
Ex. 2

suit. Neither party has any obligation to indemnify the other party in connection with any settlement made without the Indemnifying Party's written consent. The Indemnified Party has the right to participate at its own expense in the claim or suit and in selecting counsel therefor. The Indemnified Party shall cooperate with Indemnifying Party (and its insurer), as reasonably requested, at Indemnifying Party's sole cost and expense.

## 8. MISCELLANEOUS

**8.1 Protection of Confidential Information.** (a) For a period of three (3) years from the date of the termination or expiration of Jang's employment with BSC, Jang and Scimed (each, as a Receiving Party) shall limit access to Confidential Information received from the other party (each, a Disclosing Party) pursuant to this Agreement, to those of their employees, consultants and agents who need to have access to such information or material and who are obligated to maintain confidentiality sufficient to protect the Disclosing Party's rights in its Confidential Information, and shall not use or permit to be used such Confidential Information by or for the benefit of itself (except as anticipated by this Agreement) or any independent third party.

(b) Each Receiving Party shall exercise at least the same reasonable care it uses to protect its own valuable, proprietary Confidential Information in order to prevent the disclosure of the Disclosing Party's Confidential Information to independent third parties. Each Receiving Party shall promptly notify the Disclosing Party of any actual or suspected unauthorized use or disclosure of the Disclosing Party's Confidential Information of which it has knowledge and will cooperate in the investigation of and appropriate actions with respect to such unauthorized use or disclosure. Each Receiving Party shall include the Disclosing Party's reasonable proprietary rights notices on any media embodying the Disclosing Party's Confidential Information, including partial copies thereof, which are circulated within that party.

**8.2 Publicity.** Scimed and Jang shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement and the transactions contemplated hereby and shall not issue any such press release or make any such public statement except as they may mutually agree, except as is necessary for governmental notification purposes or to comply with applicable laws and regulations.

**8.3 Independent Contractors.** Each party represents that it is acting on its own behalf as an independent contractor and is not acting as an agent for or on behalf of any third party. This Agreement and the relations hereby established by and between Jang and Scimed do not constitute a partnership, joint venture, franchise, agency or contract of employment. Scimed is not granted, and shall not exercise, the right or authority to assume or create any obligation or responsibility on behalf of or in the name of Jang or its Affiliates.

**8.4 Assignment.** Except in the case of assignment by a party to its Affiliate or pursuant to a merger, consolidation or sale of substantially all of the assigning party's assets or stock, neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld in the case of any assignment; *provided* that the proposed assignee under this Section 8.4 agrees in writing to assume all of the

11

obligations of the assignor party under this Agreement. It is understood that Scimed may from time to time perform some or all of its obligations hereunder through one or more of its Affiliates; provided that Scimed shall remain responsible for the performance of such obligations.

**8.5 Successors and Assigns.** This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**8.6 Notices.** Unless otherwise provided herein, any notice, report, payment or document to be given by one party to the other shall be in writing and shall be deemed given when delivered personally or mailed by certified or registered mail, postage prepaid (such mailed notice to be effective on the date which is three (3) business days after the date of mailing), or sent by nationally recognized overnight courier (such notice sent by courier to be effective one business day after it is deposited with such courier), or sent by telefax (such notice sent by telefax to be effective when sent, if confirmed by certified or registered mail or overnight courier as aforesaid) as follows:

If to Jang, addressed to:
   G. David Jang, M.D.
   30725 Eastbern Lane
   Redlands, CA 92374
   Phone: 909.794.1803
   Fax: 909.794.1938

If to Scimed, addressed to:
   Boston Scientific Corporation
   One Boston Scientific Place
   Natick, MA 01760-1537
   Attention: Lawrence C. Best
   Phone: 508.650.8450
   Fax: 508.650.8960

With a copy to:
   Boston Scientific Corporation
   One Boston Scientific Place
   Natick, MA 01760-1537
   Attention: General Counsel
   Phone: 508.650.8567
   Fax: 508.650.8960

or to such other place as either party may designate as to itself by written notice to the other party.

**8.7 Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts, United States of America, to the exclusion of both

PAGE 46
Ex. 2

its rules on conflicts of laws and the provisions of the United Nations Convention on Contracts for the International Sale of Goods.

8.8 **Amendment and Waiver.** No provision of or right under this Agreement shall be deemed to have been waived by any act or acquiescence on the part of either party, its agents or employees, but only by an instrument in writing signed by an authorized officer of each party. Scimed and Jang may, by written notice to the other party, (a) extend the time for the performance of any of the obligations or other actions of the others under this Agreement; (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement or in any document delivered pursuant to this Agreement; (c) waive compliance with any of the conditions to their obligations contained in this Agreement; or (d) waive or modify performance of any of the obligations of the other party under this Agreement. Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of Scimed or Jang, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained in this Agreement. The waiver by Scimed or Jang of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

8.9 **Severability.** In the event any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof. The parties agree that they will negotiate in good faith or will permit a court or arbitrator to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision which is as similar as possible in substance to the invalid, illegal or unenforceable provision.

8.10 **Entire Agreement.** The terms and provisions contained in this Agreement (including the schedules), the Assignment Agreement and the Employment Agreement constitute the entire understanding of the parties with respect to the transactions and matters contemplated hereby and supersede all previous communications, representations, agreements and understandings relating to the subject matter hereof. Except for the Assignment Agreement and the Employment Agreement, no representations, inducements, promises or agreements, whether oral or otherwise, between the parties not contained in this Agreement, the Assignment Agreement or the Employment Agreement or incorporated by reference in this Agreement, the Assignment Agreement or the Employment Agreement shall be of any force or effect. No agreement or understanding extending this Agreement or varying its terms (including any inconsistent terms in any purchase order, acknowledgment or similar form) shall be binding upon either party unless it is in a writing specifically referring to this Agreement and signed by the duly authorized representative of the applicable party.

8.11 **Captions.** Captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement and shall not limit or affect the meaning or construction of the terms and conditions hereof.

**8.12 Word Meanings.** Words such as *herein, hereinafter, hereof* and *hereunder* refer to this Agreement as a whole and not merely to a section or paragraph in which such words appear, unless the context otherwise requires. The singular shall include the plural, and each masculine, feminine and neuter reference shall include and refer also to the others, unless the context otherwise requires.

**8.13 Rules of Construction.** The parties agree that they have participated equally in the formation of this Agreement and that the language and terms of this Agreement shall not be construed against either party by reason of the extent to which such party or its professional advisors participated in the preparation of this Agreement.

**8.14 Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

**8.15 Further Assurances.** At any time and from time to time, each party hereto, without further consideration, shall cooperate, take such further action and execute and deliver such further instruments and documents as may be reasonably requested by any other parties in order to carry out the provisions and purposes of this Agreement. The parties acknowledge and agree that the remedy at law for any breach of this Section 8.15 may be inadequate, and hereby agree that temporary and permanent injunctive and other relief may be sought without proof of actual damage or inadequacy of legal remedy, and without the need for posting any bond, in any proceedings which may be brought to enforce any of the provisions of this Section 8.15.

[rest of this page intentionally left blank]

<u>**Exhibit 4.2(f)**</u>

IN WITNESS WHEREOF, Scimed and Jang have duly executed this Non-Exclusive License Agreement as of the Effective Date, intending it to take effect as an instrument under seal.

SCIMED LIFE SYSTEMS, INC.

By: _____
Name: Lawrence C. Best
Title:  Chief Financial Officer

_____
G. David Jang, M.D.

PAGE 49
EX. 2

**Exhibit 4.2(f)**

**Schedule 1**
**Designs**

(Listed Below Are US Patents Only, PCT-Counterparts Are Not Listed)

**Pending Provisional Patent Applications:** (Filed in the US Patent Office: Filing Dates)

- PSJ-10 Stent 60/234,614 (09/22/00)
- PSJ-9  Stent 60/235,164 (09/23/00)
- PSJ-11 Stent 60/235,167 (09/23/00)
- PSJ-14 Stent 60/235,115 (09/25/00)
- PSJ-15 Stent 60/235,180 (09/25/00)
- Drug-Coating Enhancement Measures 60/209,255 (06/05/00)

**US Patent To Be Filed on Following PSJ-Stent Platforms:**

- PSJ-7  Stent Platform
- PSJ-8  Stent Platform
- PSJ-15 Stent Platform
- PSJ-16 Stent Platform
- PSJ-17 Stent Platform
- PSJ-18 Stent Platform
- PSJ-19 Stent Platform
- PSJ-20 Stent Platform
- PSJ-22 Stent Platform
- PSJ-23 Stent Platform
- PSJ-24 Stent Platform
- PSJ-25 Stent Platform
- PSJ-25.1 Stent Platform
- PSJ-27 Stent Platform
- PSJ-28 Stent Platform

Exhibit 4.2(f)

## Schedule 2
## Licensed Patents

| Patent/Application/Invention Disclosure Title | Serial Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|---|
| US – Intravascular Stent | 08/824,142 | 03/26/97 | Allowed | |
| US – Intravascular Stent | 08/824,866 | 03/26/97 | 5,954,743 | 09/21/99 |
| US – Intravascular Stent | 08/824,865 | 03/25/97 | 6,152,957 | 11/28/00 |
| PCT – Intravascular Stent | PCT/US97/06609 | 04/24/97 | | |
| PCT – Intravascular Stent | PCT/US97/06610 | 04/24/97 | | |
| US – Intravascular Stent | 08/845,657 | 04/25/97 | 5,922,021 | 7/13/99 |
| PCT – Intravascular Stent | PCT/US97/06907 | 04/25/97 | | |
| US – Intravascular Stent | 08/949,865 | 10/14/97 | 6,039,756 | 03/21/00 |
| US – Intravascular Stent With Non-Parallel Slots | 08/936,297 | 09/25/97 | 5,948,016 | 09/07/99 |
| PCT – Intravascular Stent | PCT/US98/05835 | 03/25/98 | | |
| PCT – Intravascular Stent | PCT/US98/05856 | 03/25/98 | | |
| PCT – Intravascular Stent | PCT/US98/08408 | 04/27/98 | | |
| PCT – Intravascular Stent | PCT/US98/08411 | 04/27/98 | | |
| PCT – Intravascular Stent With Non-Parallel Slots | PCT/US98/15531 | 07/22/98 | | |
| US (PRO) Tubular Stent Consists of Chevron-Shape Expansion Struts and Contralaterally Attached Diagonal Connectors | 60/073,412 | 02/02/98 | | |
| JP – Intravascular Stent | 9-538979 | 04/24/97 | | |
| CA – Intravascular Stent | 2,252,593 | 04/24/97 | | |
| JP – Intravascualar Stent | 9-538981 | 04/24/97 | | |
| CA – Intravascular Stent | 2,252,591 | 04/24/97 | | |
| EP – Intravascular Stent | 97922367.4 | 04/24/97 | | |
| EP – Intravascular Stent | 97918756.4 | 04/24/97 | | |
| CA – Intravascular Stent | 2,252,882 | 04/24/97 | | |

Page 51
Ex. 2

| | | | | |
|---|---|---|---|---|
| JP – Intravascular Stent | 9-538980 | 04/24/97 | | |
| CA – Intravascular Stent | 2,252,596 | 04/25/97 | | |
| JP – Intravascular Stent | 9-539031 | 04/25/97 | | |
| EP – Intravascular Stent | 97918755.6 | 04/24/97 | | |
| EP – Intravascular Stent | 97926382.9 | 04/25/97 | | |
| US – Tubular Stent With Chevron Striped Expansion Struts | Open Disclosure | | | |
| US – Tubular Stent With Contralateral Attached Connecting Struts | Open Disclosure | | | |
| US – Tubular Stent Consists of Chevron-Shape Expansion Struts and Contralaterally Attached Diagonal Connectors | 09/237,537 | 01/26/99 | Allowed | |
| PCT – Tubular Stent Consists of Chevron-Shape Expansion Struts and Contralaterally Attached Diagonal Connectors | PCT/US99/02050 | 01/28/99 | | |
| US – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | 09/241,320 | 02/01/99 | 6,113,627 | 09/05/00 |
| PCT – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | PCT/US99/02171 | 02/02/99 | | |
| US – Tubular Stent Consists of Non-Parallel Expansion Struts and Contralaterally Attached Diagonal Connectors | 09/243,911 | 02/03/99 | 6,200,334 | 03/13/01 |
| PCT – Tubular Stent Consists of Non-Parallel Expansion Struts and Contralaterally Attached Diagonal Connectors | PCT/US99/02342 | 02/03/99 | | |
| PCT – Tubular Stent Consists of Chevron-Shape Expansion Struts and Ipsilaterally Attached M – Frame Connectors | PCT/US99/03428 | 02/17/99 | | |
| US – Tubular Stent Consists of Chevron-Shaped Expansion Struts And Ipsilaterally Attached M-Frame Connectors | 09/251,650 | 02/17/99 | 6,123,721 | 09/26/00 |
| JP – Intravascular Stent | 10-545944 | 03/25/98 | | |
| EP – Intravascular Stent | 98912026.6 | 03/25/98 | | |
| EP – Intravascular Stent | 98912031.6 | 03/25/98 | | |
| JP – Intravascular Stent | 10-545953 | 03/25/98 | | |
| EP – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally | 99904533.9 | 02/02/99 | | |

18

PAGE 52
EX. 2

| | | | | |
|---|---|---|---|---|
| Attached Diagonal-Connectors | | | | |
| JP – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | 2000-529193 | 02/02/99 | | |
| EP – Tubular Stent Consists of Horizontal Expansion Struts and Contralaterally Attached Diagonal-Connectors | 99903509.0 | 01/28/99 | | |
| US (PRO) Intravascular Stent Consists of Stairstep Expansion Strut Pairs and Double Stairstep Diagonal Connecting Struts Contralaterally Extended From Expansion Struts | 60/235,164 | 09/23/00 | | |
| US -- PSJ-10 Stent | 60/234,614 | 09/22/00 | | |
| US -- PSJ-11 Stent | 60/235,167 | 09/23/00 | | |
| US -- PSJ-14 Stent | 60/235,115 | 09/25/00 | | |
| US -- PSJ-15 Stent | 60/235,180 | 09/25/00 | | |
| US – Drug-Coating Enhancement Measures | 60/209,255 | 06/05/00 | | |

PAGE 53
EX. 2